# UNITED STATES COURT OF APPEALS

# FOR THE NINTH CIRCUIT

| | |
|---|---|
| **Wild Fish Conservancy,**<br>    **Appellee,** | ) )<br>) **No. 23-35322**<br>)<br>) |
| **v.** | ) **D.C. No. 2:20-cv-00417-RAJ-**<br>) **MLP** |
| **State of Alaska, et al.,**<br>    **Intervenor-Appellant** | )<br>) **MOTION FOR STAY**<br>) **PENDING APPEAL**<br>)<br>) |
| _____ | ) |

## MOTION FOR STAY PENDING APPEAL

## <u>RELIEF REQUESTED BY JUNE 23</u>

The State of Alaska moves this Court to stay the part of the district court's

June 2 vacatur order that effectively shutters Southeast Alaska Chinook salmon

summer and winter troll fisheries. The State requests a stay by June 23 so that the

fishermen can gear up for the summer season, which starts on July 1.

The district court erred in vacating the part of 2019 Biological Opinion that

shields Alaska and its fishermen from Endangered Species Act liability while the

agency rewrites the Biological Opinion. The procedural violations the district court

found in the agency opinion were minor and have been addressed since its

issuance. And vacatur will, for certain, spawn disaster for Southeast Alaska's

economy and way of life while providing no meaningful benefit to the endangered

1

Southern Resident killer whales. This is not a case where the district court weighed devastation of the livelihoods of thousands of Alaskans, dozens of remote villages, and a way of life against the benefit of potentially saving even a small number of endangered whales. Instead, the court weighed certain harm to people, communities, and culture against speculative, and at best, minor benefit to an endangered species.

Although vacatur is supposed to be an equitable remedy, the district court for the Western District of Washington singled out an Alaskan fishery to shoulder the entire burden of conservation. This while other fisheries, notably those occurring along the Pacific Northwest coast that have disproportionately higher levels of impact, are left untouched and unrestricted. This is inequitable.

Reversal is warranted.

## BACKGROUND

### I.  Southeast Alaska depends on the Chinook troll fishery.

Troll fishing for Chinook salmon is critical to Southeast Alaska's economy, local government, and culture. It is the "way of life," passed down from one generation to the next. Dkt. 21, ¶1 (Daugherty Decl.); Dkt. 130, ¶¶2, 5, 6, 10 (Jordan Decl.). It supports thousands of Southeast Alaska jobs, which are essential to the survival of coastal communities. Dkt. 133-1, ¶36 (Keaton Decl.); Dkt. 136, ¶2 (Second Vincent-Lang Decl.). Over 1,000 people hold active troll fishing

permits. Dkt. 131-1, ¶32 (Keaton Decl.). This includes 100% of the population of Elfin Cove, 91% of Meyers Chuck, 58% of Pelican, 46% of Point Baker, and 26% of Port Alexander. Dkt. 136, ¶7 (Second Vincent-Lang Decl.). The total annual economic output[1] of the Chinook commercial troll fleet for the winter and summer seasons is approximately $29 million. Dkt. 133-1, ¶¶36, 40 (Keaton Decl.).[2] And that figure excludes the additional value from fish processing and the significant taxes that flow to local communities that enable those governments to operate. Dkt. 133-1, ¶36 (Keaton Decl.); Dkt. 136, ¶¶2, 7 (Second Vincent-Lang Decl.).

Many of the Chinook harvested by the Southeast Alaska troll fishery originate in Southeast Alaska, Northern British Columbia, and Central British Columbia, meaning those fish do not overlap with the habitat of the endangered Southern Resident killer whales (SRKW). Dkt. 135, ¶14 (Evenson Decl.); AR-47506.

---

[1]  The total output includes how much trollers are paid for their catch plus the secondary spending that occurs in Southeast Alaska as the fishermen purchase goods and services. Dkt. 133-1, ¶36 (Keaton Decl.).

[2]  The average annual ex-vessel value of the Chinook troll fishery is about $11.5 million. Dkt. 133-1, ¶34 (Keaton Decl.). That number represents only how much fish is sold, and excludes additional values, such as wages, processing, and tax revenue. *Id.* ¶36.

**II.    The Salmon Fishery Management Plan governs fishing for Chinook in federal waters.**

Congress passed the Magnuson-Stevens Act to prevent overfishing and to conserve and maintain the nation's fisheries to promote employment and food supply. 16 U.S.C. § 1801. Under the Act, the National Marine Fisheries Services (NMFS) approves Fishery Management Plans to regulate fishing. 16 U.S.C. § 1854. Fishing for Chinook in federal waters is governed by the Salmon Fishery Management Plan. AR-502. For decades, NMFS has delegated management authority of commercial troll fishing in federal waters to the State of Alaska. *See e.g.*, AR-502; 77 Fed. Reg. 75,570 (Dec. 21, 2012). The State of Alaska manages as a single unit the Southeast troll fishery in both state and federal waters. AR-515, 540.

**III.    The Pacific Salmon Treaty establishes how much salmon Canada, Alaska, and the Pacific Northwest states may catch.**

Because salmon are highly migratory and cross between Canada and the United States, the two countries signed the Pacific Salmon Treaty in 1985. AR-523. The Treaty's goals are to prevent overfishing and to provide for the optimum production and fair sharing of salmon. AR-523. The parties renegotiate the fishing regimes every ten years to update conservation goals and harvest sharing arrangements. AR-47194–95. In these updates, and in response to concerns for some Chinook stocks, the parties have reduced harvest levels for some fisheries.

AR-47201–02, 4720. The catch limit for the entire Southeast Alaska fishery is set annually based on data from the early winter troll fishery. Dkt. 43-1, 661 (Pacific Salmon Treaty, ch.3, ¶6(b)(ii)).

## IV.  Availability of Chinook salmon are one of many factors limiting the recovery of Southern Resident Killer Whales.

SRKW are a specific population of killer whales listed as endangered under the Endangered Species Act (ESA). 70 Fed. Reg. 69,903 (Nov. 18, 2005). Their decline has been caused by many factors, including disturbance from vessel sounds and traffic, bioaccumulation of toxic contaminants that depress their immune system and reproductive capability, their removal for public display in aquaria, oil spills, and the quantity and quality of prey. AR-47282–90, 70 Fed. Reg. at 69,908. The preferred diet of SRKW is mature Chinook salmon, though whales do consume other prey. AR-47283–84.

Southeast Alaska fisheries are shouldering the brunt of conservation efforts for the SRKW's prey. In the 2019 revision to the Treaty, Alaska agreed to reduce its harvests of Chinook in response to SRKW and ESA-listed Chinook conservation concerns. AR-47504. The Southeast Alaska fishery took up to a 7.5% reduction in its allowable Chinook harvest levels, on top of a prior 15% reduction under the 2009 revision of the Treaty. AR-47209, 47212. Other fisheries, notably those along the Washington and Oregon coasts—which have disproportionately higher levels of impact on the SRKW—were largely left untouched and

unrestricted. AR-47350–51; Dkt. 133-2, 114, 142 (NMFS's BiOp for Pacific Northwest fisheries quantifying impacts of those fisheries on prey abundance for SRKW).

## V.    NMFS uses hatcheries to reduce chances of species extinction.

Chinook spend about three to five years in the ocean and then, once mature, migrate back to their natal spawning grounds. Four stocks of Chinook relevant to this lawsuit are listed under the ESA, as threatened or endangered. AR-47222–26, 47245–47, 47252–57, 47261–66, 47518–19. The primary causes of declines in these stocks are loss of habitat, hydropower development, poor ocean conditions, overfishing, and hatchery practices. AR-14492, 15761, 15891. NMFS uses hatcheries to preserve vital genetic resources while other factors limiting survival and abundance are addressed. AR-47420. Depending on how a hatchery operates, its effect on salmon can be positive, neutral, or negative. AR-47420–21.

## VI.   NMFS's 2019 Biological Opinion includes an incidental take statement for Chinook that might otherwise be prey for SRKW.

The ESA requires federal agencies to ensure that their actions are not likely to jeopardize the continued existence of an endangered or threatened species or to destroy or adversely modify its critical habitat. 16 U.S.C. § 1536(a)(2). If a federal action is "likely to adversely affect" listed species or critical habitat, the agency must issue a biological opinion (BiOp). 50 C.F.R. § 402.14. If the agency determines, while producing the BiOp, that the action is unlikely to jeopardize the

continued existence of the species or result in the destruction or adverse modification of critical habitat, but will result in "take" of a listed species, the agency must issue an incidental take statement (ITS). 16 U.S.C. § 1536(b)(4)(i)-(ii). Any take in compliance with an ITS is shielded from liability under the ESA. 16 U.S.C. § 1536(o)(2).

In 2019, NMFS issued a BiOp considering the combined effects on ESA-listed species from the following federal actions: NMFS's ongoing delegation of salmon fisheries management to Alaska, federal funding to Alaska to assist meeting obligations under the Treaty, and a conservation program designed to benefit both critical stocks of Puget Sound Chinook salmon and SRKW. AR-47198–204. The conservation program has three components. AR-47202. The first two components are aimed at aiding ESA-listed Chinook by continuing conservation hatchery programs and implementing habitat restoration programs. AR-47202. By increasing Chinook abundance, these programs would incidentally bolster prey availability for SRKW over the long term. *Id.* The third component is a hatchery program designed to increase Chinook availability for SRKW, specifically. AR-47202–03. Importantly, these three mitigation components are intended to offset harms to SRKW and listed Chinook from *all* fisheries under the Pacific Salmon Treaty, not just the Alaska fishery. AR-47202–04, 47506;

Dkt. 133-2, at 24 (West Coast Fisheries BiOp). They contribute to the environmental baseline for other fishery BiOps. *Id.*

NMFS concluded that continued operation of the Southeast Alaska fishery, consistent with the Treaty-established limits and BiOp approved mitigation measures, was not likely to jeopardize the SRKW or the listed stock or adversely modify their critical habitat. AR-47502–08, AR-47485–501. The BiOp thus includes an ITS for SRKW and listed Chinook consistent with the Treaty's limits. AR-47518–19.

## VII. The Wild Fish Conservancy sues NMFS to enjoin Southeast Alaska's fisheries, and the district court finds ESA and NEPA violations.

The Wild Fish Conservancy sued NMFS to enjoin the Southeast Alaska fishery, arguing that the Southeast Alaska fishery was reducing prey that would otherwise be available to the SRKW, so NMFS should have required reduced harvests beyond those agreed to under the Pacific Salmon Treaty. Dkt. 1, ¶¶10–11 (Compl.). The Conservancy also argued that NMFS erred in relying on mitigation programs that were not yet funded and site-specific and should have analyzed whether the mitigation efforts would negatively affect ESA-listed Chinook stocks. Dkt. 1, ¶¶10–11.

The district court agreed, concluding that NMFS erred in finding no jeopardy to the SRKW, because the mitigation program that would ensure no jeopardy was not yet funded and not yet site-specific. Dkt. 111, at 25–31 (R&R),

Dkt. 122 (order adopting R&R). The court also concluded that NMFS's BiOp was procedurally flawed because it did not explicitly account for how the new prey increase program would affect ESA-listed Chinook. Dkt. 111, at 32–33. Finally, the district court concluded that NMFS failed to conduct sufficient National Environmental Protection Act (NEPA) analysis for the ITS and the prey increase program. Dkt. 111, at 34-38. The district court did not conclude that NMFS should have required reduced harvests beyond those agreed to under the Pacific Salmon Treaty, instead focusing solely on these procedural points.

## VIII. The district court chooses to decimate the lifeblood of Southeast Alaska by vacating the agency action instead of simply remanding for correction of procedural errors.

When the district court considered the remedy for the procedural errors it found, the State argued that vacating the ITS would shutter the Southeast Alaska fishery for no discernable conservation gain. Dkt. 134. But the court vacated that portion of the ITS anyway. Dkt. 144 (R&R); Dkt. 165 (adoption of R&R). The court ignored the intervening actions NMFS and Congress has taken to remedy the procedural errors, and concluded that the errors were serious enough to warrant vacatur. Dkt. 144 at 26–28. In assessing the environmental benefit to SRKW from shutting down the fishery, the court ignored the data and analysis in the 2019 BiOp and the subsequent data and declarations provided by NMFS. Dkt. 144, at 29. Instead, the court relied on the Conservancy's disproved assertions, concluding

that closing the Southeast Alaska Chinook fishery would "meaningfully improve[]" prey availability to the SRKW, as well as SRKW population stability and growth." Dkt 144, at 29. The court refused to consider the social and cultural harm closing the fishery would cost Southeast Alaskans and ostensibly considered the "disruptive economic consequences" to the economy of Southeast Alaska. Nov. 1, 2022 Hearing Transcript 48–49, Dkt. 144, at 30. The court did not vacate the prey increase program. Dkt. 144, at 30-33. And it denied the State's motion to stay vacatur of the ITS pending appeal. Dkt. 193.

## STANDARD OF REVIEW

A stay of the district court's vacatur is merited because Alaska has made a strong showing that it is likely to succeed on the merits, it will be irreparably harmed absent a stay, the stay will not substantially injure the Conservancy but will substantially injure Alaskans, and the public interest lies in granting the stay. *Lair v. Bullock*, 697 F.3d 1200, 1203 (9th Cir. 2012).

## ARGUMENT

Although the district court found procedural problems with the 2019 BiOp, this Court "leave[s] invalid agency action in place when equity [so] demands." *Ctr. for Food Safety v. Regan*, 56 F.4th 648, 663 (9th Cir. 2022). Equity demands so here. This is both a reason why Alaska is likely to succeed on the merits of its appeal, and a reason why a stay is justified.

## I. Alaska is likely to succeed on the merits.

When determining whether an agency action should remain in effect on remand, courts apply a two-factor balancing test, weighing the seriousness of the agency's errors against the disruptive consequences of an interim change that may itself be changed again later. *Regan*, 56 F.4th at 663. The district court got this analysis wrong. Dkt. 144 (R&R); Dkt. 165 (adoption of R&R).

On the first factor, an error is not serious when "the agency would likely be able to offer better reasoning" or when "by complying with procedural rules, it could adopt the same rule on remand." *Regan*, 56 F.4th at 663–64.

Here, the remand process has already shown that NMFS not only could, but would likely "adopt the same [ITS] on remand"—that is an ITS covering the same catch limits for the Southeast Alaska Chinook fishery. *See id.* at 665. First, NMFS has "cautioned against overreliance on correlative studies or implicating any particular fishery." AR-47286. NMFS has repeatedly reiterated that the Conservancy's asserted "relationship quantifying specific changes in reproduction or survival metrics from specific Chinook salmon abundances" is outdated and not based on the best available science." Dkt. 133-2, ¶6 (Third Barre Decl.). In other words, shutting down Alaska's Chinook troll fishery does not correlate to saving any or producing any more SRKW.

Second, even assuming that closing the Southeast Alaska Chinook troll fishery will create some benefit in terms of increased prey availability—albeit not increased vitality to the SRKW—that increase in prey availability is exceedingly small (*less than* 0.5% in winter and 1.8% in summer). Dkt. 133-2, ¶9 (Third Barre Decl.); AR-47440–41, 47505. And the increased prey availability would be temporary, lasting only until NMFS issues a new ITS, which is expected to be issued in fall 2024.

Third, the prey increase program is already offsetting the slight reduction in prey availability caused by the Southeast Alaska Chinook fishery. Dkt. 133-3, ¶3 (Third Purcell Decl.); Dkt. 135, ¶¶18–20 (Evenson Decl.). The district court found that NMFS erred in issuing an ITS because the mitigation program was, at the time of the 2019 BiOp, "uncertain and indefinite." Dkt. 144, at 27. Since that time, the mitigation program has become both certain and definite: it has been funded and is providing increased prey for SRKW. Dkt 133-3, ¶3 (Third Purcell Decl.); Dkt. 133-4, ¶¶7-12 (Second Rumsey Decl.). More Chinook are already in the water. In fact, in another part of its decision, the district court even recognized that "[t]he prey increase program—though previously uncertain and indefinite in the 2019 SEAK BiOp—has also now been funded and begun providing prey the past

three years." Dkt. 144, at 31.[3] But when it vacated the ITS, the district court failed to recognize that the error it found with the ITS—that the mitigation plan was not yet funded and not yet site-specific—had already been cured.[4]

Not only is NMFS likely to issue the same decision, but remand is also unlikely to result in reduced harvest limits because NMFS lacks authority to impose them. Harvest limits are set by the terms of the Pacific Salmon Treaty—not by NMFS in a BiOp. Dkt. 43-1, Att. C (Pacific Salmon Treaty). Changes to Treaty harvest regimes require consensus among the U.S. Commissioners, one of whom represents Alaska. Pacific Salmon Treaty Act, P.L. 99-5 (1985), §3(a),(h)(1).

Additionally, the catch limit for the entire Southeast Alaska fishery is set annually based on data from the early winter troll fishery. Dkt. 43-1, 661 (Pacific Salmon Treaty, ch.3, ¶6(b)(ii)). Closing the winter troll fishery compromises the U.S.'s ability to meet Treaty obligations for setting catch limits.

---

[3] The 2019 BiOp includes a mitigation plan with three parts: the first two are intended to benefit ESA-listed Chinook; the third part is meant to benefit the SRKW. AR-47202–03. Congress continues to fully fund each year the third part of the mitigation plan, Dkt. 162, at 6 (Amici Br. of Alaska Cong. Delegation); Dkt. 133-3, ¶¶ 3, 5 (Third Purcell Decl.), and that hatchery is creating more prey availability for the SRKW. Dkt. 133-2, ¶13 (Third Barre Decl.); Dkt. 133-4, ¶¶7-11 (Second Rumsey Decl.). Congress has also funded the first two mitigation programs, which are meant to benefit ESA-listed Chinook and indirectly benefit SRKW over the long-term. AR-47202; Dkt. 135, ¶8 (Evenson Decl.).

[4] The other errors the district court found, which are not germane to the relief Alaska seeks (i.e., staying vacatur of the ITS) have also been cured or are being cured. Dkt. 133-3, ¶¶4, 5 9 (Purcell Decl.).

The second factor of the two-factor test for determining whether an agency action should remain in effect on remand is the "the disruptive consequences of an interim change that may itself be changed." *Regan*, 56 F.4th at 663. That factor strongly favors Alaska because halting the Southeast Alaska Chinook troll fishery for even just a single season will create both immediate and long-lasting harms, as explained further below.

In comparable cases, when so many people's livelihoods are on the line, this Court has concluded that vacating an agency decision is unwarranted. *See, e.g.*, *Regan*, 56 F.4th at 664-68 (concluding that although EPA committed serious error by continuing to flout the ESA consultation process, vacatur was unwarranted due, in part, to the disruption to the agricultural industry vacatur would cause); *Nat'l Family Farm Coalition v. EPA*, 966 F.3d 893, 929–30 (9th Cir. 2020) (deciding to remand without vacatur, reasoning that vacating approval of a pesticide could cause serious disruption by disallowing continued use of pesticide); *Cal. Communities Against Toxics v. EPA*, 688 F.3d 989, 993–95 (9th Cir. 2012) (concluding vacatur was not warranted because closing the power plant would "be economically disastrous" to a billion-dollar venture employing 350 workers and because environmental harms from the power plant were mitigated). So too here.

Alaska is therefore likely to succeed on the merits of its challenge to the district court's vacatur order.

**II.    Shutting down Southeast Alaska's Chinook troll fisheries is a certain death knell to rural Southeast Alaska communities.**

Alaska satisfies the other prerequisites for a stay because the district court's vacatur order will cause unjustified irreparable harm. Dkt. 191 (Daugherty Decl.). The economic output of the Chinook summer and winter troll fishery is huge— about $29 million each year. Dkt. 133-1, ¶¶36, 40 (Keaton Decl.). The effects of the order will be felt most acutely in the smaller, remote communities, where many people rely on trolling as a primary source of income and, in many cases, the only source. Dkt. 136, ¶4 (Second Vincent-Lang Decl.); Dkt. 132 (Phillips Decl.). For example, 100% of the population of Elfin Cove, 91% of Meyers Chuck, 58% of Pelican, 46% of Point Baker, and 26% of Port Alexander hold trolling permits. Dkt. 136, ¶4 (Second Vincent-Lang Decl.). The effects will also be felt in larger towns like Sitka, where only 7% of the population holds a troll permit, because the fishery still brings in over eight million "ex-vessel" dollars per year—a huge number for a town with only 8,000 residents. *Id.* ¶ 5.

Secondary businesses will also feel the effects of the closure. For instance, fish processing plants, not represented in the $29 million figure above, also contribute significantly to Alaska's economy. Dkt. 133-1, ¶36 (Keaton Decl.). Because about a third of the value added from seafood processing jobs is the cost of labor, decreasing the number of fish processed significantly decreases the need for (and wages to) laborers. Dkt. 133-1, ¶36 (Keaton Decl.) These plants could

even be forced to close during the winter, because the troll fishery is their only source of fish at that time. Dkt. 136, ¶6 (Second Vincent-Lang Decl.).

The state and local governments will also lose much-needed tax revenue, which is also not included in the $29 million figure. Dkt. 133-1, ¶36 (Keaton Decl.). Fish landing taxes pay for schools, utilities, harbor maintenance, and other needed services—for both the State and its municipalities. Dkt. 136, ¶¶2, 7 (Second Decl. Vincent-Lang). Closing the troll fishery will lead to loss of municipal taxes, corporate income taxes, and motor oil tax. *Id.* at ¶7.

Shutting down the summer and winter seasons will reduce trollers' livelihood by between one third and half. *Id.* at ¶3. This might make it financially infeasible to troll fish at all. *Id.* at ¶3. Salmon troll fishermen cannot simply retrofit their boats to participate in another fishery—Alaska's fishing is high specialized and regulated, and investing in new gear and permits costs hundreds of thousands of dollars. *Id.* at ¶8. Families will have to choose between living without work or enough work, or moving to find work, the latter of which will lead to school closures if communities no longer have enough school-age children. *Id.* at ¶4.

In vacating the ITS, the district court not only undervalued the economic devastation to Southeast Alaska, but it completely ignored "the cultural and social harms" of closing the fishery. *See United States v. Washington*, 853 F.3d 946, 961 (9th Cir. 2017) (affirming injunctive relief based on damaged tribal economies,

inability of fishermen to make a living, and the social and cultural harm to communities); Nov. 1, 2022 Hearing Transcript 48–49 (after ATA asserts social harms, court expresses doubt that social harm fit into its analysis). Alaska troll fishing is the "way of life" for southeast communities, passed down from one generation to the next. Dkt. 21, ¶1 (Daugherty Decl.); Dkt. 130, ¶¶2, 5, 6, 10 (Jordan Decl.). It not only allows individuals to pay bills, but it is also critical for communities' "spiritual and physical wellbeing." Dkt. 130 ¶¶2, 5, 6, 10 (Jordan Decl.).

Shutting down the Southeast Alaska Chinook troll fishery, even for just one season, means certain economic and cultural devastation.

## III. Shutting down Southeast Alaska's Chinook troll fisheries will provide no meaningful benefit to the SRKW.

In contrast to the definite and lasting harm to Southeast Alaska, the benefits to SRKW from closing the fishery while NMFS reissues an ITS are speculative and, at best, negligible. Dkt. 133-2, at ¶7 (Third Barre Decl.). The BiOp's analysis suggests that the increase in prey would be exceedingly small (*less than* 0.5% in winter and *less than* 1.8% in summer). Dkt. 133-2 at ¶9 (Third Barre Decl.); AR-47440–41, 47505.

The district court erred in ignoring the scientific analysis of the expert agency tasked with studying effects to SRKW, and adopting instead the Conservancy's analysis. *See San Luis & Delta-Mendota Water Auth. v. Locke*,

776 F.3d 971, 994 (9th Cir. 2014) (instructing courts to be most deferential to agency action that requires a high level of technical expertise). The district court concluded that closing the fishery will create a "meaningful" benefit to the SRKW by assuming that the fishery reduces SRKW prey by about 5%. Dkt. 144, at 29 (citing Dkt. 127-2, ¶¶8, 11 (Third Lacy Decl.)). And the court relied on the Conservancy's assertion that an increase of prey availability by 5% will linearly benefit the SRKW. Dkt. 144, at 29 (citing Dkt. 127-2, ¶8 (Third Lacy Decl.)). But the Conservancy's assumptions are wrong for a host of reasons.

First, the Conservancy's 5% quantification of how the fishery reduces prey for SRKW is unsupportable. The Conservancy claims its number is "an approximate middle value" based on a range of numbers produced by NMFS that model the historical effects of the Southeast Alaska fishery throughout broad SRKW territory. Dkt. 135, ¶15 (Evenson Decl.). But the "approximate middle value" is neither a mean nor median of the range estimates in the 2019 BiOp. *Id.* Moreover, the number does not account for *where* SRKW are located *when* they are feeding. *Id.*; AR-47203, 47439, 47445. The BiOp explains that SRKW generally live in inland waters in the summer and coastal waters in the winter. AR-47280–81, 47441. Had the Conservancy used a more honest number from the data in the 2019 BiOp, they would have represented that the entire Southeast Alaska fishery (not just trollers) reduces prey in inland waters in the summer by only

approximately 1.8%. Dkt. 133-2, ¶9 (3d Barre Decl.); AR-47439–41. And when SRKW move to coastal waters in the winter, the data from the 2019 BiOp shows that the entire Southeast Alaska fishery reduced SRKW prey in winter by about 0.5%. Dkt. 133-2, ¶9 (Third Barre Decl.); AR-47440–41, 47505. Because the partial vacatur applies to only part of the fishery, the reduction in prey expected from closure of the summer and winter trolling season would be even lower. The 2019 BiOp does not suggest that the Southeast Alaska Chinook troll fishery reduces prey availability for SRKW by 5%, and the district court erred in relying on the Conservancy's unsupported assertion that it does. Dkt. 144, at 29.

Second, increased prey availability does not linearly correlate to increased benefits to SRKW. Dkt. 133-2, ¶7 (Third Barre Decl.). NMFS has explained that the many factors harming the SRKW act in concert with each other. *Id.* In the BiOP, NMFS "cautioned against correlative studies" between prey availability and SRKW recovery. AR-47286. Since the 2019 BiOp was issued, the Pacific Fishery Management Council formed a workgroup to better evaluate the effects of Council-managed fisheries on SRKW and determined that there is *no* detectable relationship between Chinook abundance and SRKW demographic rates. Dkt. 133-2, ¶7 (Third Barre Decl). The sample size of the SRKW is too small, the relationships are not constant over time, and critically, "multiple factors, not just prey abundance," may be impacting the SRKW. *Id.*

Third, the assumptions used in the BiOp's model overestimate prey reductions, because the number of predators competing with SRKW has grown since the model's historical data was compiled. Dkt. 135, ¶16 (Evenson Decl.). As mature Chinook swim back towards their spawning grounds, they are consumed by many other predators including salmon sharks, pinnipeds, and Northern Resident killer whales. *Id.* Northern Resident killer whales, whose population is burgeoning, will have an opportunity to intercept Chinook before the SRKW. *Id.* In recent studies, when there has been increased abundance of prey, the Northern Resident killer whales—not the SRKW—have seen improvement. *Id.*[5]

Fourth, the data in the BiOp does not assess the scenario the district court created here—where the Southeast Alaska Chinook troll fishery is closed, and the other fisheries enjoy a windfall. AR-47195. Before Chinook can return to feed SRKW, they are subject to capture by other commercial, recreational, and tribal fisheries off the coasts of Southeast Alaska, British Columbia, and Washington. Dkt. 135, ¶¶7, 16 (Evenson Decl.); Dkt. 34, ¶¶16-20 (Lyons Decl.). Rather than allowing more fish to return to SRKW feeding grounds, the district court decision

---

[5] Because this new data—along with others—undermined the Conservancy's request for vacatur, the Conservancy tried to strike the data from the record, which the trial court refused to do. Dkt. 138 at 12-15; Dkt. 144 at 16-24. Nevertheless, the trial court erred in ignoring the State's and NMFS's unrefuted updated data and denying the State's request for an evidentiary hearing to prove that data. Nov. 1, 2022 Hearing Transcript 8-9 (asking for evidentiary hearing); Dkt. 141 (denying request for evidentiary hearing).

gives these fisheries more opportunity to catch more Chinook. Dkt. 135, ¶ 16 (Evenson Decl.); Dkt. 34 (Lyons Decl. ¶ 20). If Alaska does not take its share of Chinook, more will pass through Canadian waters, which can trigger a different, higher in-season fishing limit for Canadian fishermen. AR-47209–10; Dkt. 34, ¶¶17–19 (Lyons Decl.).[6] The Conservancy's assumptions simply do not account for how foregone harvest of Chinook by the Southeast Alaska troll fisheries will "likely lead to improved catches in Canadian and Washington fisheries," rather than improved prey opportunity for the SRKW. Dkt. 135 ¶16 (Evenson Decl.). The district court did not restrict any other fisheries, instead placing the entire burden of conservation on Alaska's summer and winter Chinook troll fisheries.

Finally, because NMFS will likely issue a similar BiOp on remand, the district court's partial vacatur will—at best—create a minor, short-term increase of prey availability for SRKW. Even if this Court were to credit the Conservancy's unsupportable assertion that *continued* closure of the Southeast Alaska troll fishery could create 5% more prey, which would maintain a "long-term population growth rate [of] 0.00%," the Conservancy does not even try to assert that closing the fishery until NMFS reissues an ITS with the same limits will create a meaningful

---

[6]     Only a few fisheries, including Southeast Alaska, have set pre-season limits. AR-47206; Dkt. 34, at ¶¶16, 18 (Lyons Decl.). The other fisheries adjust their limits depending on in-season data—that is, higher fish counts can lead to higher limits. AR-47206–11; Dkt. 34, ¶¶19-20 (Lyons Decl.).

long-term benefit to SRKW. Dkt. 127-2, ¶9 (Third Lacy Decl.) Conversely, even a single season closure will devastate Southeast Alaska.

## IV. Keeping the Southeast Alaska Chinook troll fishery open is in the public interest.

The public interest supports a stay because the public interest favors saving the communities of Southeast Alaska from certain devastation.

Moreover, Congress has not remained silent on this issue. "Congress funds the prey increase program every year with an understanding that the program will both increase prey abundance and enable certain Alaska and Pacific Northwest fisheries to continue, albeit at a reduced level." Dkt. 162, at 3 (Amici Congr. Deleg. Br.). In doing so, Congress recommits to the Treaty goals: "to balance the interests of fisheries, protected species, and the rights and obligations of impacted states, countries, and tribes." *Id.* at 4. The district court undermined Congress's Treaty goals by vacating the ITS. *Id.* at 7. The district court's vacatur of the portion of the ITS covering the Southeast Alaska Chinook summer and winter troll fishery is contrary to the public interest.

## CONCLUSION

For the above reasons, this Court should stay the district court's order that partly vacated the ITS.

RESPECTFULLY SUBMITTED May 26, 2023.

STATE OF ALASKA
TREG TAYLOR
ATTORNEY GENERAL


By:  s/Laura Wolff
     Laura Wolff
     Assistant Attorney General
     1031 West Fourth Avenue, Ste. 200
     Anchorage, AK 99501
     (907) 269-6612 phone
     (907) 276-3697 fax


**CERTIFICATE OF COMPLIANCE**
This brief contains 5,160 words. I certify that this complies with Rule 27's word limit and Rule 32.


**CERTIFICATE OF SERVICE**
I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on May 26, 2023.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

s/Laura Wolff