Nos. 23-35322, 23-35323, 23-35324, 23-35354

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

WILD FISH CONSERVANCY,
*Plaintiff/Appellee/Cross-Appellant*,
v.

JENNIFER QUAN, in her official capacity as Regional Administrator of the National Marine Fisheries Service; JANET COIT, in her official capacity as the Assistant Administrator for Fisheries of the National Marine Fisheries Service; NATIONAL MARINE FISHERIES SERVICE; GINA M. RAIMONDO, in her official capacity as Secretary of the United States Department of Commerce; UNITED STATES DEPARTMENT OF COMMERCE,
*Defendants/Appellants/Cross-Appellees*,
and

ALASKA TROLLERS ASSOCIATION and STATE OF ALASKA,
*Intervenor-Defendants/Appellants/Cross-Appellees.*

Appeal from the United States District Court for the Western District of Washington
No. C-20-417 (Hon. Richard A. Jones)

**FEDERAL DEFENDANTS-APPELLANTS'
THIRD CROSS-APPEAL BRIEF**

Of Counsel:

SHEILA LYNCH
*Attorney*
National Oceanic and Atmospheric
    Administration
Seattle, WA

MOLLY E. WATSON
*Attorney*
National Oceanic and Atmospheric
    Administration
Juneau, AK

TODD KIM
*Assistant Attorney General*

RACHEL HERON
REBECCA JAFFE
COBY HOWELL
FREDERICK H. TURNER
THEKLA HANSEN-YOUNG
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 307-2710
thekla.hansen-young@usdoj.gov

# TABLE OF CONTENTS

TABLE OF CONTENTS..........................................................................................i

TABLE OF AUTHORITIES .............................................................................iii

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................... 1

STATEMENT OF THE ISSUES ..................................................................... 6

ARGUMENT ................................................................................................ 7

I.    The district court abused its discretion in vacating the Southeast Alaska Chinook salmon commercial troll fishery portion of the 2019 biological opinion and incidental take statement. ........................ 7

    A.    The district court misapplied the relevant standards................... 8

    B.    The agency's errors with respect to the biological opinion covering Southeast Alaska salmon fisheries were not serious. ............................................................................... 13

        1.    The existence of an ESA or NEPA violation does not automatically make an error serious. ......................... 14

        2.    NMFS likely can offer better reasoning on remand in support of the same decision. ........................... 15

        3.    The agency's ESA and NEPA errors with respect to the biological opinion covering Southeast Alaska fisheries did not seriously undermine those statutes' goals. ......................................................... 19

    C.    The limited benefits and devastating consequences of vacatur weigh heavily in favor of remand without vacatur. ...................... 25

        1.    The district court overestimated the benefits of vacatur. ................................................................. 26

        2.    The severely disruptive consequences weigh against vacatur. ................................................................. 32

D.  The unadjudicated merits error raised by the Conservancy on appeal does not support affirming the district court's partial vacatur. ...................................................................... 37

II.  The district court did not abuse its discretion in declining to vacate the biological opinion as it relates to the prey increase program. ................................................................................. 39

A.  The agency's errors regarding the prey increase program were not serious enough to warrant vacatur. ................................................ 40

1.  NMFS likely can offer better reasoning on remand to support its decision. ........................................ 40

2.  NMFS's preparation of some ESA and NEPA analysis minimized the significance of the errors. ........................... 43

B.  The district court reasonably determined that vacating the 2019 biological opinion relating to the prey increase program would have significant disruptive consequences. ........................ 47

CONCLUSION ........................................................................................................... 52

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE FOR BRIEFS

# TABLE OF AUTHORITIES

## Cases

*Abbott Labs. v. Gardner,*
    387 U.S. 136 (1967) ................................................................................11

*Alaska Wilderness Recreation & Tourism Ass'n v. Morrison,*
    67 F.3d 723 (9th Cir. 1995) ...................................................................31

*All. for the Wild Rockies v. Savage,*
    375 F. Supp. 3d 1152 (D. Mont. 2019) ..................................................13

*Allied-Signal, Inc. v. U.S. NRC,*
    988 F.2d 146 (D.C. Cir. 1993) ........................................... 7, 13, 19, 20

*Am. Medical Ass'n v. Reno,*
    57 F.3d 1129 (D.C. Cir. 1995) ...............................................................13

*Am. Passage Media Corp. v. Cass Commc'ns, Inc.,*
    750 F.2d 1470 (9th Cir. 1985) ...............................................................35

*Am. Water Works Ass'n v. EPA,*
    40 F.3d 1266 (D.C. Cir. 1994) ..........................................................7, 35

*Artichoke Joe's Cal. Grand Casino v. Norton,*
    353 F.3d 712 (9th Cir. 2003) ..................................................................12

*Ashley Creek Phosphate Co. v. Norton,*
    420 F.3d 934 (9th Cir. 2005) ..................................................................19

*California Communities Against Toxics v. EPA,*
    688 F.3d 989 (9th Cir. 2012) ............................................. 7, 10, 33, 36

*City of Los Angeles v. Dickson,*
    No. 19-71581, 2021 WL 2850586 (9th Cir. 2021) ...............................13

*Ctr. for Food Safety v. Regan,*
    56 F.4th 648 (9th Cir. 2022) ..................................................................15

*Defs. of Wildlife v. Jackson*,
  791 F. Supp. 2d 96 (D.D.C. 2011) ................................................................... 15

*Deposit Guar. Nat'l Bank v. Roper*,
  445 U.S. 326 (1980) ......................................................................................... 38

*Earth Island Inst. v. Carlton*,
  626 F.3d 462 (9th Cir. 2010) ........................................................................... 36

*Env't Prot. Info. Ctr., Inc. v. Pac. Lumber Co.*,
  257 F.3d 1071 (9th Cir. 2001) ......................................................................... 38

*Fertilizer Inst. v. EPA*,
  935 F.2d 1303 (D.C. Cir. 1991) ....................................................................... 13

*Friends of Clearwater v. Petrick*,
  588 F. Supp. 3d 1071 (D. Idaho 2022) ........................................................... 33

*Greenpeace, Inc. v. Cole*,
  50 F.Supp.3d 1158 (D. Alaska 2014) .............................................................. 13

*Hecht Co. v. Bowles*,
  321 U.S. 321 (1944) ........................................................................................... 8

*Idaho Farm Bureau Fed'n v. Babbitt*,
  58 F.3d 1392 (9th Cir. 1995) ..................................................................... 25, 49

*In re Clean Water Act Rulemaking*,
  60 F.4th 583 (9th Cir. 2023) ............................................................................. 8

*Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety & Health Admin.*,
  920 F.2d 960 (D.C. Cir. 1990) .................................................................... 12, 13

*Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.*,
  42 F.3d 517 (9th Cir. 1994), *as amended on denial of reh'g* (Dec. 20, 1994) ..................... 24

*Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*,
  634 F.2d 1197 (9th Cir. 1980) ......................................................................... 35

*Metcalf v. Daley*,
  214 F.3d 1135 (9th Cir. 2000) ......................................................................... 19

*Miller for & on Behalf of N.L.R.B. v. California Pacific Medical Center*,
991 F.2d 536 (9th Cir. 1993)..................................................................14

*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010) ..........................................................8, 11, 14, 33

*Nat. Res. Def. Council v. EPA*,
38 F.4th 34 (9th Cir. 2022)................................................................20

*Nat'l Fam. Farm. Coal. v. EPA*,
960 F.3d 1120 (9th Cir. 2020)...........................................................15

*Nat'l Wildlife Fed'n v. Espy*,
45 F.3d 1337 (9th Cir. 1995).............................................................8, 12

*Nat'l Wildlife Federation v. NMFS*,
886 F.3d 803 (9th Cir. 2018).............................................................26

*National Family Farm Coalition v. EPA*,
966 F.3d 893 (9th Cir. 2020)............................................................7, 19

*Nw. Env't Def. Ctr. v. U.S. Army Corps of Eng'rs*,
817 F. Supp. 2d 1290 (D. Or. 2011)..................................................31

*Pac. Rivers Council v. U.S. Forest Serv.*,
942 F. Supp. 2d 1014 (E.D. Cal. 2013)..............................................24

*Pollinator Stewardship Council v. EPA*,
806 F.3d 520 (9th Cir. 2015).............................................................20

*Sierra Forest Legacy v. Rey*,
577 F.3d 1015 (9th Cir. 2009)...........................................................38

*Solar Energy Indus. Ass'n v. FERC*,
80 F.4th 956, 997 (9th Cir. 2023) ..............................................15, 36

*Stand Up for California! v. U.S. Dep't of Interior*,
879 F.3d 1177 (D.C. Cir. 2018).........................................................13

*United States v. Afshari,*
    426 F.3d 1150 (9th Cir. 2005)........................................................13

*United States v. Texas,*
    599 U.S. 670 (2023) ............................................................8, 9, 10

*United States v. Mancinas-Flores,*
    588 F.3d 677 (9th Cir. 2009)........................................................38

*Winter* v. *Natural Res. Def. Council,*
    555 U.S. 7 (2008)..................................................................9, 36

## Statutes

16 U.S.C. § 1861a...........................................................................35

Administrative Prodcedure Act ("APA"), 5 U.S.C. §§ 701, *et seq.*
    5 U.S.C. § 702(1) ......................................................................11

    5 U.S.C. § 706 .......................................................................9, 10

## Other Authorities

88 Fed. Reg. 54301-01 (Aug. 10, 2023) ...............................16, 17, 25

88 Fed. Reg. 68572-01 (Oct. 4, 2023).................................16, 17, 25

89 Fed. Reg. 5210 (Jan. 26, 2024).....................................16, 17, 25

89 Fed. Reg. 5227 (Jan. 26, 2024).............................................16

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Wild Fish Conservancy ("Conservancy") challenged a 2019 biological opinion and incidental take statement issued by the National Marine Fisheries Service ("NMFS") that exempted incidental take of threatened Chinook salmon and the endangered Southern Resident killer whale resulting from federal actions related to Southeast Alaska's salmon fisheries from the Endangered Species Act's ("ESA") prohibition against such take. The biological opinion evaluated a framework funding action for the production and release of juvenile Chinook salmon to help increase the availability of prey for the killer whale (the "prey increase program") and determined such funding was consistent with the ESA.

Finding the biological opinion to be lacking in certain respects under the ESA and the National Environmental Policy Act ("NEPA"), the district court vacated the portion of the incidental take statement that applied to commercial salmon trolling in Southeast Alaska during the winter and summer fishing seasons. This ruling made it effectively impossible for the fishery to operate in compliance with the ESA and, absent this Court's order staying the remedy order pending appeal, vacatur would have shuttered Southeast Alaska's commercial troll Chinook salmon fishery, with devastating economic impacts and only small benefits to killer whales.

At the same time, the district court declined to vacate the portion of the biological opinion relating to the prey increase program, because of the program's importance to the killer whale. Leaving this program in place pending the remand will

allow NMFS to continue to fund production of additional fish that are beneficial for killer whales.

The district court's approach to the commercial fishery remedy question on the one hand and the prey increase program remedy question on the other hand are largely inverse to each other. With regard to the decision to vacate the portion of the incidental take statement relating to the fishery, the district court improperly relied on presumptions and generalizations about the ESA, while failing to give weight to record evidence demonstrating that the benefits of vacatur are uncertain and incremental, whereas the harms are established and devastating. With regard to the decision *not* to vacate the portion of the biological opinion relating to the prey increase program, by contrast, the district court gave due consideration to the likelihood that the agency could reach the same result on remand and the evidence that vacatur would cause disruptive consequences. This Court should therefore reverse the former decision and affirm the latter.

Turning first to NMFS's appeal, the vacatur order as it pertains to the incidental take statement exempting commercial trolling should be reversed by this Court for several reasons, which the Conservancy fails to rebut. As a threshold matter, the district court erroneously presumed that vacatur is the appropriate remedy for the ESA and NEPA violations it identified and thus impermissibly placed a thumb on the scale in favor of vacatur contravening the principle consistently enunciated by the Supreme Court that entitlement to equitable relief should never be presumed. The Conservancy's

assertion that vacatur should presumptively follow any APA violation is not supported by the language of the APA and its attempts to distinguish Supreme Court precedent regarding entitlement to equitable relief—of which vacatur is one form—fail.

The district court further abused its discretion by finding that the errors it identified in the biological opinion were serious enough to warrant vacatur when the judicial record showed the opposite.

The Conservancy asserts that the district court correctly vacated because the endangered status of the killer whale, combined with the existence of the ESA and NEPA violations, made the agency's errors serious. But this reasoning would apply to all ESA or NEPA violations involving a protected species, functionally obviating the equitable test for vacatur in those cases, contrary to this Court's precedent. The district court was instead required to consider the seriousness of the specific errors it identified. As NMFS's opening brief explained, those errors are not sufficiently serious to warrant vacatur because they do not preclude the agency from reaching the same decision on remand, with additional reasoning.

The Conservancy argues that the errors were nevertheless serious because they disserved the purposes of the statutes. But this is incorrect. Before it issued the 2019 biological opinion, NMFS prepared copious analyses considering the impacts of fishing on killer whales and the impacts of hatchery-origin salmon on listed salmon populations. NMFS has continued to prepare or identify appropriate ESA and NEPA analysis to support the prey increase program funding decisions that it has made each

year since 2019. The post-2019 operation of the prey increase program—evidence of which was presented to the district court—in and of itself shows that the program is sufficiently certain to occur, mitigating the seriousness of NMFS's failure to demonstrate a firm commitment that the program would go forward before relying on its benefits. And NMFS analyses collectively demonstrate that it is likely that NMFS can furnish concrete details about how it will implement the program that can support the adoption of the prey increase program on remand. Their existence further shows that NMFS's 2019 biological opinion was not entirely uninformed, thereby minimizing the extent to which the purposes of the ESA and NEPA were disserved.

The Conservancy's other asserted reason for finding the agency's errors serious is the environmental harm that will allegedly result from allowing the incidental take statement to remain in place. But the remand period will be short; NMFS expects to comply with the district court's remand order by the end of November 2024. Fishing in *all* Southeast Alaska salmon fisheries (of which the winter and summer troll fisheries are only a part) during the remand period would reduce prey availability for killer whales by an average of only 0.5% in coastal waters where whales are generally present during the winter and by an average of only 1.8% in inland waters where whales are generally present during the summer. The reductions in prey would not, in NMFS's expert opinion, jeopardize the Southern Resident killer whale, particularly in light of the fact that the remand period would be short, and that fish previously released as a result of the prey increase program were becoming available to supplement prey. Thus, while it

is true that killer whales are endangered, leaving the incidental take statement in place pending remand will not result in jeopardy to the killer whale.

In addition to the flaws in its analysis of whether the agencies' errors were serious, the district court separately abused its discretion when it weighed the disruption caused by vacatur against the incremental benefits. The disruptive consequences of vacatur would be extraordinary—causing $29 million in economic losses each year in an industry that helps ensure the livelihoods of thousands of people and supports numerous communities across Southeast Alaska. On the other hand, any benefits to killer whales from vacating the incidental take statement would be small and short-lived. The district court abused its discretion by improperly discounting vacatur's effects and overestimating any potential benefits to killer whales, and its order vacating the incidental take statement should be reversed.

The Conservancy attempts to save the district court's flawed remedy order by bootstrapping an appeal of its unadjudicated merits claim—that NMFS did not articulate a rational connection between the facts that it found and its no-jeopardy conclusion with respect to killer whales—and asserting that this Court may affirm the remedy order on this "alternate" ground, and then proceed to evaluate the remedy in that new light. But this Court may review the district court's remedy order only for the reasons provided by that court, and here, the district court expressly declined to address that merits claim. NMFS has not appealed the merits and permitting the Conservancy to raise this issue on appeal would violate general principles of judicial review.

Turning to the cross-appeal, the Conservancy asks this Court to reverse the district court's remedy ruling regarding the prey increase program, but it fails to provide a persuasive reason to do so. Although the district court wrongly found that the agency's errors were serious, it ultimately reached the right result in determining that the portion of the biological opinion relating to the prey increase program should not be vacated pending remand. Although the district court held on the merits that NMFS had not sufficiently analyzed the prey increase program in the 2019 biological opinion (a conclusion that NMFS has not appealed), NMFS has elsewhere extensively analyzed the impacts of the release of hatchery-origin fish on listed salmon populations. This analysis shows that NMFS likely can offer better explanation on remand in support of its original decision. Moreover, vacatur of the program would result in extremely disruptive consequences. The program provides significant benefits to killer whales and NMFS ensures that funded hatchery production will be determined through site-specific analysis to have limited adverse effects to ESA-listed salmon. The district court did not abuse its discretion in remanding without vacating the portion of the 2019 biological opinion relating to the prey increase program, and its order to that effect should be affirmed.

## STATEMENT OF THE ISSUES

1.     Whether the district court abused its discretion when it vacated the portion of the 2019 biological opinion and incidental take statement that exempted from ESA liability the incidental take of Southern Resident killer whales and Chinook

salmon resulting from commercial Chinook salmon harvests during the winter and summer seasons of the troll fishery in Southeast Alaska.

2. Whether the district court reasonably determined that vacatur of the 2019 biological opinion relating to federal funding for the prey increase program was not warranted.

## ARGUMENT

## I. The district court abused its discretion in vacating the Southeast Alaska Chinook salmon commercial troll fishery portion of the 2019 biological opinion and incidental take statement.

When determining whether to grant vacatur, courts should consider the factors identified in *Allied-Signal, Inc. v. U.S. NRC*, 988 F.2d 146, 150-51 (D.C. Cir. 1993)—that is, the seriousness of the agency's errors and the potential disruptive consequences (including environmental or economic harm) of vacatur—without applying an underlying assumption that the appropriate remedy is remand with vacatur. *See* NMFS Br. 22-24; *see, e.g., California Communities Against Toxics v. EPA*, 688 F.3d 989, 992-94 (9th Cir. 2012) (citing *Allied-Signal*, 988 F.2d at 150-51); *National Family Farm Coalition v. EPA*, 966 F.3d 893, 929 (9th Cir. 2020); *Am. Water Works Ass'n v. EPA*, 40 F.3d 1266, 1273 (D.C. Cir. 1994). For the reasons explained in NMFS's first brief on cross-appeal, pp. 20-40, and below, this Court should reverse the district court remedy order to the extent that it vacated the portion of the biological opinion and incidental take statement that exempted from ESA liability the winter and summer seasons of the Chinook

commercial troll fishery in Southeast Alaska because it abused its discretion in applying this two-part standard.

## A. The district court misapplied the relevant standards.

As explained in NMFS's first cross-appeal brief, pp. 20-24, the district court erroneously presumed that vacatur is the default remedy for an APA violation. 1-ER-14, 29, 35. But as the Supreme Court has said of equitable remedies, "[n]o such thumb on the scales is warranted." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157 (2010). The Conservancy defends the court's erroneous presumption on appeal, contending that vacatur is not subject to ordinary principles that apply to other forms of equitable relief (like injunctions) and that the district court correctly presumed that the party seeking to avoid vacatur must demonstrate that the equities so demand. Cons. Br. 28-31. In so doing, the Conservancy ignores the fact that vacatur is a form of equitable relief to which traditional limitations apply, including the principle that equitable relief is not presumed.

As explained in the first cross-appeal brief, a court's decision to vacate an agency action is an equitable remedy. *Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995); *In re Clean Water Act Rulemaking*, 60 F.4th 583, 593-94 (9th Cir. 2023); *United States v. Texas*, 599 U.S. 670, 702 (2023) (Gorsuch, J., concurring in the judgment); *cf. Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944) (explaining that Congress enacted the APA with the understanding that statutory remedies would be construed in accordance with "traditions of equity practice"); *Inst. for Fisheries Res. v. United States Food & Drug Admin.*,

8

499 F. Supp. 3d 657, 669 (N.D. Cal. 2020) ("[v]acatur of an agency action is an equitable remedy"). As an equitable remedy, vacatur is subject to ordinary equitable principles. One such principle is that courts must weigh equitable considerations that may make such relief inappropriate. The Supreme Court has long recognized that this includes the power to withhold relief altogether even after success on the merits. *See, e.g.*, *Winter* v. *Natural Res. Def. Council*, 555 U.S. 7, 32 (2008) ("An injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course."); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982) ("[A] federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law."). And while it is true that *Winter* and *Romero-Barcelo* specifically addressed injunctions, those cases reiterated traditional equitable limitations that apply to all forms of equitable relief. And most recently, at least one justice has acknowledged that a presumption of vacatur is inappropriate because the "faithful application of [equitable] principles suggests that an extraordinary remedy like vacatur would demand truly extraordinary circumstances to justify it." *Texas*, 599 U.S. at 702 (Gorsuch, J. concurring in the judgment).

The Conservancy attempts to distinguish vacatur from other types of equitable relief by pointing to Section 706 of the APA, which provides that "reviewing court[s] shall" "hold unlawful and set aside agency action", 5 U.S.C. § 706, and contending that "shall" means that vacatur is mandatory, or, at a minimum, should be presumed as the default remedy for an APA violation. Cons. Br. 28-29. Even assuming that Section 706

creates a remedy,[1] this Court's recognition of remand *without vacatur* as an available remedy, *see, e.g., California Communities*, 688 F.3d at 993-94, illustrates that vacatur is not, in fact, mandatory under Section 706.

To the extent that the Conservancy argues that the word "shall" in Section 706 supports application of a presumption, that argument is also wrong. The word "shall" does not invariably transform a discretionary framework into a mandatory one. *See, e.g., Lam v. United States*, 979 F.3d 665, 677 (9th Cir. 2020). Indeed, this Court has emphasized "the importance of analyzing policies that contain mandatory words in their overall context." *Id.* Here, Section 706's "shall" exists against an established baseline principle that equitable remedies do not "issue[] as of course;" instead a party seeking equitable relief must show entitlement to such relief. *Romero-Barcelo*, 456 U.S. at 311-12 (1982) (citing cases); *City of Harrisonville, Mo. v. W. S. Dickey Clay Mfg. Co.*, 289 U.S. 334, 337-38 (1933) (same). The APA itself confirms traditional limitations on available relief

---

[1] As our opening brief noted (NMFS Br. 20 n.3), the government disagrees with the premises that Section 706 is a remedial provision and that it (or the APA generally) authorizes vacatur of agency actions, as opposed to traditional remedies like injunctions or declaratory judgments. *See Texas*, 599 U.S. at 693-703 (Gorsuch, J., concurring in the judgment). Section 706 is instead a direction to courts about the scope of review, instructing courts to disregard unlawful agency action in resolving the case before the court, in the same way a court would set aside and disregard an unconstitutional statute. *Id.* at 696-97 (Gorsuch, J., concurring in the judgment). Section 703 of APA addresses judicial remedies, and refers to traditional remedies such as "actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus," with no reference to vacatur. The Court need not engage with that question here, however, because even assuming the APA authorizes vacatur, it was inappropriate here.

by, among other things, providing that the statute's authorization of judicial review does not affect "the power or duty of the court to . . . deny relief on any . . . equitable ground." 5 U.S.C. § 702(1); *see Abbott Labs. v. Gardner*, 387 U.S. 136, 155 (1967). There is thus no basis to suggest that vacatur follows presumptively from any conclusion that agency action is unlawful.

The Conservancy asserts, pp. 30-31, that traditional equitable limitations do not apply to vacatur, which it asserts (relying on *Monsanto*) is a less drastic remedy than an injunction. But *Monsanto* did not address the lawfulness of the vacatur portion of the district court's remedy order because no party challenged it; the Supreme Court therefore "assume[d] without deciding that the District Court acted lawfully in vacating the deregulation decision." 561 U.S. at 156. And while it is true the *Monsanto* court described vacatur in that case as a less drastic remedy than the affirmative nationwide injunction that was issued, the comparison simply served instead to illustrate another traditional equitable principle: namely, that a court should grant the narrowest form of equitable relief available to redress a plaintiff's injury. *See id.* at 165-66. *Monsanto* nowhere suggested, as the Conservancy does here, that the application of traditional equitable limitations should depend on whether one type of equitable relief is narrower than another; nor did it suggest that that traditional equitable limitations apply to only some types of equitable relief. *Compare id.* at 165-66 *with id.* at 157-58.

Moreover, the factors that courts should consider when deciding whether to grant vacatur are comparable to the factors that courts consider when deciding whether

to grant other forms of equitable relief. The D.C. Circuit has described the factors considered in deciding whether to grant a preliminary injunction as "analogous" to a court's consideration of the second *Allied-Signal* factor. *See Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety & Health Admin.*, 920 F.2d 960, 967 (D.C. Cir. 1990) (citing cases). In any event, the Conservancy fails to explain how any potential differences in the form or severity of equitable relief would bear on the application of ordinary equitable principles that have been consistently reiterated in *Monsanto* and other Supreme Court decisions.[2] And as discussed further below, the vacatur ordered by the court here is especially extraordinary, as it would have serious and far-reaching consequences for many entities, including those who are not a party to the litigation.

The Conservancy also contends that the presumption was appropriate in light of this Circuit's decisions suggesting that remand without vacatur is rare and that vacatur should be presumed. Cons. Br. 29-30. A thorough review of decisions, however, belies the suggestion that a presumption of vacatur stacks the deck before considering the equities.[3] The conclusion that the district court erred in applying a presumption of

---

[2] The amicus brief submitted by the Law Professors (and other amici, for that matter) do little to cure the Conservancy's flawed arguments. *See generally* 9th Cir. ECF Nos. 83-1, 84-1, 85-1, 94. This Court evaluates the district court's remedy order under an abuse of discretion standard. Absent "exceptional circumstances," this Court "do[es] not address issues raised only in an amicus brief." *Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 719 n.10 (9th Cir. 2003). No such circumstances are present here. And amicus briefs that simply repeat a plaintiff's arguments are similarly unhelpful. *See, e.g.,* ECF No. 83-2.

[3] *See* NMFS Br. 23 n.4 (citing within this Circuit); *see also, e.g., Nat'l Wildlife Fed'n*, 45 F.3d at 1343 (courts are not automatically "required to set aside every unlawful agency

vacatur here is consistent with this longstanding equitable principle that a party seeking equitable relief bears the burden to show that such relief is warranted. *See, e.g., City of Harrisonville*, 289 U.S. at 337-38.

## B. The agency's errors with respect to the biological opinion covering Southeast Alaska salmon fisheries were not serious.

Regardless of its application of the presumption, the district court erred in concluding that NMFS's errors were serious enough to warrant vacatur. *See* NMFS Br. pp. 24-29. The court erroneously assumed that the errors were serious and gave unreasonably little weight to facts in the judicial record showing that NMFS will likely be able to issue the same decision on remand after additional explanation. The district court's erroneous assumptions provide an independent basis to reverse the vacatur ruling.

---

action"); *see also United States v. Afshari*, 426 F.3d 1150, 1156 (9th Cir. 2005) (explaining that it is "well established" that the APA does not compel vacatur upon the finding of a legal violation or procedural flaw); *City of Los Angeles v. Dickson*, No. 19-71581, 2021 WL 2850586, at *3 (9th Cir. July 8, 2021) (remanding NEPA and other violations without vacatur); *All. for the Wild Rockies v. Savage*, 375 F. Supp. 3d 1152, 1157 (D. Mont. 2019) (remanding without vacatur); *Greenpeace, Inc. v. Cole*, 50 F.Supp.3d 1158, 1170 (D. Alaska 2014). The D.C. Circuit, which enunciated the two-part test governing vacatur in *Allied-Signal*, 988 F.2d at 150–51, has also "commonly remanded without vacating an agency's rule or order where the failure lay in lack of reasoned decisionmaking, . . . but also where the order was otherwise arbitrary and capricious." *Int'l Union, United Mine Workers of Am.*, 920 F.2d at 966 (citations omitted); *see, e.g., Stand Up for California! v. U.S. Dep't of Interior*, 879 F.3d 1177, 1190–91 (D.C. Cir. 2018) (affirming remand without vacatur); *Fertilizer Inst. v. EPA*, 935 F.2d 1303, 1312 (D.C. Cir. 1991) (remanding without vacatur); *Am. Medical Ass'n v. Reno*, 57 F.3d 1129, 1135–36 & n.4 (D.C. Cir. 1995) (same).

### 1. The existence of an ESA or NEPA violation does not automatically make an error serious.

As explained in NMFS's opening brief, the district court assumed that the ESA and NEPA violations that it identified at the merits stage were serious based on its conclusions that (1) those statutes serve important goals that were necessarily undermined when the agency failed to comply with them; and (2) the killer whales' endangered status necessitates reducing potential impacts on remand. 1-ER-32-33.[4] The Conservancy defends, Cons. Br. 31-33, 35-38, 61-62, this approach on appeal. But even if the court's assumptions that the agency undermined the statutes and vacatur is needed to avoid jeopardy to whales were true here (they are not, as explained below, at pp. 26-32), they are insufficient to conclude that the agency's errors were serious.

The district court's reasoning applies equally to all ESA and NEPA violations involving listed species. Not every ESA or NEPA violation, however, requires vacatur under the *Allied-Signal* factors. *See Romero-Barcelo*, 456 U.S. at 313 ("The grant of jurisdiction" to a court "to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances."); *cf. Miller for & on Behalf of N.L.R.B. v. California Pacific Medical Center*, 991 F.2d 536, 540 (9th Cir. 1993) (explaining that the Court has "never held" that "[consistency with a statute's purpose] is the only criterion for the issuance of an injunction"); *cf. Monsanto*, 561 U.S. at 157 (explaining that

---

[4] The district court considered the seriousness of the agency's violations of the ESA and NEPA together, and so we address them together here.

injunctive relief should not be presumed necessary to remedy a NEPA violation); *see, e.g., Ctr. for Food Safety v. Regan*, 56 F.4th 648, 664 (9th Cir. 2022) (concluding that an ESA violation did not warrant vacatur); *Defs. of Wildlife v. Jackson*, 791 F. Supp. 2d 96, 118 (D.D.C. 2011) (the "absence of notice and comment is not a substantive infirmity that *mandates* vacatur") (citation omitted) (emphasis in original). "[W]hen considering whether to vacate an order," a court "do[es] not evaluate the seriousness of the agency's error in the abstract." *Solar Energy Indus. Ass'n v. FERC*, 80 F.4th 956, 997 (9th Cir. 2023). The district court erred when it failed to consider whether the specific violations it identified in this case were serious based on the unique circumstances of this case.

## 2. NMFS likely can offer better reasoning on remand in support of the same decision.

An agency's error is not considered serious under the first *Allied-Signal* factor where it is likely that the agency will be able to offer better reasoning, such that it "could adopt the same rule on remand." *Nat'l Fam. Farm. Coal. v. EPA*, 960 F.3d 1120, 1145 (9th Cir. 2020) (citation omitted). The Conservancy defends the district court's decision, Cons. Br. 32-42, that this factor favored vacatur, but the record here shows that there is no "fundamental flaw," *Nat'l Fam. Farm. Coal.*, 960 F.3d at 1145, that precludes NMFS from determining on remand that the winter and summer Southeast Alaska commercial Chinook salmon troll fisheries will not jeopardize listed species. NMFS's errors were of the sort that can be cured by additional explanation, meaning that its errors were not serious.

The implementation of the prey increase program shows that NMFS likely can better explain its conclusion that the prey increase program will mitigate harm to the killer whale from the Southeast Alaska fisheries and therefore justifies a no-jeopardy conclusion for the killer whale and ESA-listed salmon. *See* NMFS Br. 24-29; 2-ER-99 ¶ 7. NMFS has ensured that all hatchery programs receiving federal funding are covered by appropriate ESA and NEPA analyses at the site-specific level, including through the preparation of five additional site-specific biological opinions since 2019. *See, e.g.,* 1-FER-290-295; 2-FER-297-595; 3-FER-597-706. NMFS can rely on those analyses in its new biological opinion and environmental impact statement to better explain its reasoning. *See, e.g.,* 2-ER-276 ¶ 5; 2-ER-100-01 ¶¶ 9-11; 2-ER-117-20; 4-ER-663 ¶ 15.

The Conservancy alleges that NMFS's choice to complete two biological opinions and environmental impact statements on remand shows that it will not issue the same decision. Cons. Br. 36, 39. But this argument conflates the substance of the agency decision and the form of the environmental analyses accompanying that decision. Both draft environmental impact statements propose as alternatives essentially the same actions that NMFS analyzed in the 2019 biological opinion. *See, e.g.,* 88 Fed. Reg. 68572-01, 68574 (Oct. 4, 2023); *see also* 88 Fed. Reg. 54301-01, 54301 (Aug. 10, 2023); 89 Fed. Reg. 5210 (Jan. 26, 2024) (notice of availability of draft environmental impact statement for the issuance of an incidental take statement); 89 Fed. Reg. 5227

(Jan. 26, 2024) (notice of availability of draft environmental impact statements).[5] For the Southeast Alaska salmon fisheries specifically, NMFS is analyzing, among other things, an alternative related to the issuance of the incidental take statement, as directed by the court. *See, e.g.,* 88 Fed. Reg. at 68574; 89 Fed. Reg. at 5211. For the prey increase program, NMFS is analyzing, among other things, a funding alternative that is designed to increase prey through hatchery releases. *See, e.g.,* 88 Fed. Reg. at 54301. The district court identified no fatal flaw that would prevent NMFS from taking either action—regardless of whether the agency does so in one single administrative process or two separate processes.

The Conservancy also alleges that NMFS cannot issue the same decision on remand because killer whales will go extinct if NMFS does not impose on Southeast Alaska fisheries a management framework identical to that in place for west coast fisheries. Cons. Br. 42. This is speculation. There are key differences in the Alaska and west coast fisheries, including the fact that west coast fisheries overlap in time and space with killer whales. Additionally, the 2019 biological opinion authorized incidental take up to the limit of allowable catch specified in the 2019 agreement implementing the Pacific Salmon Treaty. 6-ER-1205-06; 6-ER-1211-12. The actual amount of catch

---

[5] The draft environmental impacts are publicly available online at: <https://www.fisheries.noaa.gov/resource/document/draft-environmental-impact-statement-issuance-incidental-take-statement-under> and <https://www.fisheries.noaa.gov/action/prey-increase-program-southern-resident-killer-whales>.

allocated every year, however, depends on salmon abundance. 5-ER-895; 5-ER-898; 5-ER-1054, 1057. Thus, salmon fisheries are managed so as not to jeopardize listed species, without imposing the same conditions placed on west coast fisheries. NMFS is also working separately to improve the status of the killer whale. *See, e.g.,* NMFS Br. 36-37; 3-ER-868 ¶ 12; 3-ER-332-36.

The Conservancy also asserts that the failure to comply with the ESA and NEPA is itself a fundamental flaw demonstrating that NMFS will not be able to better explain its decision on remand. Cons. Br. 39-40. But NMFS's initial errors only show that *more* analysis was required; they do not show that NMFS's no jeopardy conclusions were fundamentally flawed. Moreover, as explained in greater detail below, pp. 23-24, 42-45. NMFS did prepare some ESA and NEPA analyses before issuing the 2019 biological opinion, which at least partially informed the agency's no jeopardy conclusions. And, as discussed herein, pp. 16, 21, 45, NMFS has also continued to identify or prepare appropriate site-specific ESA and NEPA analysis for each hatchery program receiving funding. These analyses demonstrate that it is likely that NMFS will be able to offer better reasoning on remand to support its original decision.[6]

---

[6] The Conservancy contends that "NMFS's insistence that it will merely adopt the same decision on remand" amounts to unlawful predetermination of the NEPA process. Cons. Br. 40. This assertion presents a false choice between an agency either necessarily reaching a different result on remand or unlawfully predetermining the outcome. Here, NMFS has instead argued—consistent with the applicable legal standard governing the seriousness of the error—that it likely can offer better or additional information on remand to support the same decision. Further, predetermination only occurs when an agency has made "an irreversible and

Where, as here, an agency's decision on remand may be cured by additional explanation, it generally is the case that the agency will "likely be able to offer better reasoning" and "adopt the same [decision] on remand." *Nat'l Fam. Farm Coalition*, 966 F.3d at 929 (quotations and citation omitted); *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985); *Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 938 (9th Cir. 2005). The district court failed to account for the fact that the prey increase program has been implemented each year since 2019 and that NMFS has completed appropriate environmental analysis at the site-specific level. 1-ER-31, 1-ER-41. These facts show that NMFS can likely offer better explanation to support another incidental take statement.

### 3. The agency's ESA and NEPA errors with respect to the biological opinion covering Southeast Alaska fisheries did not seriously undermine those statutes' goals.

Notwithstanding the likelihood that the agency will be able to reach the same decision on remand, the Conservancy argues that the errors identified below were serious because they harm the whales' condition and undermine the goals of NEPA and the ESA. The Conservancy is incorrect on both counts.[7] Contrary to the

irretrievable commitment of resources," before completing its environmental analysis. *Metcalf v. Daley*, 214 F.3d 1135, 1143 (9th Cir. 2000). The Conservancy has identified no such commitment.

[7] As explained above, the first *Allied-Signal* factor involves consideration of whether there is "at least a serious possibility that the [agency] will be able to substantiate its decision on remand." *Allied-Signal*, 988 F.2d at 151; *see* NMFS Br. 23-25, 27. While this Court has found it appropriate to consider environmental and other public interest

Conservancy's assertions, Cons. Br. 32-34, 48, the errors identified here will not exacerbate the killer whales' condition.

As explained in NMFS's first cross-appeal brief, the remand's duration will be short, and during this period, fish previously released through the prey increase program are now mature enough to increase prey abundance for the killer whale. Contrary to the Conservancy's assertions, Cons. Br. 42-43, the judicial record at the remedy phase in 2022 showed that the prey increase program had been funded (between $5.6 and 7.3 million annually) and implemented each year since 2020. *See* 1-ER-36; 2-ER-255-57 ¶¶ 7-9; 2-ER-305-07, 310-11 ¶¶ 11, 13, 22; 2-ER-275-76 ¶¶ 3-5; 2-ER-284-85; 2-ER-99 ¶ 6. Including fish from projects funded by Washington State (addressed in more detail below, pp. 22-23), the combined federal and state releases were largely expected to provide the increase in prey that NMFS anticipated in the biological opinion. 2-ER-275-76 ¶¶ 3-5; 2-ER-281-86; 5-ER-889; 4-ER-663 ¶ 13; 2-ER-99 ¶ 7. The on-the-ground increase in prey from the program minimizes the environmental significance of

---

concerns in addition to the two *Allied-Signal* factors, those decisions suggest that such factors do not go to the seriousness of an agency's errors under the first *Allied-Signal* factor. *See, e.g., Nat. Res. Def. Council v. EPA*, 38 F.4th 34, 51-52 (9th Cir. 2022), (identifying consideration of potential environmental risks as a separate consideration from whether there is a fundamental flaw in the agency's decision); *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015) (same); *see also Allied-Signal*, 988 F.2d at 150. We nevertheless address these arguments under the first *Allied-Signal* factor—the seriousness of the agency's errors—to respond to the Conservancy's arguments. We also note that the expansion of the *Allied-Signal* factors to include various equitable concerns further supports the government's argument that vacatur is an equitable remedy subject to ordinary equitable principles.

the ESA errors identified by the district court, namely, that the prey increase program was too uncertain to occur. As the district court itself noted, the "prey increase program—though previously uncertain and indefinite in the 2019 [biological opinion]—has also now been funded and begun providing prey the past three years." 1-ER-36. In these circumstances, it was error to conclude at the remedy stage that the errors were serious enough to warrant vacatur of the incidental take statement.

The Conservancy asserts that NMFS provided insufficient detail at the remedy stage to show that the program was providing benefits while ensuring no jeopardy to listed salmon populations. Cons. Br. 42-43. But NMFS's remedy declarations explain in detail the numbers of juvenile fish that were released in 2020, 2021, and 2022, the amount of funds distributed in each year, and that NMFS evaluated and concluded the actions at issue were not likely to cause jeopardy to listed species. *See, e.g.,* 1-ER-36; 2-ER-255-57 ¶¶ 7-9; 2-ER-275-76 ¶¶ 3-5; 2-ER-284-85; 2-ER-305-07, 310-11 ¶¶ 11, 13, 22; *see also* 4-ER-659-63 ¶¶ 4-13; 2-ER-99 ¶ 6. The site-specific ESA and NEPA analyses that NMFS relied upon to inform its funding decisions to implement the prey increase program, *see, e.g.,* 2-ER-276 ¶ 5; 2-ER-284-85, also copiously detail mitigation measures that hatcheries take to protect listed salmon. *See, e.g.,* 3-FER-721-22, 733 (discussing the alternatives NMFS considered, as well as a prior NEPA analysis that was prepared relating to the actions). These details showed at the remedy stage that permitting the incidental take statement to remain in effect on remand would not cause jeopardy to listed species.

Moreover, contrary to the Conservancy's assertions, Cons. Br. 33, 43-44, and as explained in detail below, pp. 26-32, permitting the incidental take statement to remain in effect pending remand would cause only minimal impacts to killer whales, because the remand period will be short, the effects of the fisheries were expected to be small, and (as stated above) the prey increase program was already increasing prey to killer whales. *See also* 2-ER-123-24 ¶¶ 7-15; 2-ER-304-07 ¶¶ 9, 11-14; *cf.* 2-SER-405 ¶ 8 (explaining the difference between meeting the recovery criteria for killer whale and NMFS's determination that the proposed actions in the biological opinion were not likely to jeopardize the continued existence of the killer whale).[8] The Conservancy suggests that the program is not providing the necessary increase in prey because the federal government has funded the release of only some of the juvenile salmon, with Washington State funding the remainder. Cons. Br. 43-44; *see* 2-ER-275 ¶ 3; 2-ER-296; 2-ER-99 ¶ 6. The record shows, however, that NMFS always considered the possibility that the anticipated release of roughly 20 million fish per year could be funded in part by nonfederal sources. The biological opinion noted that the prey increase program could be implemented through "other funding sources" besides the federal government *See* 5-ER-889. A report to Congress on how the agency would spend FY 2021 money to implement the Pacific Salmon Treaty also explained that Washington had invested

---

[8] The Conservancy suggests, p. 44-45 n.7, NMFS's predictions have been inaccurate, but that has no bearing on whether the court abused its discretion where NMFS has consistently updated the court with accurate information. *See, e.g.,* 2-ER-99, ¶ 6 (updating past information provided to district court).

money in 2019 and 2020 to increase killer whale prey and that such investments would likely continue. *See* 2-ER-266, 2-ER-271. The source of the funding does not diminish the program's measurable success to date, especially where NMFS anticipated non-federal funding sources. And while it is true that in 2019 and 2020, a total of only 11.3 and 13.4 million fish were released, more than 17 million were released in 2022 and more than 20 million were projected to be released in 2023. 2-ER-116. These fish were expected to "provide a meaningful increase in prey abundance" for the killer whale during the remand period. 2-ER 127-28 ¶¶ 14-15; 2-ER-99-100 ¶¶ 5-8.[9]

The Conservancy's assertion that NMFS's errors fundamentally undermined NEPA is likewise incorrect. While NMFS admittedly did not conduct new NEPA analysis on the 2019 incidental take statement, NMFS previously prepared NEPA analysis concerning its delegation of Chinook salmon fishery management to Alaska,

---

[9] Although the Conservancy complains that a new conservation hatchery program in the Mid-Hood Canal contemplated as part of a suite of mitigation measures in the biological opinion has not been implemented, Cons. Br. 45, this argument was not presented to the district court at the remedy stage and accordingly should not factor into this Court's analysis on appeal. *See infra* pp. 37-39. In any event, the biological opinion considered this program to be one of two avenues designed to improve Hood Canal Chinook, 5-ER-888, the other being habitat restoration projects (which were funded, *see* NMFS, Biological Opinion at 142, 153, available online at https://repository.library.noaa.gov/view/noaa/50389). The biological opinion contemplated that the new hatchery program would be subject to site-specific analysis before being funded, 5-ER-1106, which ultimately showed that it was not feasible to proceed. *See, e.g.,* 2022 Updated Guidance for Prioritizing Salmonid Stocks, Issues, and Actions for the Hood Canal Coordinating Council 13 (Dec. 2022) https://hccc.wa.gov/sites/default/files/resources/downloads/2022%20Updated%20 Prioritization%20Report_12-30-2022_Final.pdf.

most recently in 2012 as part of a public process that included meetings and public comment before the North Pacific Fishery Management Council and a NMFS-proposed rule subject to notice and comment. *See* 3-FER-721-22, 733; *see* 77 Fed. Reg. 21716, 21717 (Apr. 11, 2012) (describing public comment opportunities); 77 Fed. Reg. 19605 (April 2, 2012). This analysis discussed the impacts of Chinook salmon troll fishing on salmon and killer whales. *See, e.g.,* 3-FER-751-68. It further informed, at least to some extent, NMFS's decision-making, as well as the public about the impacts of delegating management of federal Chinook salmon fisheries to Alaska, thereby at least partially serving NEPA's goals of informing the public and the agency about potential impacts. *See, e.g., Pac. Rivers Council v. U.S. Forest Serv.*, 942 F. Supp. 2d 1014, 1021 (E.D. Cal. 2013) (concluding that the "absence of new [NEPA] analysis" was not a serious deficiency warranting vacatur because the agency had considered and made public the action's effects in previous analysis); *cf. Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.*, 42 F.3d 517, 527 (9th Cir. 1994), *as amended on denial of reh'g* (Dec. 20, 1994) (in determining whether NEPA was violated, finding that NEPA's purposes were not disserved where the public had sufficient information about potential environmental impacts despite a technical error in disclosure).

The Conservancy also suggests that NMFS's choice to prepare environmental impact statements on remand means that its decision not to do so in the first place is serious enough to warrant vacatur. Cons. Br. 36, 69. But NMFS explained that it intends to prepare the two environmental impact statements and ESA consultation "to address

the court's orders on remand." *See, e.g.,* 88 Fed. Reg. at 68573; *see also* 88 Fed. Reg. at 54301 ("This [environmental impact statement] responds to the court's decision."); 89 Fed. Reg. at 5211 ("This [draft environmental impact statement] responds specifically to the court order. . .."). NMFS does not contest the district court's conclusion that it failed to comply with NEPA and that it must accordingly take steps on remand to remedy the deficiency; that acknowledgment says nothing about whether those errors were serious enough to justify vacating the agency decision while the remand proceeds. It would be odd to penalize an agency for diligently pursuing a court-ordered remand.

In sum, while any error runs up against the purposes of ESA or NEPA to some extent, these errors did not seriously undermine the statute's goals such that vacatur is warranted.

### C. The limited benefits and devastating consequences of vacatur weigh heavily in favor of remand without vacatur.

Regardless of whether the district court erred in its application of the first *Allied-Signal* factor, this Court must also reverse due to the district court's error in applying the second factor. *See Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405-06 (9th Cir. 1995) (equitable considerations may justify remand without vacatur even when an agency has committed serious errors). The district court abused its discretion by overstating the benefits to killer whales of vacatur while discounting the evidence of disruptive consequences.

### 1. The district court overestimated the benefits of vacatur.

As NMFS's opening brief explains, the district court abused its discretion by overestimating the benefits of vacatur beyond what the record can bear. While the evidence before the court established no "definitive threat of future harm," *Nat'l Wildlife Federation v. NMFS*, 886 F.3d 803, 819 (9th Cir. 2018) (citation omitted), to the killer whales if the incidental take statement remains in place pending remand and the court itself acknowledged that the benefits of vacatur were "uncertain[]," it nevertheless asserted—without elaboration—that closing the fishery would "meaningfully" increase the prey available to whales. 1-ER-34, 39. The Conservancy's efforts to defend this conclusory finding on appeal are unavailing.

Citing the killer whale's endangered status, the Conservancy contends, Cons. Br. 25-27, 33, 48-54, that the potential harm from leaving NMFS's decision in place warranted partial vacatur. The Conservancy points to declarations by Dr. Robert Lacy, who concluded that prey abundance is the primary factor limiting the killer whale population's growth and concluded that prey must increase by 5% to stop the population's decline. Cons. Br. 49. Lacy believed that the Chinook salmon fisheries in Alaska reduced prey by around 6%, but, due to uncertainty around the number, modeled fishery prey reductions of 3%, 6%, 9%, and 12% and concluded that under all scenarios, closing the fisheries would meaningfully increase prey. *Id.*

NMFS responded with expert declarations from Ms. Lynne Barre, the Branch Chief for NMFS's Protected Resources Division, who leads the killer whale recovery program. 3-SER-862-63 ¶¶ 2-4. Despite the Conservancy's suggestions to the contrary, Cons. Br. 50-51, the district court determined that Barre was qualified to provide expert opinion, 1-ER-22-25, and the Conservancy did not appeal this determination or present any reason to reverse the district court's decision in this regard. Barre explained that while prey abundance is a factor limiting the species' recovery, it is not the only factor. 3-SER-870-71 ¶¶ 15-16. Other threats, such as harmful contaminants and human-created noise and disturbance from vessels, are also important, 3-SER-870-71 ¶¶ 15-16; 5-ER-968, and NMFS (along with state, local, and tribal partners) is working to address these other threats. *See, e.g.,* NMFS Br. 36-37; 3-ER-868 ¶ 12. The Conservancy asserts that Barre misunderstood Lacy's modeling, Cons. Br. 50-51, but Barre clearly acknowledges that the underlying Lacy model includes multiple threats and stated that the Lacy *declaration* focused exclusively on prey. *See* 3-FER-870-72 ¶¶ 14-16. The singular focus on prey availability in the Lacy declarations and the assertion that closure of a single fishery could reverse the decline oversimplifies the complex relationship of how multiple threats, as described in Lacy's own model, may be limiting recovery.

Barre explained that Lacy's analysis was flawed in other ways. 2-ER-302-04 ¶¶ 6-9. First, the analysis did not include up-to-date information about the killer whale population. 2-ER-302-03 ¶ 6. Second, the modeling relied on "outdated correlations of coastwide Chinook abundance and survival or fecundity of [killer whales]." 2-ER-302-

03 ¶ 6; 2-ER-124-25 ¶¶ 8-9 (same). The workgroup set up to advise the Pacific Fishery Management Council on salmon-fishery effects on killer whales found that the correlations upon which Lacy's modeling relies "have weakened or are not detectable," and an expert panel "cautioned against overreliance on correlative studies or implicating any particular fishery in evaluating the status of [killer whales]." 2-ER-303 ¶ 7; 5-ER-972. That is, "the relationship that Dr. Lacy relies on to support his opinions is no longer the best available science." 2-ER-124-25 ¶ 9.

Most critically, Lacy's modeling "overstate[d] the benefits that would likely be realized by the whales," 2-ER-303-04 ¶ 8, by relying on incorrect assumptions about whether fish not caught by the fishery would necessarily migrate to the killer whales' habitat and become available to whales. For example, Lacy erroneously assumed that closure of all Southeast Alaska fisheries (which overall, on average, reduces Chinook abundance by 6%) "would equate to a 6% increase in available prey." 2-ER-304 ¶ 9. Barre explained that:

> Both the Chinook salmon prey and [killer whale] predators are highly mobile. Thus, not all of the Chinook salmon caught in [Southeast Alaska] troll fisheries would migrate south into [killer whale] habitat and those that would migrate south would not all survive or be intercepted by the whales.

*Id*.; *see also* 2-ER-513-16 ¶¶ 23, 29-30 (only a portion of the Chinook salmon harvested in the winter and summer seasons would return to killer whale habitat); 3-ER-516-17 ¶ 31; 2-ER-125-26 ¶ 10. While NMFS considered the overall reductions (that is, the reduction in prey availability assuming *all* salmon not caught in the fishery would

otherwise migrate into whale habitat), the more detailed "seasonal and spatial analysis" yielded estimates more directly relevant to the whales and were therefore given more weight. 2-ER-126 ¶ 11; 2-ER-304 ¶ 9.

When taking killer whales' seasonal movements into consideration with when and where Chinook salmon become potential prey (i.e., coastal areas from October to April and inland areas from July to September), NMFS estimated that the operation of all Southeast Alaska salmon fisheries—not just the summer and winter Chinook commercial troll fisheries to which the incidental take statement applied—would cause an average prey reduction of 0.5% in coastal areas during the winter, and an average of 1.8% in inland waters during the summer. *See* 2-ER-304 ¶ 9; 2-ER-57 ¶ 11; 2-ER-126 ¶ 11 (citing 5-ER-1126-27, 6-ER-1192); *see* 5-ER-1126-27; 6-ER-1192. Prey reductions from only the summer and winter Chinook commercial troll fisheries would necessarily be even lower than NMFS's estimates for all the Southeast Alaska salmon fisheries. *See* 2-ER-57 ¶ 11; 2-ER-126 ¶ 11. Lacy's model, by contrast, assumed fishery prey reductions of 3%, 6%, 9%, and 12%, which all overestimated the average reductions of prey caused by the Alaska salmon fisheries in the locations and seasons most relevant to the whales.

Even the Conservancy identifies no real flaw with NMFS's estimates of how much the Southeast Alaska salmon fisheries reduce prey availability, and instead asserts that NMFS failed to meet its alleged burden to show that vacatur was unwarranted. *See* Cons. Br. 51-52. NMFS had no such burden, as explained above, pp. 8-13. Even if it

did, however, NMFS's analysis showed that the prey reductions that would result from operation of the targeted fisheries during remand, "particularly in the most important locations and seasons for the whales, are small and . . . will not jeopardize [the killer whales'] survival or recovery." 2-ER-302 ¶ 5.[10]

The Conservancy asserts that Southeast Alaska salmon fisheries cause greater reductions (and greater impacts to whales) when forage ratios are low, and that this could cause killer whales to spend more time foraging, citing some of NMFS's conclusions without the full explanation. *See* Cons. Br. 52. The term "forage ratio" refers to the food energy of prey available to the whales to the estimated metabolic needs of the whales. 5-ER-1039. When forage ratio is high, there is likely more prey available than needed. NMFS explained that it has "low confidence in the ratios" because "there is no available information on the whales' foraging efficiency," although consideration of these ratios may help inform its analysis. 5-ER-1039-41. NMFS puts higher weight in considering impacts from fisheries when overall Chinook salmon abundance is low. Regardless, this issue is not a concern because NMFS did not predict a low abundance year for the 2023-2024 fishing season, which overlaps with the remand period. *See* 2-ER-60-61 ¶ 19; *see also* 2-ER-59-50 ¶¶ 17-18.

---

[10] The Conservancy also attempts to turn the NMFS's accounting of spatial variability of whales on its head by asserting that the highly mobile killer whales will not necessarily be where they are expected to be. Cons. Br. 52. While it is true that killer whales are highly mobile and that foraging patterns have started to change, NMFS's estimate concerning prey reductions still represents the best available science. *See* 2-ER-57-58, ¶¶ 11-12.

The Conservancy also asserts that a declaration submitted by Alaska shows that Alaska's catch consists of a significant number of Chinook salmon from stocks deemed "priority" prey for killer whales. Cons. Br. 53-54. But, as explained in detail in NMFS's first cross-appeal brief, p. 36, and in the 2019 biological opinion, most of the salmon caught by Southeast Alaska fisheries are not from salmon stocks that are among the most important "priority" stocks for killer whales. 5-ER-1129-31; *see also* 6-ER-1194-95; 6-ER-1193; 5-ER-970-71; 5-ER-1130-31. For example, the stocks that contributed the largest percentage of fishery catch were not considered the highest priority fish for killer whales. 5-ER-1129. In any event, what is more relevant to determining the fisheries' potential impact is the expected prey reduction that would result from their operation. NMFS anticipated the prey reductions would be small. *See supra* pp. 28-29.

Instead of according any deference to the agency's expertise, the district court (without making findings on exactly how much prey would be made available from closing the fisheries) cursorily declared that despite the admitted "uncertainty as to how much prey would ultimately reach" killer whales, "closure of the fisheries meaningfully improves prey available to the [whale]." 1-ER-34, 39.[11] This was a leap too far. As

---

[11] The Conservancy asserts, pp. 50, that no deference was owed to NMFS's determinations at the remedy stage, but the analysis relied upon in NMFS declarations comes from the 2019 biological opinion. The district court identified no fundamental flaw in this analysis on the merits and this type of analysis is of the sort that is normally understood to be within the agency's expertise and entitled to deference. *Cf. Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*, 67 F.3d 723, 727 (9th Cir. 1995) (noting the strong level of deference we accord an agency in deciding factual or technical matters); *Nw. Env't Def. Ctr. v. U.S. Army Corps of Eng'rs*, 817 F. Supp. 2d

NMFS demonstrated, however, the benefits of closing the fisheries pending remand would be small, especially where the remand period would be short, 2-ER-145-46 ¶ 5, and the prey increase program had been operating for three years. 1-ER-36; *see also* 2-ER-304-05 ¶¶ 9-10; 2-ER-54-55, 59 ¶¶ 7, 15; 2-ER-123-24, 128 ¶¶ 7, 15; 2-ER-94 ¶ 41; 2-ER-99 ¶¶ 6-8; 2-ER-99-16; 4-ER-660-63 ¶ 7-10. The Conservancy's contrary proffered evidence was tainted by erroneous assumptions, as discussed above. Any limited impacts to killer whales that might result from commercial Chinook salmon troll fishery operations during the remand period will be small.

### 2. The severely disruptive consequences weigh against vacatur.

In addition to overestimating the benefits that would result from vacatur, the district court erroneously discounted the severe consequences. As explained in NMFS's first cross-appeal brief, p. 31, vacatur would cause economic losses of $29 million each year in an industry that helps ensure the livelihoods of thousands of people. *See* 3-ER-516-22 ¶¶ 31-41; *see also* 2-ER-90-94 ¶¶ 32-41; 2-ER-517 ¶ 32.

This estimate, which included the value of commercial landings and the fisheries' economic output (such as the income earned by crew, the jobs and wages generated by the purchase of goods and services supporting fishing operations, and the jobs and wages generated when skippers and crew spend their fishing income in support of their

---

1290, 1315 (D. Or. 2011) (deferring to NMFS in the context of a preliminary injunction).

households), was not, as the Conservancy asserts, pp. 57-58, overinflated. For example, wages create additional value beyond the price of the fish caught and sold by the fishermen, 3-ER-519-20 ¶¶ 36-40, and it was therefore appropriate to consider these factors among the economic losses that will result from closing the fisheries.

In any event, even if the economic loss were $9.5 million, as the Conservancy asserts, it is nevertheless true that more than one thousand active permit holders and small-scale participants depend on troll fishery income and the 23 communities across Southeast Alaska are supported to varying degrees by the troll fishery; many of these communities are small, rural, and isolated, some are Alaska Native communities, and some rely heavily on the troll fishery. *see also* 2-ER-90-94 ¶¶ 32-41; 2-ER-517 ¶ 32; 2-ER-517 ¶ 32; *see also* 2-ER-94 ¶ 41. Without the incidental take statement, trollers would have to forego fishing, businesses may close, and jobs will be lost. 2-ER-230-32 ¶¶ 4-7.

Vacatur will cause extraordinary and irreparable harm, even if it is "only" $9.5 million, and the district court erroneously discounted the significant impacts that would flow from its decision. The court erroneously gave these impacts too little weight, instead assuming that equitable relief was appropriate to address potential environmental concerns, regardless of the economic consequences. 1-ER-33-34. That decision was wrong as a matter of law. *California Communities*, 688 F.3d at 993-94; *Friends of Clearwater v. Petrick*, 588 F. Supp. 3d 1071, 1095 (D. Idaho 2022) (concluding that $2.5 million in lost labor income that vacatur would cause weighed against vacatur despite having found an ESA violation); *cf. Monsanto*, 561 U.S. at 157 (explaining that it is

erroneous for courts to assume that equitable relief is required to remedy violations of environmental statutes).

The Conservancy attempts to downplay the consequences of vacatur on appeal by describing the district court's partial vacatur as narrow, suggesting that the court could instead have chosen to vacate the biological opinion in its entirety. Cons. Br. 56-57. This is wrong. The limited errors identified by the district court would have provided no basis to vacate the entirety of the biological opinion and incidental take statement. Moreover, in terms of fishing, the commercial troll fisheries in Southeast Alaska that operate in the winter, spring, and summer seasons are allocated an average of roughly three-quarters of the overall limit for treaty Chinook salmon in the State; the commercial troll fisheries that the Conservancy targeted through the request for vacatur (the winter and summer seasons) harvest the majority of Chinook, with the fishery in the spring season harvesting only a small portion of the troll allocation. *See* 3-ER-512 ¶ 19-22. Of the three fishing seasons, the winter and summer combined account for most of the harvest of treaty Chinook salmon (118,945 of 129,802 treaty Chinook salmon harvested on average from 2017-2021). 3-ER-512-14 ¶¶ 21-23.

The Conservancy's assertion that the vacatur ruling is narrow because it would affect only a small fraction of Southeast Alaska total salmon harvests (and harvest value) should be rejected too. Any number (the economic value created by the winter and summer commercial Chinook salmon troll fisheries) may be made to look small by comparing it to a larger number (all of the salmon fisheries in Southeast Alaska). It is

incredible to assert that a ruling that seriously harms thousands of individuals, numerous businesses, and many dependent communities is "narrow" just because it does not affect even more people. 2-ER-514, 517 ¶¶ 26, 32; 3-ER-516-22 ¶¶ 31-41; *see also* 2-ER-91-94 ¶¶ 34-40; 2-ER-230-32 ¶¶ 4-7.

Indeed, even the Conservancy posits that the district courts' remedy order could be characterized as a "fishing *disaster*[]," Cons. Br. 58 (emphasis added), that (it believes) could qualify for disaster-relief funding made available in limited situations, including where there is "significant revenue loss," 16 U.S.C. § 1861a. NMFS cannot predict whether such relief would be available here and the Conservancy does not support its statement that such relief would negate most economic losses. Regardless, any hypothetical disaster funding would not be available until *after* the irreparable harm from businesses closures and impacts to dependent communities would have occurred; such funding would not remedy (or prevent) such harm. *See Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1474 (9th Cir. 1985) ("[t]he threat of being driven out of business is sufficient to establish irreparable harm."); *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1203 (9th Cir. 1980) (a potential business closure constitutes irreparable harm); *Am. Water Works Ass'n*, 40 F.3d at 1273. Even alluding to disaster funding proves NMFS's point that the effects of vacatur would be devastating.

The Conservancy nevertheless asserts that the district court's weighing of the equities is consistent with this Circuit's case law that more heavily weights potential environmental harm that might result absent vacatur. Cons. Br. 58-62. But this Court

has never held that the mere potential for environmental harm mandates vacatur. Equitable relief, even for ESA and NEPA violations, is never presumed. *See supra* pp. 8-15. The party seeking such relief must show that environmental harm will result absent such relief. *See Winter*, 555 U.S. at 32. Moreover, economic considerations alone may justify remand without vacatur. *Solar Energy*, 80 F.4th at 994 (declining to vacate an agency order due to the disruptive regulatory and economic consequences of vacatur and in spite of the potential for environmental impacts); *California Communities*, 688 F.3d at 993-94; *cf. Earth Island Inst. v. Carlton*, 626 F.3d 462, 475 (9th Cir. 2010) ("Economic harm may indeed be a factor in considering the balance of equitable interests."). Here, the environmental harm to killer whales that might occur during the remand period would be minimal, while the disastrous economic consequences weighed heavily against vacatur. This Court tacitly recognized the error in the district court's equitable analysis, explaining in its stay order that "the moving parties have established a sufficient likelihood of demonstrating on appeal that the certain and substantial impacts of the district court's vacatur on the Southeast Alaska salmon fishing industry outweigh the speculative environmental threats posed by remanding without vacatur." 2-ER-50. The Conservancy has presented no reason for this Court to depart from its interim ruling.

In sum, the district court abused its discretion in finding that the significant consequences of vacatur would not outweigh the minimal harms of leaving the incidental take statement in place pending the short remand.

**D.** **The unadjudicated merits error raised by the Conservancy on appeal does not support affirming the district court's partial vacatur.**

On the merits, the district court ruled in favor of the Conservancy on some of its claims, concluding that NMFS relied on uncertain mitigation to find no jeopardy, did not adequately analyze the prey increase program's impact on listed salmon, and did not conduct certain NEPA analysis. The district court found it was "not necessary to decide more," however, and specifically "decline[d]" to rule on the merits claim that the Conservancy now presses on appeal—that NMFS did not draw a rational connection between the facts and its conclusion that the Southeast Alaska salmon fisheries would not result in jeopardy to the killer whale. *See* 4-ER-638 n.4 (internal quotations and citations omitted).

The district court's remedy order was accordingly based only on its assessment of the seriousness of the errors that it identified on the merits, and not on the merits claim the district court did not reach and that the Conservancy advances on appeal. *See, e.g.* 1-ER-31-33; 1-ER-38; 1-ER-41-42. That merits claim (upon which the Conservancy asks this Court to rule in the first instance, Cons. Br. 23-27, 34-35, 41-42) therefore cannot serve as justification for the district court's remedy ruling. The Court may easily reject this contention as a basis to affirm—or enlarge, for that matter—the district court's remedy order for either reason presented below.

First, while it is generally true that the Court may affirm a district court's decision on any basis in the record, the unadjudicated error alleged by the Conservancy does not

supply such a basis. As explained in NMFS's first cross-appeal brief, p. 19, this Court reviews the district court's remedy order for abuse of discretion. The abuse-of-discretion standard requires the Court to evaluate the district court's decision based on the reasons *given by the court* for its decision. *Cf. United States v. Mancinas-Flores*, 588 F.3d 677, 683 (9th Cir. 2009) ("Abuse-of-discretion review is not meaningful where a court fails to give reasons for its decision and its reasons are not apparent from the record."). Here, the district court explicitly declined to rule on the alleged error and did not rely on it in determining the remedy. To do as the Conservancy suggests would require this Court not only to decide in the first instance the merits of this claim, but also to "conduct [its] own assessment" of whether any newly identified error warranted vacatur in light of equitable considerations. *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1023 (9th Cir. 2009). This assessment "would overstep the bounds of abuse of discretion review." *Id.* The unadjudicated allegation relating to the merits of NMFS's decision does not supply a basis in the record to review the district court's remedy order.

Second, the Court may decline to address the Conservancy's unadjudicated merits allegation because "[o]rdinarily, only a party aggrieved by a judgment or order of a district court may exercise the statutory right to appeal therefrom." *Deposit Guar. Nat'l Bank v. Roper,* 445 U.S. 326, 333 (1980). By contrast, a "party who receives all that he has sought generally is not aggrieved by the judgment affording the relief and cannot appeal from it." *Env't Prot. Info. Ctr., Inc. v. Pac. Lumber Co.*, 257 F.3d 1071, 1075 (9th Cir. 2001). There are exceptions to this rule. A party may seek reformation of a

favorable decree, but not review of its merits. *Id.* A party may also be "considered aggrieved by a favorable judgment if future economic loss will result [from the adverse] collateral rulings." *Id.* at 1076. Finally, a party may seek review "[i]f the adverse [collateral] ruling can serve as the basis for collateral estoppel in subsequent litigation." *Id.* None of these exceptions apply here. The district court did not rule in NMFS's favor on the unadjudicated claim. Nor can the Conservancy show that it is "aggrieved" by the district court's failure to reach that claim; NMFS is conducting the remand as ordered by the district court and that remand will necessarily include additional explanation to support any decision that it makes. Bootstrapping an appeal of the district court's decision not to reach a merits issue by arguing that resolution of the question is necessary to affirm the remedy order would circumvent the general rule that appeals may be taken only by aggrieved parties.

In sum, the alleged deficiency in the biological opinion supplies no basis for this Court to affirm (or enlarge) the district court's remedy ruling.

## II. The district court did not abuse its discretion in declining to vacate the biological opinion as it relates to the prey increase program.

The Conservancy cross-appeals the district court's decision to remand without vacatur the portion of the 2019 biological opinion relating to the prey increase program. *See* Cons. Br. pp. 31-47, 62-70. But with regard to the prey increase program—in stark contrast to its unsupported assumptions regarding closure of the fishery—the district court correctly recognized that vacatur of the biological opinion was not warranted

given the "serious and certain risk to prey abundance and availability" that would result and the likelihood that NMFS will be able to offer better explanation, and potentially adopt the same decision on remand. 1-ER-41-42.

## A. The agency's errors regarding the prey increase program were not serious enough to warrant vacatur.

As an initial matter, while the district court ultimately reached the right conclusion—that vacatur was unwarranted—it erred in determining that NMFS's errors regarding the prey increase program were serious. 1-ER-32-33.

The court found two violations on the merits with respect to the prey increase program. First, the court held that NMFS violated the ESA by failing to consider the prey increase program's impacts on threatened Chinook salmon populations. Second, the court held that NMFS violated NEPA by failing to conduct new NEPA analysis on the prey increase program at the programmatic level. 4-ER-644-46; 4-ER-650-51. Neither is serious under the *Allied-Signal* test.

## 1. NMFS likely can offer better reasoning on remand to support its decision.

As discussed above, the critical consideration in determining whether an error is "serious" under the *Allied-Signal* test is the likelihood that the agency could reach the same decision on remand, with the benefit of additional explanation. The district court itself recognized that the "seriousness" factor "[did] not fully counsel in favor of vacatur," of the prey increase program, because NMFS is "poised on remand to remedy

deficiencies," suggesting that "NMFS will be able to offer better reasoning on remand for the continued operation of the prey increase program." 1-ER-41.

The Conservancy disagrees. Cons. Br. 63-64, 68-70. But this element of the district court's decision was supported by the record. As the evidence presented at the remedy phase showed (and as herein, pp. 16, 21, 23, 44-45), since the district court's merits ruling, NMFS has implemented the prey increase program generally as contemplated in the biological opinion and completed site-specific ESA and NEPA analyses or identified existing analyses that evaluated the effects of increased hatchery production, including impacts to listed salmon. *See also* 2-ER-276 ¶ 5; 2-ER-298-99; 2-ER-100-01 ¶¶ 9-11; 2-ER-118-20; 4-ER-660-63 ¶ 7-10. This demonstrates that NMFS will likely be able to offer better support for its decision on remand, both because the implementation shows that funding has been relatively certain to date and because NMFS has developed criteria that will apply to its funding decisions (as well as mitigation measures required through its site-specific biological opinions).

The Conservancy also complains that NMFS is unlikely to be able to issue the same prey increase program decision on remand because it previously had no concrete plans regarding the program. Cons. Br. 40, 67-68. In the 2019 biological opinion, the prey increase program was evaluated at the framework programmatic level. 5-ER-1118-19. But that does not mean that NMFS had no plan. The 2019 biological opinion set forth a "preliminary design" for the hatchery program, which specified that hatchery releases should be distributed during times and areas most important to killer whales.

5-ER-888-89; 5-ER-1118; 6-ER-1213. NMFS conducted an analysis to estimate the number of smolts that would have to be released in the broad geographic region, as well as a cost estimate, and explained that, to finalize additional details, it needed to work collaboratively with tribal and state co-managers and other interested parties and conduct site-specific assessments. 5-ER-1119; 5-ER-888-89; *see also* 6-ER-1303-05 (describing completed research). While the plan was not concrete enough to satisfy the district court as to the merits, the lack of detail in its 2019 biological opinion does not preclude NMFS from adopting the same—albeit more concretely defined and better explained—decision on remand in 2024. *Cf. Lorion*, 470 U.S. at 744 (remand without vacatur enables agencies to better explain their decisions).

The Conservancy also asserts that NMFS must issue a different decision on remand requiring new mitigation measures to ensure the prey increase program is consistent with the ESA. Cons. Br. 41-42. But the 2019 biological opinion anticipated that NMFS would have to develop site-specific mitigation measures to "increas[e] prey abundance," while "minimiz[ing] the risk to listed salmon species." 5-ER-1119. Many of these measures (e.g., better aligning hatchery broodstocks with the diversity of potentially affected natural-origin populations and marking juvenile hatchery-origin fish so that they can be differentiated from natural-origin fish, 5-ER-1030-31) were discussed in the 2019 biological opinion, which in turn referenced other site-specific

biological opinions. *See also* 3-FER-801-20. This discussion shows that NMFS likely can offer better reasoning to support adopting the prey increase program on remand.[12]

Finally, contrary to the Conservancy's claims, pp. 41-42, the unadjudicated claim that the Conservancy advances on appeal (that NMFS failed to articulate a rational connection between the facts it found and its conclusion of no jeopardy for killer whales) cannot provide a basis for this Court to enlarge the district court's remedy order to vacate the prey increase program for the reasons identified above, pp. 37-39.

### 2. NMFS's preparation of some ESA and NEPA analysis minimized the significance of the errors.

Despite recognizing that NMFS could likely reach the same result on remand, the district court wrongly concluded that NMFS's errors relating to the prey increase program were serious simply because they violated the ESA and NEPA. 1-ER-32-33. As explained above, pp. 14-15, an ESA or NEPA violation does not automatically make the error serious under the first *Allied-Signal* factor.

Regardless, the district court failed to consider whether the distinct statutory violations at issue here disserved the purposes of the ESA and NEPA. *See, e.g.,* 1-ER-33; 1-ER-41-42. The significance of the errors committed by NMFS were mitigated to some extent by NMFS's preparation of some ESA or NEPA analyses that informed its

---

[12] It also shows that, contrary to the Conservancy's assertions at p. 68, NMFS understands that hatchery releases may contribute to the low productivity of natural populations and was addressing this potential impact. *See, e.g.,* 5-ER-1030-31; 5-ER-1108-1111; *see also* 5-ER-1113, 1118 (discussing use of habitat restoration to improve productivity).

decision making. The Conservancy is simply wrong when it asserts that NMFS's no jeopardy conclusions were uninformed. Cons. Br. 33, 36-38, 40-41, 45-47, 63, 68-70.

In the 2019 biological opinion itself, NMFS described in general the effects of the release of hatchery-origin fish on natural-origin fish. *See* 5-ER-1118-19 (citing to 5-ER-1106-13). NMFS discussed the specific risks to natural salmon populations from releasing hatchery-origin fish and incorporated a 2018 biological opinion that analyzed impacts of numerous hatcheries and included an incidental take statement authorizing take of listed salmon species in certain circumstances. 5-ER-1106 (citing 3-FER-796-846). This analysis did not satisfy the district court as to the merits, but it does show, at a minimum, that NMFS in fact understood (in large part, if not fully) the impacts that could result from releasing hatchery fish. Contrary to the Conservancy's assertions, pp. 40-41, 68-70, NMFS's decision was not uninformed.

NMFS has long understood the potential impacts of releasing hatchery fish on natural salmon populations. Before issuing the 2019 biological opinion, NMFS had already prepared extensive, site-specific analyses under the ESA and NEPA that considered impacts that could result from releasing fish from specific hatcheries. *See, e.g.,* 2-ER-275-77 ¶¶ 5-8; 2-ER-298-99.

As one example, NMFS prepared a final environmental impact statement in 2014 to guide its annual funding decisions for hatchery programs in the Columbia River Basin. 2-ER-298-99 (referencing the 2014 Final Environmental Impact Statement to Inform Columbia River Basin Hatchery Operations and the Funding of Mitchell Act

Hatchery Programs ("2014 Mitchell Act FEIS"), available at <https://media.fisheries.noaa.gov/2021-11/mitchell-act-hatcheries-feis-final.pdf>). For the same fisheries, NMFS prepared five biological opinions before 2019. *See* 2-ER-118 (listing biological opinions for Columbia River Basin fisheries); *see* 1-SER-56-312; 1-FER-4-289. Where appropriate, NMFS relies on these documents as its ESA and NEPA compliance for the Columbia River Basin hatchery programs that receive funding as part of the prey increase program. *See, e.g.,* 2-ER-275-77 ¶¶ 5-8; 2-ER-298-99; 2-ER-100-03 ¶¶ 10-15; 2-ER-118.

The 2014 Mitchell Act FEIS evaluated the environmental impacts of proposed hatchery funding, including potential genetic risks posed from releasing hatchery-origin fish, and the public had an opportunity to participate in the NEPA process. *See, e.g.,* 2014 Mitchell Act FEIS at 1-42, 3-7-3-14, 4-136-4-137. Although it does not overlap completely, this NEPA analysis covers some of the actions evaluated in the 2019 biological opinion and provided the public with extensive information regarding the impacts of releasing hatchery-origin fish. Similarly, the five biological opinions that NMFS prepared before issuing the 2019 biological opinion document NMFS's conclusion that it may fund releases of hatchery-origin fish from these hatcheries without causing jeopardy to listed salmon populations. *See* 1-SER-56-312; 1-FER-4-289.

The Conservancy complains that the pre-2019 ESA and NEPA documents cannot be considered site-specific analysis for funding decisions to implement the 2019

prey increase program because the analyses were prepared before 2019. Cons. Br. 45-47, 63. But, as NMFS explained, simply because some environmental analysis occurred before 2019 does not mean it is insufficient for future site-specific activity. 2-ER-101 ¶ 12. In fact, NMFS's analyses typically include an evaluation of "the effects of higher levels of production than what is typically produced in a hatchery program to give [hatchery operators] the flexibility to increase production if additional funding becomes available." *Id.* NMFS "tracks production levels and other parameters on which hatchery managers are required to report under the incidental take statements associated with the relevant biological opinions" to ensure compliance. *Id.* NMFS also reviews new research on hatchery production effects and will conduct new ESA or NEPA analysis where new information triggers such a need. *Id.* NMFS reviewed the preexisting ESA and NEPA analyses for the hatchery programs before dispersing funds through the prey increase program to ensure that it was appropriate to rely on the previously issued documents. *Id.* And where new ESA or NEPA analysis is warranted, NMFS has prepared it, as evidenced by the post-2019 ESA and NEPA documents that NMFS prepared in support of hatchery-funding decisions. *See, e.g.,* 2-ER-276 ¶¶ 5-6; 2-ER-298-99.[13]

---

[13] The Conservancy also contends that NMFS decides some funding decisions do not require ESA or NEPA review. Cons. Br. 45. The tables cited by the Conservancy show, however, that these disbursements were for costs including "overhead" and did not involve any fish release. 2-SER-397-98. For any funding decisions that resulted in fish releases, appropriate ESA and NEPA analysis was identified or prepared. 2-SER-397-98; *see, also* 2-ER-298-99.

The Conservancy further asserts that the error is serious because NMFS never completed a programmatic analysis, Cons. Br. 33-34, 36, 47, but NMFS explained that its "site-specific ESA and NEPA analyses are the best way to evaluate risks associated with the prey increase programs because it is difficult to understand biological risks without knowing the project-level details." 2-ER-100-01 ¶ 11. As of the time of the remedy briefing, NMFS had completed biological opinions and NEPA documents "on close to 200 hatchery programs." 2-ER-102 ¶ 14; 4-ER-663-65 ¶¶ 14-17. NMFS included some consideration of the aggregate effects of hatchery programs in these site-specific analyses. *See* 2-ER-103 ¶ 16 (noting consideration of "cumulative" impacts). These analyses thus ensured that the purposes of the ESA and NEPA were at least partially satisfied.

In sum, the purposes of the ESA and NEPA were not seriously disserved because NMFS had already completed a significant amount of relevant ESA and NEPA documentation.

**B.     The district court reasonably determined that vacating the 2019 biological opinion relating to the prey increase program would have significant disruptive consequences.**

Despite erring on the seriousness factor, the district court nevertheless correctly concluded that vacatur was unwarranted due to the ensuing disruptive consequences. 1-ER-36. NMFS showed that the consequences to killer whales would be substantial. The prey increase program has been operating since 2020 and resulted in "a certain and definite increase in prey" for the 2023-2024 fishing season. 1-ER-36; 2-ER-304-05; 2-

ER-123, 124, 132-34 ¶¶ 7, 15, 23-25, 27; 2-ER-99 ¶¶ 6-8; 2-ER-106-18; 4-ER-660-63 ¶ 7-10. The Conservancy asserts that the district court overestimated the impacts of vacatur, because only federally funded releases would be halted if the biological opinion relating to the prey increase program were vacated. Cons. Br. 67. But NMFS consistently informed the court that Washington State was funding hatchery releases to increase killer whale prey. *See, e.g.,* 2-ER-275 ¶ 3; 4-ER-660-61 ¶ 7. The district court also understood that not all of the hatchery releases were funded by the federal government when it assessed the prey increase program's benefits. *See, e.g.,* 1-ER-36 (describing the amount of federal funds and then identifying the total amount released).

The Conservancy's assertions, moreover, ignore the fact that vacatur would disrupt future federal funding decisions. Without such funds, hatchery operators would be unlikely to spawn additional fish that are necessary to ensure increased prey for killer whales in the future. *See* 2-ER-277-78 ¶ 9; 2-ER-104 ¶ 18. Shuttering the program ultimately "could manifest in the whales foraging for longer periods, traveling to alternate locations, or abandoning foraging efforts." 2-ER-131-32 ¶ 21. This impact "could result in [killer whales] not consuming sufficient prey to meet their energetic needs, which could affect the health of individual whales, reproduction and the status and growth of the population." *Id.* Moreover, vacatur could lead hatchery operators to release fish early, "in which case they would have [a] lower chance of survival, reducing their potential contribution to [killer whale] diet." 2-ER-104 ¶ 18. Further biological concerns include the probability that if fish are released early, they would not be

externally marked or tagged, which would limit the ability to "monitor and manage genetic risks" to wild fish. *Id.* These environmental harms counselled against vacatur. *See Idaho Farm Bureau,* 58 F.3d at 1405-06. The district court correctly deferred to the agency's expertise in this matter in concluding that the environmental consequences of vacatur would be too severe.

At the same time, the prey increase program will not cause substantial harm to wild fish populations, as the Conservancy contends. Cons. Br. 34, 64-66. To be sure, at certain times and locations, hatchery-origin fish may pose a risk to wild fish, including from competition or breeding, which can reduce genetic diversity and fitness. *See* 2-ER-102-03 ¶ 15; 2-ER-276 ¶ 7; 4-ER-664-65 ¶¶ 16-17. These risks are best addressed at the site-specific level, where NMFS evaluates the risks posed by hatchery releases and will continue to evaluate genetic risks posed by individual releases based on where the fish are being released, the origin of the broodstock being used by the hatchery, how many wild fish are incorporated into the broodstock, and whether hatchery fish will be removed from the wild before spawning to control the numbers of fish that might interact with wild fish, among other things. *See* 2-ER-100-01 ¶¶ 9-11; 2-ER-277 ¶ 8. NMFS has considered these risks in numerous site-specific ESA and NEPA documents governing specific hatchery programs and has developed methods to ensure that hatchery releases will not jeopardize listed salmon populations. *See supra* pp. 23-24, 42-45; *see also* 2-ER-277 ¶ 8; 4-ER-666-67 ¶¶ 19-20; 1-SER-56-312; 1-FER-4-289; 2-ER-100-01 ¶¶ 9-11.

With respect to the Conservancy's specific allegation (based on the declaration of Dr. Gordon Luikart) that the release of fish will harm certain populations that are already at heightened risk from too many hatchery-origin fish, Cons. Br. pp. 34, 64-66, NMFS determined that Luikart, who does not have a background in hatchery management, erroneously assumed that NMFS would focus hatchery releases in areas that are at heightened risk. 4-ER-665-66 ¶ 18. The prey increase program will fund hatchery releases in salmon stocks throughout different areas, meaning that fish releases (and subsequent return of those fish to tributaries to spawn) will not be concentrated. And in any event, NMFS works with hatchery operators to ensure that none of the hatchery releases will jeopardize the survival or recovery of ESA-listed species by adopting mitigation measures that are unique to each hatchery. 4-ER-666-67 ¶¶ 19-20; *see supra* pp. 42-43.

The Conservancy also cites to the 2017 Mitchell Act biological opinion that limited the number of hatchery-origin fish that may be released in certain areas to ensure that the proportion of hatchery-origin spawning fish (or "pHOS") will not be too high. *See* Cons. Br. 34, 65 (citing to 3-SER-809, 820). NMFS has explained, however, that funding decisions—and efforts to reduce genetic risk—are consistent with those biological opinions. *See* 4-ER-667 ¶ 20. Importantly, NMFS will not fund the hatchery-fish releases if they will jeopardize any ESA-listed species, including threatened salmon populations. 2-ER-277 ¶ 8; *see, e.g.,* 4-ER-66-67 ¶¶ 19-20.

Additionally, citing extra-record documents, the Conservancy complains that Washington State failed to implement weirs that were contemplated in the 2017 Mitchell Act biological opinion, which it believes renders invalid the opinion (on which NMFS partially relies to make site-specific funding determinations). Cons. Br. 66. This extra-record information is not necessary to review the district court's remedy order under the abuse of discretion standard. *See supra* pp. 37-38. Regardless, the extra-record documents show only that NMFS reinitiated consultation with Washington State over its concerns that the state "may not have met the letter of the [biological o]pinion." *See* Cons. Mot. for Judicial Notice, Ex. 3, p. 1, Ex. 5 p. 2. NMFS did not find that the biological opinion was invalid. If anything, the documents show that NMFS takes seriously its obligations to ensure no jeopardy to listed species and that its funding decisions are covered by valid environmental analysis.

Finally, contrary to the Conservancy's assertions, p. 55, the 2019 biological opinion (which includes both the incidental take statement and the prey increase program) is a part of the complex framework for managing fisheries. The vacatur sought by the Conservancy would disrupt that framework and the balance struck by Congress between Chinook salmon fisheries and killer whale preservation represented through its funding decisions. NMFS Br. 33-34; *see* 2-ER-255-57 ¶¶ 7-9. Disrupting this framework—and NMFS's ability to provide funds—could also frustrate NMFS's relationships with its partners as the agency seeks to strengthen those relationships and

work collaboratively on broader efforts to promote the recovery of ESA-listed species. *See* NMFS Br. 39-40; 2-ER-64-65 ¶¶ 25, 27; 2-ER-132-34 ¶¶ 23-25, 27.[14]

In sum, as the district court explained, "[t]here is an inherent conflict in this case from the Chinook salmon, a threatened species, serving as priority prey for the endangered [killer whale]" and any "risks" to wild fish can be mitigated at the site-specific level "to limit any potential negative impacts." 1-ER-39-40. There was ample support in the judicial record to support this decision. NMFS has carefully evaluated the prey increase program's effects on threatened salmon and ensures before acting at the site-specific level that no jeopardy will result. The Conservancy provides no justification for discarding either the district court's conclusions or NMFS's expert opinion, developed through years of studies and experience.

## CONCLUSION

For all these reasons, the district court's order should be reversed insofar as it vacated the portion of the 2019 biological opinion and incidental take statement that exempted from ESA liability the incidental take of Southern Resident killer whales and Chinook salmon resulting from commercial harvests of Chinook salmon during the winter and summer seasons of the troll fishery in Southeast Alaska. The order should be affirmed insofar as it declined to vacate the portion of the 2019 biological opinion relating to the prey increase program.

---

[14] The Conservancy asserts that NMFS raised this argument for the first time on appeal, but the district court briefing shows otherwise. *See* 3-FER-707-09; 1-FER-2-3.

Of Counsel:

SHEILA LYNCH
*Attorney*
Office of General Counsel
National Oceanic and Atmospheric
   Administration
Seattle, WA

MOLLY E. WATSON
*Attorney*
Office of General Counsel
National Oceanic and Atmospheric
   Administration
Juneau, AK

January 26, 2024
DJ# 90-8-6-08342

*/s/ Thekla Hansen-Young*
TODD KIM
*Assistant Attorney General*

RACHEL HERON
REBECCA JAFFE
COBY HOWELL
FREDERICK H. TURNER
THEKLA HANSEN-YOUNG
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 307-2710
thekla.hansen-young@usdoj.gov

## STATEMENT OF RELATED CASES

Undersigned counsel is unaware of any cases that are considered related within the meaning of Circuit Rule 28-2.



January 26, 2024
DJ# 90-8-6-08342

*/s/ Thekla Hansen-Young*
THEKLA HANSEN-YOUNG
*Attorney for Federal Defendants/Appellants*

**CERTIFICATE OF COMPLIANCE FOR BRIEFS**

I hereby certify that this brief contains 13,847 words, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6). I certify that this brief complies with the word limit of Cir. R. 28.1.

January 26, 2024
DJ# 90-8-6-08342

*/s/ Thekla Hansen-Young*
THEKLA HANSEN-YOUNG
*Attorney for Federal Defendants/Appellants*