United States Court of Appeals for the Ninth Circuit
_____

WILD FISH CONSERVANCY, a Washington non-profit corporation,
*Cross-Appellant-Plaintiff,*
v.

JENNIFER QUAN, in her official capacity as Regional Administrator of the
National Marine Fisheries Service; JANET COIT, in her official capacity as the
Assistant Administrator for Fisheries of the National Marine Fisheries Service;
NATIONAL MARINE FISHERIES SERVICE; GINA M. RAIMONDO, in her
official capacity as Secretary of the United States Department of Commerce;
UNITED STATES DEPARTMENT OF COMMERCE,
*Appellants-Defendants*,

THE STATE OF ALASKA,
*Appellant-Intervenor*,

THE ALASKA TROLLERS ASSOCIATION,
*Appellant-Intervenor*,

_____

Appeal from U.S. District Court, Western District of Washington, Seattle
Honorable Richard A. Jones
No. C-20-417-RAJ

**THIRD CROSS-APPEAL BRIEF FOR STATE OF ALASKA**

TREG TAYLOR
ATTORNEY GENERAL
STATE OF ALASKA

Laura Wolff
Assistant Attorney General
1031 West Fourth Ave., Suite 200
Anchorage, Alaska 99501
(907) 269-6612 (phone)
laura.wolff@alaska.gov
*Attorney for Appellant-Intervenor State of Alaska*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................3

INTRODUCTION ...............................................................................6

ARGUMENT .....................................................................................7

    I.    The district court abused its discretion in effectively enjoining the Southeast Alaska Chinook troll fishery.................................8

        A.    Vacatur is an equitable remedy....................................8

        B.    The equities demanded remand without vacatur. .....................13

        C.    The agency will likely issue a new ITS with the same harvest levels, which also favors remand without vacatur...................26

            1.    NMFS has cured the main problem the district court found with the 2019 BiOp. ....................... 28

            2.    NMFS has substantially complied with the ESA and NEPA and continues to evaluate the prey increase program's effect on ESA-listed salmon. ............. 32

    II.    To the extent this Court analyzes in the first instance NMFS's "no jeopardy" determination, NMFS rationally concluded that its actions are not likely to jeopardize the SRKW. ..............................................35

    III.    The Court should reject the amicus briefs because they are based on arguments and disputed data that were not presented to the district court.....................................................................................43

    IV.    The Court should deny the Conservancy's motion for judicial notice. ............................................................................................46

    V.    The district court did not abuse its discretion in refusing to enjoin the prey increase program. ........................................................49

CONCLUSION.................................................................................50

CERTIFICATE OF COMPLIANCE........................................................51

# TABLE OF AUTHORITIES

**Cases**

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
  988 F.2d 146 (D.C. Cir. 1993)............................................................10, 11, 34

*Burwell v. Hobby Lobby Stores, Inc.*,
  573 U.S. 682 (2014)................................................................................43

*Cal. Cmtys. Against Toxics v. U.S. E.P.A.*,
  688 F.3d 989 (9th Cir. 2012) ..............................................8, 13, 18, 19, 24

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
  807 F.3d 1031 (9th Cir. 2015) ...............................................................42

*Ctr. For Food Safety v. Regan*,
  56 F.4th 648 (9th Cir. 2022)...............................................11, 13, 26, 27, 33

*Cutter v. Wilkinson*,
  544 U.S. 709 (2005).................................................................................35

*Flick v. Liberty Mut. Fire Ins. Co.*,
  205 F.3d 386 (9th Cir. 2000) ..................................................................46

*Great-W. Life & Annuity Ins. Co. v. Knudson*,
  534 U.S. 204 (2002)....................................................................................8

*Maine Lobstermen's Ass'n v. NMFS*,
  70 F.4th 582 (D.C. Cir. 2023)............................................................21, 42

*Monsanto v. Geertson Seed Farms*,
  561 U.S. 139 (2010).......................................................................8, 9, 33

*Nat'l Fam. Farm Coal. v. U.S. Env't Prot. Agency*,
  966 F.3d 893 (9th Cir. 2020) ..................................................................27

*N.D. ex rel. parents acting as guardians ad litem v. Hawaii Dep't of Educ.*,
  600 F.3d 1104 (9th Cir. 2010) ...............................................................48

*Paulsen v. Daniels*,
  413 F.3d 999 (9th Cir. 2005) ..................................................................12

*Planned Parenthood of Greater Washington & N. Idaho v. U.S. Dep't of Health &*
  *Hum. Servs.*, 946 F.3d 1100 (9th Cir. 2020).................................................35

*Pollinator Stewardship Council v. U.S. E.P.A.*,
  806 F.3d 520 (9th Cir. 2015) ..................................................................27

*Pyramid Lake Paiute Tribe of Indians v. U.S. Department of Navy*,
    898 F.2d 1410 (9th Cir. 1990) .......................................................18, 41, 42

*Ramsey v. Kantor*,
    96 F.3d 434 (9th Cir. 1996) ...................................................................12, 33

*Reina-Rodriguez v. United States*,
    655 F.3d 1182 (9th Cir. 2011) ........................................................................48

*Rybachek v. EPA*,
    904 F.2d 1276 (9th Cir. 1990) ........................................................................48

*Smith v. Marsh*,
    194 F.3d 1045 (9th Cir. 1999) ........................................................................43

*Turtle Island Restoration Network v. U.S. Dep't of Com.*,
    672 F.3d 1160 (9th Cir. 2012) ........................................................................12

*TVA v. Hill*,
    437 U.S. 153 (1978)..........................................................................................18

*Wild Fish Conservancy v. Salazar*,
    628 F.3d 513 (9th Cir. 2010) .........................................................................41

**Federal Statutes**

16 U.S.C. § 1532(6) ......................................................................................6, 36

16 U.S.C. § 1532(19) .........................................................................................41

16 U.S.C. § 1536(a)(2).................................................................................36, 41

16 U.S.C. § 1536(b)(4).................................................................................36, 38

16 U.S.C. § 1538(a)(1)(B) .................................................................................41

16 U.S.C. § 1540 ................................................................................................11

16 U.S.C. § 1855(f)(1) .......................................................................................38

Pacific Salmon Treaty Act, Pub. L. 99-5, 99 Stat. 7 (1985).............................16, 47

**Federal Regulations**

50 C.F.R. § 11.33 ...............................................................................................11

50 C.F.R. § 402.02 .................................................................................21, 37, 41

**Alaska Regulations**

5 AAC 29.140(a) ....................................................................................45

5 AAC 47.055 ......................................................................................45

**Court Rules**

Fed. R. App. P. 10 ...............................................................................43

Fed. R. Evid. 201(b) ............................................................................46

**Other Authorities**

88 Fed. Reg. 68, 572 (Oct. 4, 2023) ...................................................34

88 Fed. Reg. 54,301 (Aug. 10, 2023) .................................................34

## INTRODUCTION

It is undisputed that SRKW are listed as "endangered" under the ESA, and are thus "in danger of extinction." 16 U.S.C. § 1532(6). But the whales' endangered status does not resolve whether the district court erred in vacating the incidental take statement. The whales' endangered status does not mean the remedy for an agency error must be to issue any relief that might help the whales, no matter how speculative or minor the benefit. This is especially so when the consequences of vacatur would certainly devastate Southeast Alaska communities. And this is especially so when Alaska's minor effect on whales is already being offset by mitigation (i.e., the prey increase program). The district court abused its discretion in issuing its vacatur order, which—but for this Court's stay order— would have had the practical effect of beaching the Southeast Alaska Chinook troll fishery, and which the court below acknowledged was a "radical" decision.

By focusing on the whales' endangered status and generalizations about how the whales do not have enough prey availability, the Conservancy disregards that the Southeast Alaska fishery's effect on whales is minor and that any benefit to them from closing the fishery would be both speculative and insignificant. And by focusing on how the prey increase program to offset Alaska's minor impact was not yet funded and certain in 2019, the Conservancy discounts that the program has been consistently funded and certain since. Finally, by focusing on the lack of

programmatic NEPA review of the prey increase program in 2019, the Conservancy overlooks that there had already been NEPA and ESA review considering how increased hatchery production impacts wild salmon at specific sites used in the program. And the Conservancy tries to downplay that NMFS has been augmenting those reviews, where appropriate, since the 2019 BiOp was issued. Given the circumstances, vacatur was an abuse of discretion.

## ARGUMENT

The district court abused its discretion in vacating the incidental take statement, which would have effectively enjoined the fishery but for this Court's stay order. The district court erred in putting a thumb on the scale of such drastic relief. Given the certain and lasting devastating effects to Southeast Alaska communities from vacatur and the speculative and at best minor environmental benefit of remanding with vacatur, the equities alone demanded remand without vacatur. Vacatur was further unwarranted because NMFS is likely to issue on remand a new ITS with the same harvest limits. The main violation the district court found had already been cured and NMFS has been substantially complying with the ESA and NEPA as it prepares new environmental analyses.

Although this Court need not address arguments the district court declined to resolve, NMFS did not arbitrarily conclude that the Southeast Alaska fishery does not jeopardize the endangered whales. In fact, it is unlikely that the fishery would

even "take" a whale, much less jeopardize the existence of the species. It seems NMFS included whales in the ITS in an excess of caution to account for worst-case scenarios and a lack of data to establish the quantitative relationship between prey availability and effects to SRKW.

As for the new evidence and arguments being offered for the first time on appeal—whether in the form of amicus briefs or a motion for judicial notice—this Court should reject such overtures.

Finally, as more fully explained in the other third cross-appeal briefs, the district court did not abuse its direction in denying the Conservancy's request to enjoin the prey increase program.

## I.   The district court abused its discretion in effectively enjoining the Southeast Alaska Chinook troll fishery.

### A.   Vacatur is an equitable remedy.

Both vacatur and injunctions are equitable remedies. *California Communities Against Toxics v. U.S. E.P.A.*, 688 F.3d 989, 992 (9th Cir. 2012); *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 211 n.1 (2002). While vacatur can, depending on the circumstances, be a "less drastic remedy" than an injunction, an injunction is always "a drastic and extraordinary remedy." *Monsanto v. Geertson Seed Farms*, 561 U.S. 139, 165–66 (2010).[1] Thus, when vacatur has

---

[1]    In *Monsanto v. Geerston Seed Farms*, for example, vacating a decision deregulating genetically modified alfalfa was a less drastic remedy than enjoining

the practical effect of an injunction—when it effectively enjoins communities from fishing, communities whose families have fished for Chinook by hook and line for generations—that is also a "drastic and extraordinary remedy." *Id.*

The Conservancy sought injunctions and other court orders to halt the Southeast Alaska salmon fisheries. In its complaint, the Conservancy sought to "[e]njoin [NMFS] from continuing to . . . allow salmon fisheries in [federal waters] of Alaska" and to "[e]njoin NMFS from authorizing take associated with salmon fisheries in the [federal waters] of Alaska" "until NMFS complies with the ESA and NEPA." 8-ER-1873. In other words, the Conservancy sought an injunction that would stop the fishery in federal waters during the remand process. On top of that, the Conservancy sought the functional equivalent of an injunction to stop the

---

the agency from authorizing any prospective growing and harvesting of that alfalfa until an EIS was completed. 561 U.S. 139 (2010). There, vacatur would have allowed farmers who had already purchased their seeds to plant, harvest, and sell their crop that season and allowed the agency to issue an interim rule partly deregulating the crop and allowing more planting during the remand. *Id.* at 148, 152, 162. An injunction against any prospective growing and harvesting, by contrast, was much more restrictive of farmers in that case. That vacatur was a "less drastic" remedy does not mean it was correct, however. The Conservancy's discussion of vacatur in *Monsanto*—that the Supreme Court "reversed entry of the injunction, *but left in place vacatur*"—is misleading in that it suggests that the Court approved of the vacatur decision. WFC Second Br. 30 (emphasis added). It did not. Rather, the Court left the vacatur order in place because the petitioners did not appeal the vacatur order. *Monsanto*, 561 U.S. at 150, 156 ("Because petitioners and the Government do not argue otherwise, we assume without deciding that the District Court acted lawfully in vacating the deregulation decision.").

fishery in state waters by asking the district court to "[s]et aside NMFS's . . . incidental take statement." 8-ER-1873. The State's initial brief simply points to the undisputed facts and law: the Conservancy wants to use a court order to stop the Southeast Alaska troll fishery from fishing, an injunction is a "drastic and extraordinary remedy," and whether to remand with or without vacatur—like whether to grant an injunction—depends on the equities.

The parties' disagreement appears to be about who bears what burden when courts consider whether to remand with or without vacatur. The Conservancy argues that only if it directly seeks an injunction does it bear the burden of justifying its request under the traditional four-factor test for injunctive relief. *See* WFC Second Br. 29–30. If it instead recasts its request for injunctive relief as vacatur of the ITS, it argues, the opposing party bears a nearly insurmountable burden to defeat its request, and any potential environmental harm—no matter how uncertain and insignificant—is dispositive in favor of granting it. *See* WFC Second Br. 22, 29, 48–54. This makes no sense.

The analytic framework for vacatur and injunctive relief are not "very different." WFC Second Br. 31. True, the *Allied-Signal* test controls. AK First Br. 33; WFC Second Br. 31. But the *Allied-Signal* test does not tilt the scales so heavily in the Conservancy's favor. Instead, the *Allied-Signal* test weighs "the seriousness of the agency's errors against 'the disruptive consequences of an

interim change that may itself be changed.'" AK First Br. 33 (quoting *Ctr. For Food Safety v. Regan*, 56 F.4th 648, 663 (9th Cir. 2022) (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993)). The second prong of this analysis requires the court to consider the equities. AK First Br. 33. As this Court has repeatedly said, this Court "leave[s] invalid agency action in place when equity [so] demands." *Regan*, 56 F.4th at 663 (internal quotation marks omitted) (citing cases). Courts must weigh the equities whether directly prohibiting an activity with an injunction or indirectly doing the same thing by vacating an agency action.

The district court's vacatur order here effectively enjoined troll fishing just two months before the season opened, leaving no time for NMFS to issue a new ITS on remand. The effect of the vacatur order was tantamount to an injunction. The Southeast Alaska troll fishermen take some ESA-listed Chinook, albeit in limited numbers. 6-ER-1205, 6-ER-1193. Without the shield of an ITS, these small-boat family fishermen are subject to criminal charges and bankruptcy-inducing civil penalties for each such take, and they can be ordered to pay attorney's fees when the Conservancy sues them. 16 U.S.C. § 1540(a), (b), (g); 50 C.F.R. § 11.33 (up to $61,982.00 per knowing take of ESA-listed fish). Vacatur thus effectively enjoined the fishery. 2-ER-50. This Court has previously acknowledged that when a fishery cannot harvest non-listed salmon without

incidentally taking some listed salmon, "the incidental take statement . . . is functionally equivalent to a permit because the activity in question would, for all practical purposes, be prohibited but for the incidental take statement." *Ramsey v. Kantor*, 96 F.3d 434, 444 (9th Cir. 1996).

That the district court's vacatur order anticipated no fishing during the winter and summer seasons—even under the former ITS—further illustrates that its vacatur order had the practical effect of an injunction. Normally, "[t]he effect of invalidating an agency rule is to reinstate the rule previously in force." *Paulsen v. Daniels,* 413 F.3d 999, 1008 (9th Cir. 2005); *see also Turtle Island Restoration Network v. U.S. Dep't of Com.*, 672 F.3d 1160, 1165 (9th Cir. 2012) ("[R]einstatement of the [former] incidental take limit operates as a matter of law under the vacatur [of the new incidental take limit]."). But the district court's vacatur decision did not reinstate the former ITS, which shielded Southeast Alaska fishermen from section 9 liability under the 2009 Treaty agreement terms. 3-FER-787–89. Rather, the district court's decision vacated ITS coverage so that the troll fishermen would not fish. 1-ER-35, 1-ER-4.

The district court erred in finding that its vacatur order did not have the practical effect of an injunction. 2-ER-68–69.[2] And the district court erred in

---

[2]     The district court's finding that vacatur did not prohibit fishing is inconsistent with its finding of a NEPA violation. The district court concluded that NMFS violated NEPA because issuing the ITS was the "functional equivalent" to

relying on a strong presumption of vacatur instead of simply considering the equities, which weighed against such drastic relief. 1-ER-19.

### B.   The equities demanded remand without vacatur.

Even if an agency's errors are serious, the equities can require remand without vacatur. *See, e.g.*, *Regan*, 56 F.4th at 664–69 (repeatedly noting that EPA's violations of the ESA were "serious," but concluding that the violations were not "serious enough to warrant vacatur," especially considering the serious disruption if a pesticide that has been registered for many years can no longer be used); *Cal. Cmtys. Against Toxics*, 688 F.3d at 993–94 (concluding that the equities warranted remand without vacatur despite "substantive" errors). Here, the equities demanded remand without vacatur because vacating the ITS would cause catastrophic social and economic harm to Southeast Alaska and undermine the Treaty goals while barely benefiting the whales, if at all.

As discussed in the State's opening brief, shutting down Southeast Alaska's Chinook troll fishery, even for just one season, is a certain death knell to rural Southeast Alaska communities. AK First Br. 35–39. The Conservancy does not seriously dispute this, but downplays the effects because vacatur would not close *all* Southeast Alaska salmon fisheries. WFC Second Br. 56–57. That's like saying

---

issuing a federal permit authorizing the fishery, and the fishery "could not occur but for the ITS." 4-ER-650, 4-ER-612. Either NEPA was triggered because the ITS was akin to a permit and vacating the ITS is akin to an injunction, or neither is true.

laying off a quarter of the State's employees would not be a big deal because three

quarters would remain employed. The Conservancy's argument that the economic

harm "may" be lessened *if* Congress appropriates "relief funding for fishery

disasters" is speculative and confirms that the economic harm would, indeed, be

"disaster[ous]." WFC Second Br. 58. As for the dispute over which expert's

economic opinion to rely on—both show disastrous harm except the

Conservancy's expert considered much narrower impacts, focusing on loss of

income only, whereas NMFS's expert considered the broader economic impact that

includes not just loss of income but also loss of secondary spending as money no

longer circulates within these remote communities. *Compare* 4-ER-599–603, *with*

3-ER-516–22; *see also* 2-ER-229. Notably, even though the Conservancy's

expert's valuation of economic harm was lower than NMFS's, the Conservancy's

expert implied that NMFS *under*valued the economic impact to Southeast Alaska

(at least in one respect), because NMFS's valuation excludes processing, which the

Conservancy says accounts for a quarter of the generated income from the fishery.

4-ER-602–03. And the Conservancy does not deny the social and cultural harms

from closing the fishery, and that the district court ignored those harms. AK First

Br. 38; WFC Second Br. 47, 54–62.

Shutting down the fishery is also counter to the public interest because it

undermines the United States' goals in its international Treaty negotiations.

AK First Br. 46–48. The negotiating parties did not contemplate that NMFS would reduce the Southeast Alaska fishery's harvest below Treaty levels as the Conservancy suggests. WFC Second Br. 55. The parties *did* contemplate such action for *other* fisheries by agreeing that *"[w]ith respect to ISBM[3] fisheries . . . either or both Parties may implement domestic policies that constrain their respective fishery impacts on depressed Chinook stocks to a greater extent than is required by [the Treaty]."* 7-ER-1675 (italics added). But the Treaty agreement contains no similar language with respect to the three aggregate abundance-based management (AABM) fisheries, of which the Southeast Alaska fishery is one. 7-ER-1666–86.[4] This makes sense because if the Southeast Alaska fishery does not harvest its Treaty share, fish migrate to other areas along the coast and increase abundance of Chinook for other fisheries. This means that Canadian inside waters fisheries (referred to as ISBM fisheries) that are down the line can then catch more

---

[3]    ISBM fisheries are individual stock-based management fisheries that have flexibility to increase or decrease their harvest depending on in-season abundance levels of constituent stocks. 8-ER-1794–95, 5-ER-895. All but three Treaty fisheries are ISBM fisheries. 5-ER-895, 7-ER-1671–72. Alaska does not have any ISBM fisheries and the winter and summer troll fisheries are AABM fisheries, not ISBM fisheries. 7-ER-1671.

[4]    The 2009 BiOp similarly discussed how the ESA might require further reductions in *ISBM* fisheries. 3-FER-778 ("The U.S. Federal representatives involved in the [Pacific Salmon Commission] negotiations routinely reminded all U.S. participants that additional stock and/or ESU specific ESA constraints will continue to be required and will be applied to U.S. ISBM fisheries through U.S. domestic management forums.").

fish, which undermines the U.S.'s goal of fairly sharing with Canada both the conservation burden and the resource harvest. 8-ER-1795, 6-ER-1423.[5]

Likewise, shutting down the fishery is counter to the public interest because it undermines the negotiations within the United States leading up to its international Treaty commitments. AK First Br. 20–21, 46–48; Washington Br. 4, 14–17. Before the United States negotiates with Canada, the Pacific Salmon Treaty Act requires that the states and Pacific Northwest tribes reach consensus on negotiable terms. Pacific Salmon Treaty Act, Pub. L. 99-5, §3(a),(g), 99 Stat. 7 (1985). In those negotiations, the State of Alaska agreed to reduce its Southeast Alaska Chinook harvest in 2019 by up to 7.5%. *See* 7-ER-1695. Reducing Alaska's share beyond what it agreed to undermines the consensus the Treaty Act requires, and will hamper future intranational negotiations.

Even if the parties to the Treaty negotiations had contemplated that NMFS would *reduce* Alaska's harvest below Treaty levels—and they didn't—they certainly did not contemplate reducing the Chinook troll fishery to *zero*. Doing so would hamper the United States' ability to comply with its international obligation to provide data about the status of Chinook to the Treaty's Commission, because

---

[5]    This also explains why Canadian AABM fisheries can reduce their harvest and not reduce Canada's overall take of Chinook. It is because Canadian ISBM fisheries then catch more fish. *See* 8-ER-1795.

Alaska gathers some of that required information from the troll fishermen. 7-ER-1669–70, 5-ER-886–87. It would also undermine the Treaty's goal of conserving the countries' shared resource, because management coordination is critical to sustaining the shared resource. 6-ER-1423, 7-ER-1624. And as discussed above, it would undermine the Treaty's goal of fairly sharing salmon with Canada. 6-ER-1423, 7-ER-1624. If Alaska does not harvest its Treaty share, the fish move into Canadian waters and Canadian fisheries (particularly ones in Northern British Columbia) can then catch more fish. 8-ER-1795, 7-ER-1675.

While the Conservancy lauds the steps Canada is taking to minimize its impact on threatened Chinook stocks and the whales, the Conservancy does not go so far as to assert that Canada is voluntarily taking fewer Chinook than the Treaty permits. WFC Second Br. 37, 55. Canada has tried to help the SRKW by, for instance, seasonally closing fishing in the whales' critical habitat by the mouths of some rivers, prohibiting whale watching tours from coming close to the whales, reducing vessel speeds where SRKW are feeding, and offering to buy some commercial fishing licenses to reduce the number of people who fish commercially. 2-SER-357–59, 2-SER-365–74. But there is no evidence that the number of Chinook that Canada's fisheries kill (i.e., the mortality rate) has declined. *See* 2-ER-210 (explaining that retiring permits so that fewer fishermen fish doesn't mean that fewer fish are caught). The Conservancy's insinuation that

Canadian fisheries are collectively taking fewer fish, and that those fisheries will voluntarily forego taking the surplus of fish caused by Alaska foregoing its harvest, is both speculative and unsupported. WFC Br. 37; 8-ER-1795, 7-ER-1675.

The State agrees with the Conservancy that considering the equities includes considering environmental impacts. WFC Second Br. 60–62. But the Conservancy's analysis is incomplete when it asserts that vacatur was merited simply because vacatur would not cause environmental harm. WFC Second Br. 60. A full analysis of the equities at the remedy stage must also consider the environmental benefits of the proposed remedy, as well as the certainty (or uncertainty) and degree of those benefits. For instance, if a federal action will "eradicate the known population of [the endangered species]," and halting the federal action will prevent eradication of the species, the environmental impact tilts in favor of halting the federal action. *TVA v. Hill*, 437 U.S. 153, 171, 194 (1978). But when the harm to the species from the federal action is minor and the benefit of vacating the federal action is not only minor but also speculative, the equities do not tip in favor of that remedy. In *Pyramid Lake Pauite Tribe of Indians v. U.S. Department of Navy*, this Court explained that the purpose of the ESA is not served by "insignificant" conservation measures. 898 F.2d 1410, 1418 (9th Cir. 1990). And in *California Communities Against Toxics*, this Court concluded that the equities weighed in favor of remand without vacatur despite the pollution that

would ensue from authorizing construction of the disputed power plant because that environmental harm would be "insignificant with mitigation." 688 F.3d at 994. So too here.

The district court erred as a factual matter in concluding that closing the Southeast Alaska fishery during the remand process would be "meaningful" for SRKW's population stability and growth. 1-ER-34. And it erred as a legal matter when it ignored that the Southeast Alaska fishery's minor impact was already being mitigated by the prey increase program. 1-ER-32–33.

The Conservancy responds to the State's discussion of factual errors by arguing that any potential increase in prey availability must be meaningful for the SRKW because the whales are in peril, they need more prey, and the Southeast Alaska harvests some of their prey. WFC First Br. 48–54. But whether a benefit is meaningful depends on likelihood and degree, and a "speculative," temporary, and minor benefit—like we have here—is not meaningful. *See* 2-ER-50.

None of Dr. Lacy's numerical projections show a meaningful benefit to SRKW. First, they are based on the faulty premise that if the Southeast Alaska fishery currently reduces prey availability by X%, foregoing the Southeast Alaska harvest will create an X% increase in prey availability to SRKW. 4-ER-608–09. This assumption is flawed because foregoing Alaska's harvest will cause other fisheries and marine mammals to increase their harvests, meaning that the increase

in prey availability from a foregone harvest will be less than the decrease in prey availability caused by that harvest. AK First Br. 43–45. In fact, another of the Conservancy's experts explained this in terms of economic impact: "If any element of the [Southeast Alaska] commercial troll fishery . . . were constrained or eliminated, it would <u>not</u> mean an equal amount of economic loss to eastern Pacific Ocean economies" because "Chinook salmon can be harvested in other migration route geographic areas . . . [as management would change] within other areas to account for abundance increases due to the SEAK catch decreases." 4-ER-603. Dr. Lacy's model did not account for changes in behavior by fisheries and other predators in response to Southeast Alaska's foregone harvest. The Conservancy does not respond to this argument. WFC Second Br. 48–54. The State's point is not that there would be zero increase in prey availability to SRKW if Alaska foregoes its harvest, only that Dr. Lacy's numbers are gross overestimates.

Second, Dr. Lacy's numbers are further inflated because they do not reflect Alaska's typical impact on prey availability. AK First Br. 41–42. The *lowest* number Dr. Lacy uses in his modeling assumes that the Southeast Alaska fishery reduces prey by 3%, but this is six times the projected average in relevant winter areas and almost twice the projected average in relevant summer areas.[6] *Compare*

---

[6]     The BiOp shows that, on average, the entire Southeast Alaska fishery reduces prey availability in SRKW's typical winter habitat by 0.5% and that it

4-ER-609–10, *with* 2-ER-304, 5-ER-1126–27, 6-ER-1192. And the highest number

Dr. Lacy uses, 12%, is not supportable as an estimate of the Southeast Alaska

fishery's impact on prey availability for SRKW. That number is based on an

aberrant year nearly two decades ago in which projections showed that the entire

Southeast Alaska fishery (not just trollers) reduced prey availability for SRKW in

coastal waters during the summer by 12.9%, and where the fishery reduced prey

availability in inland waters in the summer by 2.3%. 5-ER-1126. Because of the

seasonal movements of whales—SRKW generally spend the summer in inland

waters—the 12.9% figure is not particularly relevant. 5-ER-1126–27, 6-ER-1192.

Even if this aberrant year were relevant, the ESA directs the Service to consider

effects that are "reasonably certain to occur," rather than "worst-case scenario[s]."

50 C.F.R. § 402.02 (defining "[e]ffects of the action"); *Maine Lobstermen's Ass'n

v. NMFS*, 70 F.4th 582, 595–600 (D.C. Cir. 2023). Because NMFS cannot "indulge

in worst-case scenarios and pick 'pessimist' values in order to give 'the benefit of

the doubt' to the species," neither can the court. *See id.* at 595–96.

    The only defense the Conservancy musters for Dr. Lacy's numbers is that

whales are mobile and have recently been spending less time in inland waters, so

impacts to prey reduction in coastal areas in summer might be more relevant now

---

reduces prey availability in SRKW's typical summer habitat by in 1.8%. 2-ER-304; 5-ER-1126–27; 6-ER-1192.

than in the past. WFC Second Br. 52. But *some* change does not mean the whales no longer migrate. And even ignoring the whales' temporal patterns, the entire Southeast Alaska fishery reduces SRKW prey availability in coastal waters by an average of 5% and in inland waters by an average of 1%. 5-ER-1125. Dr. Lacy's assumptions that the troll fishery—just a sub-part of the Southeast Alaska fishery—reduces prey availability for SRKW by 3 to 12% is simply not a fair estimate given the data. WFC Second Br. 49, 51.

Finally, the Conservancy fails to respond to the point that Dr. Lacy's model shows no appreciable benefit to SRKW if we consider the time-limited nature of halting the fishery (i.e., that the relief lasts only until NMFS issues a new ITS). 4-ER-609; AK First Br. 45. Dr. Lacy concluded that *if* the Southeast fishery reduced prey by 3% (six times the projected average in winter in relevant areas and almost twice the projected average in relevant areas in summer), closing that fishery would slow the decline in SRKW population by *0.3% per year* while the fishery remains closed. 4-ER-609. This assumes that foregoing Alaska's harvest will lead to a commensurate increase in prey availability, which is incorrect as explained above. And it assumes that data supports quantifying the relationship between prey availability and whale health, which the BiOp said is not scientifically sound. 6-ER-1191. And it assumes that reducing harvest from a particular fishery will likely influence recovery of the whales, which the BiOp cautioned against because many

factors affect the abundance, productivity, spatial structure, and diversity of Chinook. 5-ER-972. In any event, it is clear error to conclude that closing the fishery would meaningfully benefit the SRKW on the ground that it would slow their decline by less than a third of a single percentage for less than two years (until a new BiOp is issued). The district court's finding that any increase in prey availability would be meaningful was clear error because, among other reasons, it did not consider the insignificance of its time-limited vacatur order on the SRKW.

The Conservancy argues that because some constituent stocks caught in the troll fishery are considered high priority stocks for SRKW, closing the fishery must be meaningful. WFC Second Br. 53–54. But the Conservancy ignores that the principal high priority stock contributing to the troll fishery is Upper Columbia River brights, which have a "relatively large run size." 5-ER-1131, 5-ER-571. In other words, the Upper Columbia River bright runs are strong, for both the fishery and the whales. Simply increasing the number of Columbia River brights would make an already numerous stock even more numerous when and where that stock runs. It would not provide similar benefits to the prey increase program, because that program's portfolio "represent[s] an array of Chinook stocks from different geographic areas and run timings." 4-ER-661.

The Conservancy argues that if the prey increase program is meaningful, then enjoining the Alaska fishery must also be meaningful, because the former

produces about 150,000 adult high priority Chinook salmon each year and the latter harvests about 76,000 adult high priority Chinook salmon each year. WFC Second Br. 54; *see also* 1-SER-17. But the prey increase program is not a single-year program; it is a program that adds 150,000 extra high priority salmon each year for at least ten years. 5-ER-889. And the program's diversity of stocks provides more prey in diverse locations and times, 4-ER-661, whereas shutting down Alaska's fishery would predominately increase just Columbia River brights.

The Conservancy's argument also highlights the district court's legal error in ignoring the prey increase program's mitigation of Southeast Alaska's impact. AK First Br. 49–50. The Conservancy acknowledges that the prey increase program intends to annually produce about twice as many high priority adult Chinook salmon as Southeast Alaska annually harvests. WFC First Br. 54. That makes this case just like *California Communities Against Toxics*, where this Court concluded that the environmental harm from remand without vacatur would be "insignificant with mitigation," meaning that the equities demanded remand without vacatur. 688 F.3d at 994.

The Conservancy's framing of the district court's order as somehow "narrow" and "mitigat[ing]" the disruptive consequences to Southeast Alaska is offensive. WFC Second Br. 54–58. Indeed, even the magistrate judge who recommended the remedy agreed that it was not "narrow" but "radical." 2-ER-204.

Because the Chinook harvest comprises such a large proportion of the troll fleet's earnings, shutting down that fishery could make it financially infeasible for many fishermen to fish for other types of salmon. 2-ER-229. This means the vacatur order actually reaches well beyond the ITS. The relevant part of the ITS is for Chinook and SRKW only. 6-ER-1205–06. But had this Court not stepped in to stay the district court's order, that order would have beached fishermen who would otherwise fish for coho and chum salmon, preventing even more fishing than was covered by the ITS. 2-ER-229. True, the court's vacatur order kept in place the ITS for sport and net fisheries, but the commercial troll fishery harvests on average 80% of Alaska's Chinook Treaty catch. 4-ER-609. The district court's order was not "narrow" but "radical" and its practical consequences bled beyond even the scope of the ITS.

The district court's order is also an abuse of discretion because it provided broader interim relief from the court than the relief the plaintiffs ultimately seek from the agency on remand. The Conservancy suggests that on remand, NMFS could "reduce[] harvests and compensate[] impacted parties" by buying troll permits instead of maintaining current harvest levels and increasing hatchery production. WFC Second Br. 37. The State's position is that NMFS lacks authority to amend Southeast Alaska's Treaty harvest limit because doing so would effectively override both intra- and inter- national negotiations. AK First Br. 53.

But even if NMFS had the authority to *reduce* the harvest, not even the

Conservancy is proposing that NMFS reduce the troll Chinook harvest to zero and

to do so immediately, as the district court's order—if not stayed by this Court—

would have done.

The State agrees with the Conservancy that this Court reviews the district

court's decision for abuse of discretion. WFC Second Br. 58–60. But the district

court does not have unbounded discretion. Here, its weighing of the equities rested

on both clear errors of fact as well as errors of law, and was beyond reasonable

under the circumstances. AK First Br. 32–33. The equities demanded remand

without vacatur in this case regardless of the seriousness of the agency's errors.

### C.     The agency will likely issue a new ITS with the same harvest levels, which also favors remand without vacatur.

Remand without vacatur is also warranted here when considering the

"seriousness" of the agency errors. An agency's errors are not serious when "the

agency would likely be able to offer better reasoning or whether by complying

with procedural rules, it could adopt the same rule on remand." *Regan*, 56 F.4th at

663–64. In other words, where a court finds that an agency action is flawed, but

believes the agency may be able to provide an explanation sufficient to sustain the

agency decision, it will often remand without vacatur. *Compare Regan*, 56 F.4th at

657–68 (concluding that the EPA could issue the same pesticide registration

notwithstanding its repeated failure to make an effects determination under the

ESA and its failure to engage in notice and comment under FIFRA), *with*

*Pollinator Stewardship Council v. U.S. E.P.A.*, 806 F.3d 520, 532–33 (9th Cir.

2015) (considering whether, after remand, EPA would conclude that a lower

maximum application of a pesticide was warranted or that the pesticide could not

be registered at all).[7] When an agency has "substantially compli[ed]" with the law,

that favors remand without vacatur. *Nat'l Fam. Farm Coal. v. U.S. Env't Prot.*

*Agency*, 966 F.3d 893, 929 (9th Cir. 2020). Even when an agency's error is serious,

so long as the agency did not greenlight the project in "total disregard" of its

potential harm, that can favor remand without vacatur too. *Regan*, 56 F.4th at 664.

The question here is whether, after remand, the agency could issue the same ITS or

prey increase program. From Alaska's perspective, the question is more

specifically whether NMFS will issue an ITS with the Treaty harvest limits after

remand.

---

[7]     The professors reprise an argument that this Court already rejected in *Regan*, 56 F.4th at 663–64 & n.11. Prof. Br. 20–21. In that case, the plaintiff (represented by same counsel and non-profit institution as the professors are here) argued that when considering the seriousness of an agency's procedural misstep, "the vacatur inquiry asks *not* whether the *ultimate* action could be justified, but whether the agency could, with further explanation, *justify its decision to skip* that procedural step." *Ctr. For Food Safety Pet.'s Opening Br.,* 2021 WL 743385, *56 (9th Cir.). This Court already rejected that very same argument made by the very same litigant. *Regan*. 56 F.4th at 663–64 & n.11. Precedent and estoppel foreclose this argument. The argument also makes no sense because if a procedural error were always "serious" unless the agency could show on remand that the procedural error wasn't actually an error at all, that would mean all procedural errors are "serious."

NMFS can and will issue an ITS with the Treaty harvest limits after remand because NMFS lacks authority to override the Treaty-established harvest limits via a BiOp, AK First Br. 53–54. And even if NMFS had that authority, it would have no reason to use it. The Conservancy argues that NMFS will not issue an ITS with the same harvest limits on remand because the Southeast Alaska fishery is jeopardizing the survival of the whales. WFC Second Br. 34–35. As discussed below, *see infra* Section II, it is not. The State does not contest that the whales are endangered. But the Southeast Alaska fishery has only a minor impact on SRKW. And the prey increase program is already mitigating the fishery's minor impact to SRKW. NMFS is conducting site-specific ESA and NEPA analyses to determine the prey increase program's effect on ESA-listed salmon, and is continuing the prey increase program.

### 1. NMFS has cured the main problem the district court found with the 2019 BiOp.

The Conservancy seems to agree that when analyzing whether the agency could issue the same ITS on remand, the court must consider what has happened since issuing the ITS. WFC Second Br. 42–47. In the Conservancy's words, the seriousness analysis does not look simply at whether the errors were serious in 2019, but whether, the errors "remain serious" when the court considers the remedy. WFC Second Br. 42. What has happened since 2019 goes to the likelihood the agency will issue the same rule on remand.

The Conservancy does not contest that the district court failed to consider in its "seriousness" analysis that the mitigation measures that it previously found to be uncertain and indefinite were—by the time the court was considering the remedy in 2023—funded and providing prey. WFC Second Br. 42–47.

The Conservancy seems to argue instead that if the district court had not committed this legal error—i.e., if it had considered, in its "seriousness" analysis, how the mitigation measures were funded and producing prey—the court still would have concluded that the errors related to the mitigation plan were not cured. WFC Second Br. 42–45. But the court repeatedly found otherwise. At oral argument, the court acknowledged that "the Prey [Increase] Program is no longer hypothetical. It's in process," and "the reason we found that the BiOp had serious flaws was because of the hypothetical nature of [the prey increase program], but now it's in place." 2-ER-214. And in the part of its order explaining why it would not enjoin the prey increase program, the court discussed how the "prey increase program—though previously uncertain and indefinite in the 2019 SEAK BiOp—has also now been funded and begun providing prey the past three years." 1-ER-36, 1-ER-4.

None of the Conservancy's arguments undermine the finding that the main flaw in the 2019 BiOp had been cured–or at least substantially so—by 2023.

First, the absence of a final environmental analysis describing the prey increase program as a whole does not mean we do not know "how, when, and where" hatchery fish are being released to benefit the SRKW. WFC Second Br. 43. Since the 2019 BiOp was issued, NMFS has worked with hatchery operators and states to identify and fund programs that meet the following criteria: "[i]ncreased hatchery production should be for stocks that are a high priority to SRKW," "[i]ncreased production should represent an array of Chinook stocks from different geographic areas and run timings," "[i]ncreased production cannot jeopardize the survival and recovery of any ESA-listed species," "increased production proposals should not require major capital upgrades to hatchery facilities," "[a]ll proposals should have co-manager agreement," and "[a]ll increased production must be reviewed under the ESA and NEPA, as applicable." 4-ER-661–62, 2-ER-99–100, 2-ER-107–16, 2-ER-284–85. NMFS is working with the State of Washington to coordinate increasing prey for SRKW, and it has identified for each year for the past several years: which facilities it is using, the increase in hatchery production at each facility, whether the brood source is local at each facility, where the hatchery fish are released, and how much each facility has been funded each year. 2-ER - 287–96. Thus, NMFS has provided ample evidence of its "detailed plan showing how and when mitigation will be implemented." WFC Second Br. 43.

Second, the fact that the prey increase program is not, by itself, producing the number of smolts it initially anticipated, does not undermine the benefits of the mitigation program. WFC Second Br. 43–44. If it produced only half the smolts initially anticipated (i.e., creating an expected 2–2.5% increase in prey availability rather than 4–5% increase), this would still greatly exceed the prey reduction caused by the entire Southeast Alaska fishery (approximately 0.5% during winter in coastal waters and 1.8% during summer in inland waters). 5-ER-1126–27, 6-ER-1192, 2-ER-304. Plus, the federal and Washington State prey increase programs have ramped up to collectively release the number of smolts NMFS anticipated in the BiOp. 2-ER-275, 2-ER-285. If NMFS did not coordinate its prey increase program with Washington's, then the Conservancy would no doubt complain that the two programs combined were releasing too many hatchery fish.

Third, the proposed Mid-Hood Canal project to benefit Puget Sound Chinook has little relevance here. WFC Second Br. 45. The Southeast Alaska summer and winter troll fishery takes very few ESA-listed Puget Sound salmon, and that mitigation program is not part of the prey increase program for SRKW but rather part of the $61.8 million Puget Sound salmon mitigation plan that is meant to mitigate Canadian and Pacific Northwest fisheries' large impact on Puget Sound Chinook as well as habitat degradation in the Pacific Northwest. 2-ER-243–45, 5-ER-1031, 5-ER-1105, 6-ER-1281–94. While the conservation measures for Puget

Sound salmon are intended to boost Puget Sound Chinook numbers in the future, and thus incidentally boost SRKW prey in the intermediate and long-term future, those programs have no relevance to the more immediate mitigation measure (the prey increase program) that is currently underway. 2-ER-243–45, 5-ER-888.

Thus, the main flaw in the 2019 BiOp had been cured by 2023, and the district court erred in not taking this into account.

> ### 2. NMFS has substantially complied with the ESA and NEPA and continues to evaluate the prey increase program's effect on ESA-listed salmon.

The Conservancy protests that the uncertainty of the mitigation plan was not the only error the district court found, but the other errors have also been addressed and NMFS is substantially complying with the ESA and NEPA too. WFC Second Br. 45–47. NMFS is not operating the prey increase program in a vacuum, but is doing so based on site-specific environmental analyses and considering cumulative impacts to ESA-listed salmon. 2-ER-100–02, 2-ER-118–20. Although some of the analyses pre-date the prey increase program, they are still relevant because they consider higher levels of hatchery production than is typically produced, on the chance that the hatcheries would be able to increase production if additional funding became available. 2-ER-101. The prey increase program provides that additional funding. The Conservancy misses the point when it argues that NMFS has not yet completed a new programmatic analysis of the prey increase program.

WFC Second Br. 47. The relevant question is not whether NMFS has already fully cured every violation the district court found, but whether NMFS could issue the same decision on remand. As was the case in *Regan*, even if there *were* serious errors, remand without vacatur can still be appropriate when the agency is not operating its program "in total disregard" of the action's potential harm. *See Regan*, 56 F.4th at 664.

The Conservancy makes clear that it is actually seeking injunctive relief under another name when it argues that the NEPA violations meant that the district court had to indirectly enjoin the fishery by vacating the ITS. WFC Second Br. 35–38. Vacatur of an ITS does not flow from a NEPA violation. *See Monsanto*, 561 U.S. at 156–57 (requiring plaintiff to prove the traditional four-factor test when seeking an injunction for a NEPA violation); *Ramsey*, 96 F.3d at 444, 446 (concluding that the agency erred in not conducting a NEPA evaluation *before* issuing the ITS, but apparently not vacating the ITS as a result). A NEPA violation could prompt a court to vacate an Environmental Impact State (EIS). And a NEPA violation could prompt a litigant to seek an injunction until the completion of an EIS. But the Conservancy is seeking to vacate the ITS (not an EIS) and it did not ask for an injunction based on failure to complete an EIS (at least, not directly).

The Conservancy is correct that NMFS is now undertaking two separate NEPA analyses: one for the Southeast Alaska fishery ITS and one for the prey

increase program. WFC Second Br. 36, 39.[8] But this does not mean that the ITS harvest limits will be different in the end. In fact, this bifurcation undercuts the Conservancy's arguments that any difference in the prey increase program dooms the ITS, because changes to the prey increase program are separate from the ITS. *See* WFC Second Br. 41. The prey increase program is providing more high priority prey and should continue as is, but even if NMFS chose an alternative so some of the funding for the prey increase program went to "improve the productivity of natural-origin salmon through habitat restoration/ enhancement" instead of increased hatchery production, that different form of mitigation would not mean there would be no mitigation benefit and therefore would not undercut the ITS. *See* 88 Fed. Reg. 54,301, 54,301 (Aug. 10, 2023).

In sum, to the extent this Court's analysis does not stop with the equities, the "seriousness" prong of the *Allied-Signal* test also favors remand without vacatur. The district court erred as a matter of law when it considered only whether the errors were serious in 2019 without also considering whether the errors remained serious in 2023. Had the district court not committed legal error, it would have concluded that the main error in the BiOp was no longer serious. This is because it

---

[8]      NMFS has explained it is preparing an EIS for its issuance of an ITS not because its issuance of the ITS is a major federal action triggering NEPA, but rather because it is responding to the district court's order in this case. 88 Fed. Reg. 68, 572, 68,574 (Oct. 4, 2023).

already concluded that "the reason [it] found that the BiOp had serious flaws was because of the hypothetical nature of [the prey increase program], but now it's in place." 2-ER-214; *see also* 1-ER-4, 36. And NMFS is substantially complying with the ESA and NEPA in other respects.

## II.    To the extent this Court analyzes in the first instance NMFS's "no jeopardy" determination, NMFS rationally concluded that its actions are not likely to jeopardize the SRKW.

The Court need not analyze, in the first instance, the Conservancy's further allegations of an ESA violation that the district court declined to address. The equities are dispositive in this case. *See supra* I.B. And appellate courts are courts of review, not first view. *Cutter v. Wilkinson*, 544 U.S. 709, 718 n.7 (2005) (declining to review in the first instance arguments that the court below did not address). "In general, an appellate court does not decide issues that the trial court did not decide." *Planned Parenthood of Greater Washington & N. Idaho v. U.S. Dep't of Health & Hum. Servs.*, 946 F.3d 1100, 1110 (9th Cir. 2020). And this case does not merit an exception to that general rule. *See id.* (describing exceptions as cases "where proper resolution is beyond any doubt," when "injustice might otherwise result," and "when an issue is purely legal"). But if the Court analyzes the merits of this issue for the first time on appeal, NMFS did not arbitrarily and capriciously conclude that its actions related to the Southeast Alaska troll fishery would not jeopardize the SRKW.

The State agrees with the Conservancy that the SRKW are experiencing historic low numbers. WFC Second Br. 25. Indeed, this is why they are listed as endangered under the Endangered Species Act. An "endangered" species is one that is "in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). But the question is not whether the SRKW are "in danger of extinction," *id.*, or as the Conservancy asks, whether the whales are "jeopardized." WFC Second Br. 24. The question is whether the federal action and any resulting incidental take are likely to put the whales in appreciably more risk of extinction than they would otherwise be in. *See* 16 U.S.C. § 1536(b)(4)(A)–(B).

The ESA requires federal agencies to ensure that any action they fund, authorize, or carry out is "not likely to jeopardize the continued existence of any endangered species." 16 U.S.C. § 1536(a)(2). Before issuing an incidental take statement, NMFS must conclude that the agency action and any take permitted incidental to the action will not jeopardize the species. 16 U.S.C. § 1536(b)(4)(A)– (B). To "[j]eopardize the continued existence of means to engage in an action that *reasonably would be expected*, directly or indirectly, *to reduce appreciably* the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02 (italics added).

The federal actions related to the Southeast Alaska fishery are not reasonably expected to appreciably reduce the likelihood of the survival and recovery of SRKW. And any incidental take associated with the federal action is not reasonably expected to appreciably reduce the likelihood of the survival and recovery of SRKW.

First, to determine whether the agency action jeopardizes the whales, we articulate the scope of the action. *See* 50 C.F.R. § 402.02 (defining actions as those that are "authorized, funded, or carried out" by federal agencies). Three federal actions are at issue here: delegation of management of the salmon fishery in federal waters to the State of Alaska under the Magnuson Stevens Act; granting funds to the State to meet federal obligations under the Pacific Salmon Treaty; and funding for conservation programs for imperiled Puget Sound stocks, Puget Sound habitat restoration, and SRKW prey. 5-ER-884–89. The existence of the Southeast Alaska Chinook troll fishery does not depend on any of these actions. As for the delegation, most of the Chinook troll fishery occurs in state waters, meaning the delegation covers only a small part of the fishery. 7-ER-1441–42. Moreover, because delegation of the federal fishery is a regulation under the Magnuson Stevens Act, the Conservancy would have had to file suit within 30 days if it wanted to enjoin it, which it did not do. 16 U.S.C. § 1855(f)(1). As for the Treaty implementation funding, if NMFS did not fund the United States' Treaty

obligations, the United States would be violating an international treaty, but that would not itself prevent the Southeast Alaska fishery from operating, although it would require Alaska to use alternative funding for its fisheries management. And the federal conservation programs are separate actions from the Alaska fishery. Plus, they help the SRKW by providing more prey. In short, none of the federal actions at issue jeopardize the SRKW.

The next question is whether any incidental take of SRKW by the Southeast Alaska fishery will jeopardize the continued existence of the species. 16 U.S.C. § 1536(b)(4)(B). It will not. As discussed in the State's opening brief, it is unlikely the Southeast Alaska fishery would "take" a single whale, AK First Br. 29 n.5, much less put the entire population in jeopardy.

It is not reasonably likely that the Southeast Alaska fishery is causing the whales to be in jeopardy because the whales' decline over the past couple decades has been attributed to multiple factors including prey availability, toxins in their environment and food, and vessel noise and vessel traffic that disturbs use of echolocation to forage and communicate. 5-ER-968–76. While the Conservancy argues that *the* primary cause of SRKW's decline is inadequate prey, the BiOp actually concludes that prey availability is one of many factors impacting the whales. 5-ER-968-76, 6-ER-1189-1190. True, the BiOp discusses Dr. Lacy's study that opined that prey abundance had the largest impact on population growth, 5-

ER-964, 6-ER-1190, and acknowledges that his modeling has "attempted to identify which threats are most significant to survival and recovery." 5-ER-968. But the BiOp concludes that "the data and analyses do not currently support a quantitative process for killer whales that directly links effects of an action such as a reduction in prey, to survival and recovery (i.e., mortality and reproduction)." 6-ER-1191.

Comparing Northern Resident and Southern Resident killer whales shows that other factors aside from prey availability are impacting SRKW. Indeed, Northern Resident killer whale populations are burgeoning, they consume the same adult Chinook salmon as their neighboring SRKW, and they share overlapping habitat with SRKW, except northern residents' critical habitat is off the quieter northeast Vancouver Island whereas the southern residents' critical habitat is in the busy inside waters off southern Vancouver Island and Washington State. 2-ER-243, 3-ER-339, 3-ER-351. This comparison suggests the problems with SRKW might not stem primarily from prey availability so much as other impacts, such as vessel disturbance[9] and environmental contamination, which are worse in the

---

[9] Notably, Law of the Wild argues that whale watching should be prioritized over the Southeast Alaska fishery, even though whale watching disturbs the whales' echolocation and ability to feed. Law of Wild Br. 13–15; 6-ER-1169–70, 6-ER-1337–38.

SRKW's more populated summer habitat. 2-ER-243, 6-ER-1169–70, 6-ER-1337–38.

Even assuming prey availability is *the* rather than *one of several* causes of the SRKW's decline, the Southeast Alaska fishery's impact on prey availability is minimal, meaning it is not reasonably likely that the Southeast Alaska fishery is causing the whales to be in jeopardy. The BiOp found that the entire fishery (i.e., sport, net, and troll) has historically reduced SRKW prey availability in inland waters from July through September by 1.0% to 2.5%, and in coastal waters from October through April by only 0.2 to 1.1%. 5-ER-1126–27, 6-ER-1192, 6-ER-1194. These temporal and spatial analyses are important because, despite the whales' mobility and some variation from year to year, WFC Second Br. 52, they typically live in inland waters in the summer and coastal waters in the winter. 5-ER-966–67, 6-ER-1191–92. Even ignoring temporal relevance, the entire Southeast Alaska fishery reduces SRKW prey availability in coastal waters by an average of 5% and in inland waters by an average of 1%. 5-ER-1125. Plus, the prey increase program is more than compensating for the minor prey reduction caused by Alaska's fishery. 2-ER-245–46. It was therefore not arbitrary for NMFS to conclude that the fishery's Chinook harvest is not *appreciably* reducing the likelihood of the whales' recovery and survival. 50 C.F.R. § 402.02.

This case is unlike *Wild Fish Conservancy v. Salazar*, 628 F.3d 513 (9th Cir. 2010), in which an in-stream hatchery operation was *the* obstacle for migratory bull trout to reach their natal spawning grounds. WFC Second Br. 25–27. After migrating down past the hatchery, the bull trout could not swim back upstream past the hatchery to return to spawn, meaning they could not reproduce and kept dwindling toward extirpation. *Wild Fish Conservancy*, 628 F.3d at 526. Given this large and obvious impact, the Court concluded that the Service irrationally found that the hatchery operations would not jeopardize the bull trout. *Id.*

This case is more akin to *Pyramid Lake Paiute Tribe of Indians v. U.S. Department of Navy*, in which this Court found that the Navy's diversion of water did not even "take" any endangered fish.[10] 898 F.2d 1410, 1419–20 (9th Cir. 1990). In that case, the parties stipulated that there was inadequate water flow of the Truckee River into Pyramid Lake, which led to a "precarious condition" for ESA-listed fish in that lake. *Id.* at 1413. The parties also recognized that additional

_____

[10]     The term "take" refers to harming or killing a single ESA-listed animal, 16 U.S.C. §§ 1532(19) (defining "take"), 1538(a)(1)(B) (prohibiting taking), whereas the term "jeopardize" refers to appreciably reducing the likelihood that the entire species will continue to exist. 16 U.S.C. § 1536(a)(2) (prohibiting agency action that would likely "jeopardize the continued existence of any endangered species"), 50 C.F.R. § 402.02 (defining "jeopardize the continued existence of"). This Court has recognized "there may be some actions that do not jeopardize a species that nonetheless may constitute 'harm' under section 9." *Pyramid Lake Paiute*, 898 F.2d at 1420 n.21.

flows from the Truckee River into Pyramid Lake were required to bring the species back to a point they were no longer endangered. *Id.* But the Navy was one of many water users diverting water from the Truckee River. *Id.* at 1420. And there was insufficient evidence to show that the Navy's action under review "had actually caused" the fish's spawning problems. *Id.* at 1420.

The Conservancy tries to recast the relevant question—which is whether the federal action and ITS will jeopardize SRKW—as instead whether "the Southeast Alaska salmon harvests, *when added to other fisheries*" will jeopardize the SRKW. WFC Second Br. 26–27 (emphasis added). While other fisheries are relevant to understanding the environmental baseline of the whales, the relevant question for the jeopardy analysis is not whether all Treaty fisheries combined will jeopardize the species. An agency action does not cause jeopardy simply because other baseline factors are adversely affecting the species. *See Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 807 F.3d 1031, 1052 (9th Cir. 2015). The question is whether the agency actions here will likely jeopardize the SRKW. And the answer to that is clearly no. In fact, had NMFS concluded otherwise—had it found that its agency action would jeopardize the SRKW—the State would have sued NMFS because *that* finding would have been arbitrary and capricious. *Cf. Maine Lobstermen's Ass'n v. NMFS*, 70 F.4th 582 (D.C. Cir. 2023) (finding

arbitrary and capricious NMFS's assumption that the fisheries took a specific number of right whales because such taking was not reasonably certain to occur).

## III. The Court should reject the amicus briefs because they are based on arguments and disputed data that were not presented to the district court.

Most of the amicus briefs should be rejected because they are based on information and arguments that were not presented to the district court. A fundamental principle of appellate practice is that review is confined to the record. *See* Fed. R. App. P. 10. Another fundamental principle of appellate practice is that arguments cannot be made for the first time on appeal. *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999) ("[A]n appellate court will not consider issues not properly raised before the district court."). These fundamental principles apply to both the parties and their amici. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 721 (2014) (applying to amici the general rule that courts do not entertain arguments not raised by the parties below). Considering new arguments and new information would be especially improper here because this Court is reviewing whether the district court abused its discretion in selecting a remedy given the information and arguments before it. Material never presented to the district court is simply not relevant to whether the district court abused its discretion, so briefs based on such material should be rejected.

Had these arguments and data been presented to the district court, the State could have presented responsive arguments and data. For instance, the Law of the Wild Brief cites a 1998 scientific paper cited in a 2008 NMFS document for the proposition that hatchery salmon are smaller than wild salmon and thus are less fatty (lipid-rich) and less caloric. Law of Wild Br. 4. The Conservancy never made this argument distinguishing wild and hatchery fish to the district court, whereas NMFS repeatedly emphasized that whales do not distinguish between wild and hatchery fish. 2-ER-58, 2-ER-180. Recent studies show that "[h]atchery fish were generally larger at ocean entry and remained larger compared to wild fish up to ocean age- 3" but then the "average sizes [for wild and hatchery Chinook] were similar for ocean ages 4 and 5." 3-FER-853. While it is true that the size of adult Chinook has decreased in the past several decades, this is true not just for hatchery fish but also "all wild populations." 3-FER-857.

Or consider the Canadian conservation organizations' assertion that some fisheries, including the Southeast Alaska fishery, take up to 50% immature salmon and thus induce population shifts to smaller salmon. Raincoast Br. 15. As an initial matter, the Southeast Alaska sport and troll regulations require Chinook to be at least 28 inches from snout to tip in order to harvest them (meaning they're about

four or more years old[11]). 5 AAC 29.140(a); 5 AAC 47.055; 3-FER-849, 3-FER-853. Even if the assertions about catching so many "immature" fish were correct—and they're not—it's not clear what the argument is. If smaller salmon were harvested leaving only the largest salmon, one might think this would create larger salmon (i.e., breeding of large salmon with large salmon).

The Canadian conservation organizations are likewise incorrect in asserting that Alaska repeatedly exceeds its harvest limits while Canada doesn't. Raincoast Br. 16–17. The Canadian organizations provide no evidence for their assertion. They might be referring to the fact that Alaska sometimes exceeds postseason targets that are calculated after a season is completed. The Treaty obligates Alaska to manage its fisheries so as not to exceed preseason limits. 7-ER-1671. Postseason targets help evaluate performance of the model used to set preseason catch limits, and they help determine whether adjustments to the model are needed. 7-ER-1673-74, 7-ER-1678–79. The State's harvests are below, but close to the preseason limits, so in the years the preseason limit is an overestimate, the Alaska fishery sometimes exceeds postseason targets. Alaska has worked with the Treaty Commission to improve the model used to establish preseason catch limits with the

---

[11]     Chinook spend 0 to 2 years in freshwater before emigrating to the ocean, and spend 1 to 5 years in the ocean before returning to their natal streams to spawn. 3-FER-848.

goal of reducing the variance between the preseason catch limits and postseason catch targets. Canada's West Coast Vancouver Island AABM fishery is less frequently over that postseason target because it has been decreasing its harvest somewhat in order to increase its harvest in ISBM fisheries. Canada's overall Chinook mortality (i.e., the number of fish it kills) has not declined. It has simply shifted inside the surf line.[12]

In short, the Court should reject these amicus briefs because they are irrelevant—the question is whether the district court abused its discretion and the briefs' new arguments and information were never presented to the district court. Relatedly, the briefs are filled with misleading and incorrect assertions that the State could have rebutted if they were presented below.

## IV.    The Court should deny the Conservancy's motion for judicial notice.

This Court "rarely" takes judicial notice of facts presented for the first time on appeal. *Flick v. Liberty Mut. Fire Ins. Co.*, 205 F.3d 386, 392 n.7 (9th Cir. 2000). First, judicial notice is inappropriate if facts are "subject to reasonable dispute." Fed. R. Evid. 201(b). The Court must therefore consider what facts the

---

[12]    The State does not anticipate that the Court will accept extra-record information, but includes the citation below and explanation above simply to explain that had the amici presented their arguments below, the State could have responded with appropriate argument and supportive data. *See Pacific Salmon Commission Chinook Technical Committee Report, Report of Catch and Escapement for 2022*, *available at* https://www.psc.org/publications/technical-reports/technical-committee-reports/chinook/.

Conservancy is asking for judicial notice of and why. While the fact that a federal or state agency published a particular document is not subject to reasonable dispute, snippets of text from it may be misinterpreted and inferences drawn therefrom may be disputed. That is the case here.[13] On this reason alone, the Conservancy's motion for judicial notice should be denied.

Even if the exhibits the Conservancy seeks to admit met the judicial notice standard in Evidence Rule 201, it is nonetheless inappropriate to admit them as "evidence" on appeal given the procedural posture of this case. The parties have been litigating this case for years and have had multiple opportunities to present evidence to the district court. The Court of Appeals is not the place to introduce new evidence. Relatedly, the question this Court is reviewing is not whether this

---

[13]      For example, the Conservancy cites a flyer from the Alaska Department of Fish and Game. WFC Second Br. 15–16. That flyer discusses some federal funding Alaska receives to offset the harvest cuts it agreed to from Treaty negotiations. If the Conservancy means to suggest that the United States can just pay Alaska more to mitigate its economic harms, an understanding of the Treaty negotiations shows why that is not so simple. During the 2009 international negotiations, the United States used Alaska as a bargaining chip to secure reductions in Canada's fisheries because Canada's Westcoast Vancouver Island fisheries are the primary driver harming ESA-listed Puget Sound Chinook. 2-ER-244–45. Because Alaska takes many fish of Canadian origin, Canada agreed to reduce its harvest if Alaska reduced its harvest of fish that would otherwise return to Canadian rivers. *Id.* But Alaska did not have an interest in reducing its harvest and the Pacific Salmon Treaty Act requires consensus among states and tribes prior to international negotiations. Pacific Salmon Treaty Act, Pub. L. 99-5, §3(a),(g), 99 Stat. 7 (1985). Alaska agreed to take a cut in exchange for partial economic mitigation.

Court would make a different decision if it had additional information (and additional argument based on that information), but whether the district court erred in its understanding of the equities given the information before it. *See N.D. ex rel. parents acting as guardians ad litem v. Hawaii Dep't of Educ.*, 600 F.3d 1104, 1113 (9th Cir. 2010) (concluding that the district court did not abuse its discretion in finding irreparable harm when weighing the equities "*based on the evidence presented to the district court*") (emphasis added); *cf. Reina-Rodriguez v. United States*, 655 F.3d 1182, 1193 (9th Cir. 2011) (refusing "to consider material outside the district court record" because the appellate court was a reviewing court).

Where extra-record materials are referenced in, or attached to, an appellate brief, the appropriate remedy is to strike the materials and references in the brief, and argument based upon them. *See Rybachek v. EPA*, 904 F.2d 1276, 1296 n.25 (9th Cir. 1990) (granting a motion to strike portions of a petitioners' brief that included and relied on extra-record material); *see also* Circuit Advisory Committee Note to 9th Cir. R. 27-1(7) ("The parties may refer to the materials the request [for judicial notice] addresses with the understanding that the Court may strike such references and related arguments if it declines to grant the request."). The Court should deny the request for judicial notice and strike the corresponding portions of the Conservancy's brief.

**V.     The district court did not abuse its discretion in refusing to enjoin the prey increase program.**

The State joins NMFS and the Alaska Trollers Association on this issue, but adds one point to help the Court evaluate the Conservancy's arguments.

The Wild Fish Conservancy's self-stated mission is to preserve and restore the northwest's "native fish species and the ecosystems upon which those species depend." 8-ER-1849. The Conservancy believes that increasing hatchery production in the Pacific Northwest harms local wild fish and has therefore sought to enjoin increased hatchery production. WFC Second Br. 34, 64–65, 68–70. The endangered SRKW provided the legal hook for the Conservancy's lawsuit, but the Conservancy's mission is aimed at promoting wild fish, not whales. That does not mean that the Conservancy cannot pursue an unstated mission of also helping whales. But it does mean that when the two are pitted against each other, the Conservancy advocates for the wild fish. And because the Conservancy believes that hatcheries are harming wild fish, it must malign hatchery-produced fish, even if hatchery production helps the whales. The Conservancy's farfetched argument that increasing production of high-priority prey for SRKW is somehow harmful to SRKW must be understood in the context of the Conservancy's mission: promoting wild fish by reducing the use of hatcheries.

## CONCLUSION

For these reasons, the Court should reverse the district court's vacatur decision and affirm the decision not to enjoin the prey increase program.

Dated: January 26, 2024.

TREG TAYLOR
ATTORNEY GENERAL

*/s/ Laura Wolff*
Laura Wolff
Alaska Bar No. 1411108

*Attorney for Appellant-Intervenor*
*State of Alaska*

## CERTIFICATE OF COMPLIANCE

I certify that this brief contains 10,996 words, excluding the items exempted by Fed. R. App. P. 32(f), and therefore complies with Circuit Rule 28.1-1(b). The brief's type size and typeface comply with FRAP 32(a).

January 26, 2024

*/s/ Laura Wolff*
Laura Wolff