Nos. 23-35322, 23-35323, 23-35324, 23-35354

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

───────────────────────────────────────────────

WILD FISH CONSERVANCY,

Plaintiff-Appellee/Cross-Appellant,

vs.

JENNIFER QUAN, in her official capacity as the Regional Administrator for the
National Marine Fisheries Service, et al.,

Defendants-Appellants/Cross-Appellees,

and

STATE OF ALASKA and ALASKA TROLLERS ASSOCIATION,

Intervenor-Defendants-Appellants/Cross-Appellees.

───────────────────────────────────────────────

On Appeal from the United States District Court for the
Western District of Washington,
Case No. 2:20-cv-00417-RAJ-MLP

───────────────────────────────────────────────

**ALASKA TROLLERS ASSOCIATION'S THIRD CROSS-APPEAL BRIEF**

───────────────────────────────────────────────

Douglas J. Steding, WSBA #37020
Greg A. Hibbard, WSBA #60526
Northwest Resource Law PLLC
71 Columbia Street, Suite 325
Seattle, WA 98104
206.971.1564
dsteding@nwresourcelaw.com
ghibbard@nwresourcelaw.com

*Attorneys for Intervenor-Defendant-Appellant/Cross-Appellee Alaska Trollers
Association*

# TABLE OF CONTENTS

I.  INTRODUCTION ........................................................................................1

II.  SUMMARY OF ARGUMENT.....................................................................3

III.  ARGUMENT................................................................................................5

    A.  Equity Demands Remanding Without Vacating the ITS or the Prey

        Increase Program. .....................................................................................5

        1.  WFC Incorrectly Identifies a "Strong Presumption" of

             Vacatur. ......................................................................................5

        2.  WFC Refuses to Acknowledge or Mischaracterizes the

             Disruptive Consequences of Vacating the ITS. .........................8

             a.  The District Court's Decision to Vacate the ITS Will

                  Cause Significant Harm to Cultures Across Southeast

                  Alaska. ..............................................................................9

             b.  WFC Fails to Appreciate the Full Extent of Economic

                  Consequences from Vacating the ITS. ...........................11

             c.  Vacatur Will Also Disrupt the International Management

                  Scheme of Pacific Salmon. .............................................15

             d.  In Contrast, There Will Be Few Disruptive Consequences

                  from Maintaining the ITS on Remand............................16

3.    WFC Overestimates the Environmental Risks of the ITS and the Prey Increase Program. ........................................................17

    a.    WFC's Estimates of Prey Increase from Closing the SEAK Troll Fishery Are Unreliable. .............................17

    b.    The Prey Increase Program Will Mitigate More Than the Limited Prey Impacts from the SEAK Troll Fishery. ....22

    c.    WFC Overestimates the Environmental Risks of the Prey Increase Program. ...........................................23

4.    NMFS's Errors Do Not Require Vacatur of the ITS or the Prey Increase Program. ......................................................26

    a.    There Is a Serious Possibility that NMFS Will Be Able to Substantiate the ITS and Prey Increase Program Decisions on Remand. ...................................27

    b.    NMFS Is Not Required to Demonstrate that Its Actions Will Definitively Recover the SRKW on Remand. .......29

    c.    NEPA Violations Do Not Demand Vacatur. ..................31

B.    The District Court Abused Its Discretion by Deciding to Vacate the ITS After Upholding the Prey Increase Program. ...............................31

C.    The District Court's Decision to Strike Opinions of ATA Members Is Worthy of this Court's Consideration. .................................34

    D.    WFC's Motion for Judicial Notice Should Be Denied. ......................35

IV.    CONCLUSION...............................................................................35

# TABLE OF AUTHORITIES

**Cases**

*All. for the Wild Rockies v. Marten*,

CV 17-21-M-DLC, 2018 WL 2943251 (D. Mont. June 12, 2018) ......................16

*All. for the Wild Rockies v. Savage*,

375 F. Supp. 3d 1152 (D. Mont. 2019)..................................................16

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*,

988 F.2d 146 (D.C. Cir. 1993) ............................................................27

*Bichindaritz v. Univ. of Washington*,

550 Fed. Appx. 412 (9th Cir. 2013)......................................................35

*California Communities Against Toxics v. U.S. E.P.A.*,

688 F.3d 989 (9th Cir. 2012)...........................................................5, 16

*Cook Inletkeeper v. Raimondo*,

541 F. Supp. 3d 987 (D. Alaska 2021) .................................................16

*Ctr. for Food Safety v. Regan*,

56 F.4th 648 (9th Cir. 2022) ....................................................... 5, 6, 26

*In re Clean Water Act Rulemaking*,

568 F. Supp. 3d 1013 (N.D. Cal. 2021) ...............................................16

*Kenney v. United States*,

458 F.3d 1025 (9th Cir. 2006)............................................................31

*Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin.*,

109 F. Supp. 3d 1238 (N.D. Cal. 2015) ..................................................6

*Morales v. Hickman*,

438 F.3d 926 (9th Cir. 2006).......................................................... 32, 33

*N. Plains Res. Council v. U.S. Army Corps of Engineers*,

460 F. Supp. 3d 1030 (D. Mont. 2020)..................................................16

*Pit River Tribe v. U.S. Forest Serv.*,

615 F.3d 1069 (9th Cir. 2010)...............................................................31

*Pollinator Stewardship Council v. U.S. E.P.A.*,

806 F.3d 520 (9th Cir. 2015)................................................................27

*Se. Alaska Conservation Council v. United States Forest Serv.*,

468 F. Supp. 3d 1148 (D. Alaska 2020), *appeal dismissed*, 20-35738, 2020 WL

6882569 (9th Cir. Oct. 22, 2020) ........................................................16

*Solar Energy Indus. Ass'n v. FERC*,

80 F.4th 956 (9th Cir. 2023) ......................................................... 16, 31

*Tennessee Valley Auth. v. Hill*,

437 U.S. 153 (1978)...............................................................................7

*Turtle Island Restoration Network v. United States Dep't of Commerce*,

878 F.3d 725 (9th Cir. 2017).................................................................29

*United States v. Hankey*,

   203 F.3d 1160 (9th Cir. 2000)...................................................................34

*Watersheds Project v. McCullough*,

   No. 23-15259, 2023 WL 4557742 (9th Cir. July 17, 2023) ................................31

*Wendell v. GlaxoSmithKline LLC*,

   858 F.3d 1227 (9th Cir. 2017)...............................................................35

# GLOSSARY OF ACRONYMS

| | |
|---|---|
| ATA | Alaska Trollers Association |
| BiOp | Biological Opinion |
| ESA | Endangered Species Act |
| ITS | Incidental Take Statement |
| NEPA | National Environmental Policy Act |
| NMFS | National Marine Fisheries Service |
| NRKW | Northern Resident Killer Whale |
| PST | Pacific Salmon Treaty |
| SEAK | Southeast Alaska |
| SRKW | Southern Resident Killer Whale |
| WDFW | Washington Department of Fish and Wildlife |
| WFC | Wild Fish Conservancy |

# I. INTRODUCTION

This appeal concerns Plaintiff-Appellee/Cross-Appellant Wild Fish Conservancy's ("WFC") attempt to prioritize its anti-hatchery policy preferences over agency decisions designed to benefit the endangered Southern Resident Killer Whale ("SRKW") that involve a hatchery program. The United States and Canada have cooperatively managed species of salmon of mutual concern—including those threatened or endangered "stocks" of Chinook salmon that are the SRKW's preferred prey—for conservation and harvests over the last four decades under the Pacific Salmon Treaty ("PST" or "Treaty"). Without regard for the devastation that would befall the communities of Southeast Alaska, WFC requests that the Court close the Southeast Alaska ("SEAK") troll fishery instead of relying on a hatchery program to benefit the SRKW. That request neither reflects what is best for the SRKW nor what the equities demand. WFC's preferred approach must not override the careful management of these related species that flows from the PST.

In the 2019 Southeast Alaska Biological Opinion ("2019 SEAK BiOp"), Defendants-Appellants/Cross-Appellees National Marine Fisheries Service, *et al.* (collectively, "NMFS"), committed to compromises that would benefit the SRKW, listed Chinook salmon, and would allow SEAK fisheries to continue harvesting under the limits of the PST. In the 2019 SEAK BiOp, NMFS (1) approved Intervenor-Defendant-Appellant/Cross-Appellee State of Alaska's (the "State" or

"Alaska") continued management of the SEAK fisheries, (2) issued an incidental take statement ("ITS") that allowed the SEAK fisheries to harvest Chinook salmon without liability, and (3) instituted a prey increase program designed to mitigate prey impacts from harvests under the PST by providing crucial prey from hatcheries to the SRKW. Although NMFS committed errors under the Endangered Species Act ("ESA") and the National Environmental Policy Act ("NEPA"), the equities demand remanding the 2019 SEAK BiOp without vacating the ITS or the prey increase program. Vacating the ITS will close the SEAK troll fishery and will come at great expense to the cultures and economies of Southeast Alaska while providing only limited benefits to SRKWs.

On appeal, WFC asks this Court to affirm vacatur of the ITS and, despite the benefits that the program provides to the SRKW, reverse the district court's decision to not vacate the prey increase program. Although WFC purportedly initiated this litigation on behalf of the SRKW, it has become clear that WFC is only seeking to advance the interests of the SRKW on its own terms. WFC pushes simplified narratives to promote its policy preferences. However, shutting down the troll fishery on remand will do little to help SRKWs; it will only decimate cultures and economies across Southeast Alaska. Similarly, halting the prey increase program will not recover wild Chinook populations; it will only remove prey specifically designed to reach SRKWs.

WFC's desire to end hatcheries has led it astray of best management decisions and to ignore the human costs of its request. The Alaska Trollers Association (the "ATA") respectfully requests that the Court hold that equity demands that the 2019 SEAK BiOp be remanded without vacatur of the ITS or the prey increase program and remand for relief consistent with that holding.

## II.     SUMMARY OF ARGUMENT

The ATA submits this cross-appeal brief to reply in support of its arguments on appeal and to respond to the arguments presented by WFC and proposed *amici*[1] that support WFC's position. Specifically, this brief reinforces that equity demands remand without vacatur of the ITS or the prey increase program and that the district court abused its discretion in vacating the ITS while keeping the prey increase program in place.

In arguing that vacatur of both the ITS and prey increase program is required, WFC makes multiple arguments that undermine its analysis. WFC attempts to distort the balancing test that courts must undertake to determine whether vacatur is appropriate—arguing for a "strong" presumption of vacatur

---

[1] Despite the significant *amicus* filings, this appeal can be resolved purely on the record. Nevertheless, the ATA addresses multiple arguments presented by *amicus* parties in the event that the Court considers those materials. If the Court declines to consider any *amicus* arguments, the ATA agrees that any related references to those materials in this third cross-appeal brief should be stricken.

unsupported by caselaw. When discussing the disruptions from vacating the ITS to be balanced against NMFS's errors, WFC devalues the substantial economic harm to Southeast Alaska, refuses to acknowledge the cultural harm to the region, and refuses to acknowledge the impacts to the international management of Pacific salmon. In contrast, WFC exaggerates the environmental risks of leaving the ITS in place while NMFS remedies its errors on remand. WFC also fails to acknowledge that closing the prey increase program would pose environmental risks to the health of the SRKW by removing critical sources of prey.

The ATA does not appeal the district court's conclusion that NMFS committed multiple legal errors with the 2019 SEAK BiOp and related actions. However, given the extreme nature of the disruptive consequences, and the likelihood that NMFS will be able to substantiate its decisions on remand, remand without vacatur is appropriate. The district court's decision to keep the prey increase program in place but vacate the ITS was an abuse of discretion and should be reversed so that neither the ITS nor the prey increase program are vacated on remand.

This cross-appeal brief also establishes that the district court's decision to strike opinions presented by ATA members was reversible error, and that WFC's motion for judicial notice should be denied.

# III. ARGUMENT

## A. Equity Demands Remanding Without Vacating the ITS or the Prey Increase Program.

"A flawed [agency decision] need not be vacated." *California Communities Against Toxics v. U.S. E.P.A.*, 688 F.3d 989, 992 (9th Cir. 2012). Courts are required to conduct a "balancing test" that "weigh[s]" the disruptive consequences of vacatur against the agency's errors and "leave [an] invalid agency action in place when equity demands." *Ctr. for Food Safety v. Regan*, 56 F.4th 648, 663 (9th Cir. 2022) (internal quotation marks omitted). In its first cross-appeal brief, the ATA demonstrated that the balance here favors remand without vacating the ITS or prey increase program. ECF No. 60[2] at 27-39. In arguing to the contrary, WFC misstates the balancing test, mischaracterizes the disruptive consequences of vacatur, and overestimates the environmental risks of vacatur. Because the disruptive consequences of vacatur outweigh NMFS's errors in the 2019 SEAK BiOp, this is an instance where equity demands remand without vacatur.

### 1. WFC Incorrectly Identifies a "Strong Presumption" of Vacatur.

WFC distorts the legal standard for vacatur. According to WFC, "[t]here is a strong presumption that unlawful agency actions should be vacated." ECF No. 88 at 22, 28. As NMFS demonstrated in its first cross-appeal brief, there is significant

---

[2] All ECF numbers referred to in this cross-appeal brief reference Docket No. 23-35322.

question as to whether there is *any* presumption of vacatur. ECF No. 57 at 20-24. Even if there is some presumption applied, WFC fails to establish that there is a *strong* presumption of vacatur. If the Court accepts WFC's impression of the law, it risks nullifying the requisite balancing test altogether.

WFC maintains that, when conducting this balancing test, "courts tip the scale in favor of protecting listed species in considering vacatur under the [Administrative Procedure Act]." ECF No. 88 at 61-62 (relying on *Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin.*, 109 F. Supp. 3d 1238, 1242 (N.D. Cal. 2015)). As the ATA highlighted in its first cross-appeal brief, that caselaw is rooted in injunction analyses and in situations that presented much more risk to the listed species at issue than what is presented here. ECF No. 60 at 39-42. Rather than addressing this argument, WFC hypocritically faults NMFS for basing its argument that no presumption applies on caselaw concerning injunctions and attempting to "superimpose injunction standards onto the APA's prescribed remedy of vacatur." ECF No. 88 at 30-31.

WFC's hypocrisy aside, the caselaw demonstrates that courts must undertake a "balancing test" and "weigh" the disruptive consequences against the agency's errors when determining whether vacatur is appropriate. *Ctr. For Food Safety*, 56 F.4th at 663. The ultimate question is whether "equity demands" that an

invalid agency action be left in place in the interim while the errors are remedied. *Id.* (internal quotation marks omitted).

WFC suggests that no balance is necessary, arguing that the "economic consequences, while not inconsequential, cannot outweigh the seriousness of the ESA and NEPA violations" and that "the loss of SRKWs or salmon populations is 'incalculable.'" ECF No. 88 at 60, 62 (quoting *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 187-88 (1978)). The balancing test before the Supreme Court in *Tennessee Valley Auth.* was dramatically different than the one at issue here. In that case, the Supreme Court was tasked with determining whether to enjoin the construction of a dam when completing the dam would have immediately *eradicated* an entire species. 437 U.S. at 173-74. That harm was justifiably considered "incalculable." *Id.* at 187. As discussed in more detail below, that degree of harm is not at issue here—WFC cannot argue in good faith that allowing the SEAK troll fishery to operate while NMFS remedies its analyses on remand will directly cause the eradication of the SRKW.

The SEAK troll fishery does not pose great risk to the SRKW, and the law is equipped to determine which actions should be held accountable for the SRKW. That is why the context and balance of NMFS's errors, environmental threats, and the disruptive consequences of vacatur is crucial. As provided in the following

subsections, the full context of this matter demonstrates that equity demands remand without vacatur.

**2. WFC Refuses to Acknowledge or Mischaracterizes the Disruptive Consequences of Vacating the ITS.**

A fully informed balancing test must account for the cultural harm, economic devastation, and other disruptive consequences from vacating the ITS. WFC misrepresents some of the disruptive consequences of vacating the ITS and omits others altogether. In its first cross-appeal brief, the ATA demonstrated that vacating the ITS imposes multiple forms of disruptive consequences. ECF No. 60 at 33-36. In its cross-appeal brief, WFC wholly failed to address these disruptive consequences raised by ATA and *amicus* parties.

WFC's attempt to diminish the impacts from its requested relief by mischaracterizing it as a "narrow remedy" is a tired tactic taken by WFC in this litigation. Repeating that its quest to shut down the SEAK troll fishery is a "narrow" remedy will not make it so. WFC suggests that the remedy is "narrow" because the district court's order fell short of what WFC believes to be the "presumptive remedy," full vacatur. ECF No. 88 at 56 (internal quotation marks omitted). The ATA rejects WFC's misguided notion that WFC has sacrificed anything by singling out the SEAK trollers in "narrowing" its desired remedy. WFC has chosen to pin NMFS's mistakes and the plight of the SRKW on the

trollers of Southeast Alaska. The ATA reiterates the full scope of the disruptive consequences to correct WFC's faulty analysis.

### a. The District Court's Decision to Vacate the ITS Will Cause Significant Harm to Cultures Across Southeast Alaska.

The district court's decision to vacate the ITS, at WFC's request, threatens the generational way of life centered around trolling in Southeast Alaska. Eric Jordan, a third-generation troller from Sitka, Alaska, portrays a personal relationship with Chinook salmon formed from a conservation ethic. 3-ER-0544–45. Trollers consider themselves one of the Chinook's strongest advocates because trollers revere Chinook for their sacrifice of their bodies to sustain the trollers with healthy food for their physical wellbeing. 3-ER-0545. Chinook are also more than just food to trollers—they are crucial for trollers' spiritual wellbeing and trollers' way of life. 3-ER-0545–47. The fear of losing a "way of life" is shared across the region and echoed by the mayor of Pelican, Alaska, Patricia Phillips, and the Executive Director of the ATA, Amy Daugherty. 3-ER-0524–25; 2-ER-0074. Trollers have endured substantial reductions in their fishery for decades and have been fighting for survival. 2-ER-0072; 5-ER-0898 (22.5 percent loss in catch in last two PST revisions, combined). Their "Alaskan Dream" is hanging in the balance. *See* 3-ER-0555.

If the district court's vacatur decision is upheld, it may sound the final "death knell" to this way of life. 3-ER-0525. Closing the winter and summer

seasons of the SEAK troll fishery would cause the entire fishery to close because the spring season cannot support the entire fishery. ECF No. 60 at 34 (citing 2-ER-0073–74). If the entire fishery is closed for a whole year, the resulting loss of income and inability to meet significant fixed costs, coupled with the cost regulatory barriers of entry into other fisheries, would cause most trollers to cease fishing altogether. *Id.*; 2-ER-0229–32. Thus, vacating the ITS would be a permanent, not temporary, disruption. With the SEAK trollers in WFC's crosshairs—despite the fact that fisheries from Canada and the west coast of the United States also harvest Chinook—trollers like Eric Jordan can only ask "[w]hy does my traditional fishery have less 'value' than other fisheries?" 3-ER-0547.

The ATA does not suggest that there is only one culture that would be impacted by vacating the ITS. Multiple Tribal communities have come forward to explain the impacts to their cultures. Trolling for Chinook, the "king" salmon, has been "maintained by Southeast Alaska Indigenous communities over thousands of years." ECF No. 72-2 at 3. "Troll-caught salmon is a culturally important food source" to the Tribal communities in Alaska. ECF No. 42-2 at 5. "[A]pproximately 31% of Southeast Alaska trollers are tribal citizens" and the troll fishery directly supports many Tribal communities. *Id.* at 2. In short, the effects of vacating the ITS "would threaten community health and culture, and potentially cause long-

term harm to Tribes and their homelands." ECF No. 72-2 at 8. No money can compensate or replace these types of harms. *Id.* at 21.

Even with the ATA and the Tribal *amici* emphasizing the cultural impacts of vacating the ITS, WFC makes *no* mention of those disruptive consequences in its cross-appeal brief. Simply put, how can WFC claim it has put forth the appropriate balance of the equities and disruptive consequences when it ignores a crucial component of those consequences? The ATA does not expect an out-of-state group like WFC to understand these impacts, but WFC's refusal to acknowledge them undermines its analysis.

> ### b.     WFC Fails to Appreciate the Full Extent of Economic Consequences from Vacating the ITS.

The district court's decision to vacate the ITS will cause devastating economic consequences within and outside Southeast Alaska. WFC asserts that the district court "fully considered and substantially mitigated" the "economic disruptions" from vacating the ITS. ECF No. 88 at 54, 56; *see also* ECF No. 97-2 at 24 (similar argument by *amici* Law Professors). To be clear, the district court did not implement *any* mitigation to alleviate impacts from its order; it merely adopted WFC's requested remedy. 1-ER-0029, 44-45 (report and recommendation); 1-ER-0004 (adopting report and recommendation). And, respectfully, the district court did not fully consider the economic disruptions to the communities of Southeast Alaska sought by WFC.

WFC relies on its own expert's interpretation of Southeast Alaska fishing to attempt to establish that "the district court's equitable remedy would affect a small fraction of the Southeast Alaska salmon harvests authorized by NMFS's faulty ITS." ECF No. 88 at 57. WFC acknowledges that its estimates of economic harm are significantly lower than that of NMFS, the State of Alaska, and the ATA. *Id.* WFC intentionally reports income impacts rather than total economic output impacts. 1-SER-5–6. WFC's total valuation of the winter and summer seasons of the SEAK Chinook troll fishery amounts to $9.5 million. ECF No. 88 at 57. In contrast, WFC's expert acknowledged that two other studies conducted to assess the economic output of the SEAK Chinook troll fishery used different methods but reached remarkably similar results—$28.5 million and $28.8 million, respectively. 1-SER-4. The multiplier effect of all direct and indirect impacts associated with the troll fishery reflects that the true economic costs of vacating the ITS could be between $72 million and $85 million. 3-ER-0520.

Using the year 2020 as something of a case study, WFC only highlights the harvest value for all commercial salmon fisheries in Southeast Alaska, $55.2 million, and omits the $182.9 million in value for fish processing identified by its expert. ECF No. 88 at 56; 3-ER-0588. WFC argues that, although the SEAK troll fishery accounted for roughly thirty-eight percent of all SEAK commercial salmon harvests that year, the only value relevant to potential vacatur is that the harvest

value of Chinook salmon caught by the troll fishery was *only* twenty-one percent of the total commercial fishery in Southeast Alaska. ECF No. 88 at 56-57. Claiming that over one-fifth of an industry is insignificant is remarkable, and further reflects that WFC's reasoning is unreliable in seeking the closure of the SEAK troll fishery.

The impacts from vacatur are likely greater than twenty-one percent of the industry. According to WFC, Chinook constituted around fifty-four percent of the entire 2020 catch for the SEAK troll fishery. ECF No. 88 at 56. That significant share supports the ATA's argument, presented above, that the importance of Chinook to the SEAK troll fishery is so outsized that losing the ability to catch Chinook would effectively close the entire fishery—trollers, without Chinook, may have to cease trolling altogether. *See* ECF No. 60 at 34 (citing 2-ER-0073–74); 2-ER-0229. According to WFC, the entire SEAK troll fishery represents thirty-eight percent of annual SEAK commercial salmon harvests. ECF No. 88 at 56. Thus, vacating the ITS risks losing much more than just twenty-one percent of the commercial fisheries harvest, but calls into question the entire thirty-eight percent share of commercial fishing in Southeast Alaska due to the importance of Chinook to trollers.

Lastly, WFC appears to have inadvertently highlighted additional evidence that demonstrates it is significantly underestimating the economic consequences of

vacatur. Through information brought forth in its motion for judicial notice,[3] WFC argues that when the 2019 PST reduced the SEAK fisheries' harvest allocation by up to 7.5 percent, the federal government offered $22.4 million to offset the resulting economic consequences. ECF No. 88 at 15-16. If a 7.5 percent decrease in catch warrants over $20 million in compensation, WFC's argument that losing the troll fishery would only be a loss of $9.5 million is a substantial misrepresentation.

The economic consequences of vacatur are more than just dollars and cents. The SEAK troll fishery supports many jobs in a region where finding other jobs is very difficult, if not impossible. 2-ER-0230; 3-ER-0517–19; ECF No. 42-2 at 8. In the City of Pelican, Alaska, the port "would struggle to remain viable" if the SEAK trollers were not paying for moorage, buying ice, refueling, and visiting the local café. 3-ER-0524. The taxes from the troll fishery are also crucial to the City of Pelican as they fund services like education, water/wastewater, electricity, snowplowing, trash, boardwalk/harbor repairs, and public health and safety services. *Id.* These are tangible socioeconomic impacts that will be felt not just in Pelican, but throughout Southeast Alaska.

---

[3] As addressed in Section III.D of this brief, the ATA submits that this motion should be denied. If denied, the ATA agrees that this reference should be stricken.

### c. Vacatur Will Also Disrupt the International Management Scheme of Pacific Salmon.

The district court's decision to alter the management of salmon fisheries with no regard for the implications of that decision is also troubling. The Alaska Congressional Delegation explains that the ITS is "vital to the success of the Treaty's negotiated approach to management." 2-ER-0136; ECF No. 77-2 at 3. The Alaska Congressional Delegation expresses concern over whether vacating the ITS would "undermine Congress's complementary objectives under the Treaty." 2-ER-0141; ECF No. 77-2 at 11. *Amicus* Washington Department of Fish and Wildlife ("WDFW") explains that, in addition to harming Washington's economy, vacatur "would result in significant harm to interstate and international relations." ECF No. 75-2 at 6, 16. WFC ignored these disruptions. Once again, how can WFC's weighing of the equities be persuasive when it does not account for all the relevant factors?

The arguments of *amici* in support of WFC do not resolve this question. The *amici* Law Professors ask this Court to narrow its analysis, suggesting that economic and other non-environmental disruptive consequences are inappropriate to consider in this matter because "the 'disruption' prong *should* be consequences to the environment." ECF No. 97-2 at 21 (emphasis added). The Law Professors' impressions of what the law "should be" aside, the caselaw is clear that it is appropriate and commonplace to consider non-environmental consequences such

as economic consequences or regulatory challenges, even if they do not always demand vacatur. *See e.g.*, *Solar Energy Indus. Ass'n v. FERC*, 80 F.4th 956, 998 (9th Cir. 2023); *California Communities Against Toxics*, 688 F.3d at 993-94; *In re Clean Water Act Rulemaking*, 568 F. Supp. 3d 1013, 1028 (N.D. Cal. 2021); *Cook Inletkeeper v. Raimondo*, 541 F. Supp. 3d 987, 993 (D. Alaska 2021); *Se. Alaska Conservation Council v. United States Forest Serv.*, 468 F. Supp. 3d 1148, 1154-55 (D. Alaska 2020), *appeal dismissed*, 20-35738, 2020 WL 6882569 (9th Cir. Oct. 22, 2020); *N. Plains Res. Council v. U.S. Army Corps of Engineers*, 460 F. Supp. 3d 1030, 1040 (D. Mont. 2020); *All. for the Wild Rockies v. Savage*, 375 F. Supp. 3d 1152, 1157 (D. Mont. 2019); and *All. for the Wild Rockies v. Marten*, CV 17-21-M-DLC, 2018 WL 2943251, at *4 (D. Mont. June 12, 2018).

### d.     In Contrast, There Will Be Few Disruptive Consequences from Maintaining the ITS on Remand.

The cultural, economic, and management disruptions of vacating the ITS for even one year stand in stark contrast to the potential disruptive consequences alleged by proposed *amici* Law of the Wild, Orca Conservancy, and Wild Orca. Those parties allege that "potential economic fallout of a diminishing SRKW population on whale watching in the Puget Sound Region" would be "profound."[4]

---

[4] Notably, proposed *amici* Law of the Wild, Orca Conservancy, and Wild Orca appear to rely on the multiplier effect that was disavowed by WFC to estimate their economic impacts. ECF No. 94-2 at 13-14.

ECF No. 94-2 at 2. If the ITS is upheld during that interim period, there will be no immediate impacts on the recreational activity of whale watching—an activity that may directly harm SRKW itself through the vessels' physical presence or underwater sounds. *See* 5-ER-1042–43. One year of the SEAK troll fishery will not cause the loss of the SRKW population. If, however, the ITS is vacated, the identified cultural, economic, and other harms will begin that very same day.

**3. WFC Overestimates the Environmental Risks of the ITS and the Prey Increase Program.**

WFC overestimates the environmental risks of remanding without vacating the ITS and prey increase program. In contrast to WFC's attempts to minimize the SEAK troll fishery to support that its requested relief is "narrow," WFC argues that the SEAK troll fishery is significant enough to jeopardize the SRKW. The SEAK fisheries, let alone only the SEAK troll fishery, will not jeopardize the SRKW. This is particularly true in light of the mitigation available from the prey increase program.

**a. WFC's Estimates of Prey Increase from Closing the SEAK Troll Fishery Are Unreliable.**

In arguing that the SEAK troll fishery is too detrimental to the SRKW for the ITS to be maintained, WFC reports the prey decrease values from the 2019 SEAK BiOp. *See* ECF No. 88 at 51. The SEAK troll fishery, however, is just one

component of the SEAK fisheries analyzed in the 2019 SEAK BiOp and, accordingly, those numbers do not reflect the impacts from the troll fishery.[5]

WFC also alleges that the SEAK troll fishery, alone, is responsible for about a 4.85 percent reduction in prey to the SRKW. ECF No. 88 at 49. A closer look at that evaluation raises questions. WFC relies on its expert's determination that the SEAK troll fishery is responsible for about 80.8 percent of the Chinook catch in the SEAK fisheries. 4-ER-0608–09. According to that expert, "an approximate middle value from the many estimates made in the 2019 SEAK BiOp" is that the total prey reduction from *all* the SEAK fisheries is six percent. 4-ER-0608. But that expert simply states this conclusion without showing the work that led to it. It is unclear how this "approximate middle value" was calculated—the number is neither an average nor a median. 1-SER-14. NMFS explained in its first cross-appeal brief that its "experts reviewed the declaration and concluded that it was significantly flawed." ECF No. 57 at 37 (citing 2-ER-0302–04).

WFC's estimate may be inflated because it does not account for the seasonal movements of SRKWs when evaluating prey impacts. SRKWs are typically found south of Alaska near Washington, Oregon, and Vancouver Island. 3-ER-0343.

---

[5] *Amici* Raincoast Conservation Foundation, *et al.* assert that Alaskan fisheries have exceeded catch ceilings more than half the time since 2010. ECF No. 99-2 at 16. The ATA joins the State's response to that argument which explains that *amici* misinterpret the relevant metrics. *See* ECF No. 113 at 45-46.

SRKWs are present in coastal waters during October to April and May to June. 5-ER-1127. In July through September, SRKWs are most often present in inland waters. *Id.* In those months, between 1999 and 2014, the average reduction in prey from all of the SEAK fisheries was 0.5 percent in coastal waters during the winter and 1.8 percent in inland waters during the summer. 2-ER-0304.

There is little likelihood, let alone guarantee, that foregone harvests from closing the SEAK troll fishery will become prey for the SRKW. However, WFC's estimations also appear to assume that any prey increase necessarily results in more prey for the SRKW. Given the lack of geographical overlap between the SEAK trollers and the SRKW, any Chinook not harvested by the trollers must survive a "gauntlet" of other harvesters or predators to become SRKW prey. 8-ER-1777–80. Recent studies have proven WFC's assumption wrong—when prey abundance is increased, the Northern Resident Killer Whale ("NRKW") improves, not the SRKW. *See* ECF No. 59 at 44; 2-ER-0243. This aligns with what is known about NRKWs. The Law of the Wild, Orca Conservancy, and Wild Orca *amicus* brief filed in support of WFC alleges that NRKW females are 257 percent more efficient in conducting dives for prey than SRKW females. ECF No. 94-2 at 6. Beyond NRKWs, other fisheries, such as those in Canada, may be able to increase their harvests in response to increased Chinook abundance. *See* ECF No. 59 at 44; 2-ER-0243; 8-ER-1795.

WFC does not respond to this argument in earnest; rather, it twists it into a straw man argument that every fish not harvested by the trollers will not be eaten by the SRKW. ECF No. 88 at 50. WFC deems that argument "illogical." *Id.* (internal quotation marks omitted). WFC suggests that an overall increase in prey abundance will benefit the SRKW. *Id.* at 49-50. That suggestion assumes, however, that every other harvester or predator would not increase their take of Chinook in response to a prey abundance increase and that the increase is passed onto the SRKW in one form or another. WFC's estimations appear to be too static, and WFC fails to factor in other variables, such as NRKWs or Canadian fisheries, that may change in response to prey abundance increases.

Further calling into question the risks posed by the SEAK troll fishery to the SRKWs is the composition of the troll fishery's harvests. WFC overstates the importance of the Chinook salmon stocks harvested by trollers to the SRKW by focusing on averages that ignore the finer points of the analysis in the 2019 SEAK BiOp.[6] WFC's own summary table reflects that, taking all the SEAK fisheries together, the average annual harvest of the top two groups of priority stocks of the SRKW—which includes eight distinct stocks—amounts to only 2.29 percent of the fisheries' harvest. ECF No. 88 at 53 (citing 5-ER-0971, 5-ER-1130–31). Again, the

_____

[6] While SRKWs prefer Chinook salmon, their diets do not exclusively consist of Chinook. In the late summer months, coho salmon compose over forty percent of the SRKWs' diet. 5-ER-0969.

trollers are a subset of the SEAK fisheries analyzed in the 2019 SEAK BiOp, so the amount of these fish taken by the trollers is lower. By and large, the most important Chinook salmon stock to the SRKW that is harvested the most by the SEAK fisheries is the Columbia Upriver Bright. 5-ER-1130–31. But, as explained in the 2019 SEAK BiOp, harvest of these fish is less of a concern because those stocks have "a relatively large run size." 5-ER-1131. Beyond that exception, "the largest stocks contributing to the SEAK fisheries catch are currently not considered at the top of the priority prey list for SRKWs." *Id.*

Regardless of the accuracy of WFC's estimation, WFC fails to respond to the ATA's argument that an interim closure of the SEAK troll fishery—until NMFS completes its analyses on remand—will not have the prey increase benefits that WFC anticipates. *See* ECF No. 60 at 36-37. According to WFC's expert, closing the SEAK troll fishery could stabilize the population of SRKWs (0.00 percent growth rate) over the "long-term" of 100 years. *Id.* (citing 4-ER-0607–09). NMFS has represented that it will issue new decisions on the ITS and prey increase program by November 2024. ECF No. 57 at 1. How will closing the SEAK troll fishery for less than a year have a tangible benefit on the SRKW if it will take 100 years without the troll fishery to stabilize the SRKW? While WFC argues that the record reflects that vacating the ITS "would benefit SRKWs," ECF No. 88 at 54,

WFC fails to support how temporarily closing the troll fishery will result in a meaningful benefit for the SRKW.

WFC relies on numbers that do not tell the whole story, including SRKW migratory patterns, SRKW preferred stocks, other predators, potential increased harvests elsewhere, and more. By oversimplifying the issues in that manner, WFC has committed the very mistakes that NMFS and an independent science panel cautioned against—"overreliance on correlative studies or implicating any particular fishery." 5-ER-0972.

      **b.**      **The Prey Increase Program Will Mitigate More Than the Limited Prey Impacts from the SEAK Troll Fishery.**

Whatever risk the SEAK troll fishery could pose to the SRKW must be placed in context. That context is the prey increase program, which was designed to mitigate prey impacts from the SEAK fisheries, Canadians fisheries, and "SUS," or southern U.S. fisheries. 5-ER-0888; 5-ER-1132. The mitigation is more effective than closing the SEAK troll fishery because it will provide prey at the "times and areas considered most important to [SRKWs]." 5-ER-1133. Specifically, the prey increase program was designed to provide an increase in prey abundance of four to five percent in inland waters when SRKWs are typically found in those waters in the summer, and an increase of four to five percent in coastal waters when SRKWs are typically found in those waters in the winter and spring. *Id.* These prey increases are significantly higher than the impacts from the

SEAK fisheries—let alone just the SEAK troll fishery—and, unlike closing the troll fishery, would provide prey at the most beneficial times and places to SRKWs. WFC's own estimates demonstrate that the prey increase program would mitigate more than the entire troll fishery catch of Chinook salmon. ECF No. 88 at 54.

c. **WFC Overestimates the Environmental Risks of the Prey Increase Program.**

WFC also takes issue with the environmental risks of the prey increase program. WFC's view is too myopic. Hatchery salmon are a significant portion of the prey available to SRKWs, and SRKWs do not distinguish between wild or hatchery fish. *See* 5-ER-0972; 2-ER-0058.

As the State of Washington's response to the troubles facing the SRKW demonstrates, hatcheries are a reasonable response to help the SRKW. *See* ECF No. 75-1 at 3-5; ECF No. 75-2 at 1-3 (describing Governor Inslee and Washington State's SRKW Task Force's decision to increase hatchery programs to assist the SRKW). In fact, given the resources already poured into the prey increase program, *amicus* WDFW posits that closing the prey increase program now would actually impose environmental risk on the SRKW by leaving a significant gap in prey availability for a lengthy period of time. *See* ECF No. 75-2 at 9. The district court emphasized this same risk of closing the prey increase program when electing to uphold the program. *See* 1-ER-0036 ("A disruption to

the prey increase program, or its funding, thus appears primed to result in gaps in prey abundance that would lead to increased risk to the health of the SRKW[.]").

WFC's concerns about hatcheries are not ignored; they are addressed when NMFS's actions in the 2019 SEAK BiOp are taken as a whole. The 2019 SEAK BiOp recognizes that "[h]ealthy natural-origin salmon populations are important to the long-term maintenance of prey populations available to [SRKWs]" and that "hatcheries also pose risks to natural-origin salmon populations." 5-ER-1133. As the district court found, the record reflects that environmental risks from hatcheries can be mitigated. 1-ER-0040. In the words of the 2019 SEAK BiOp, "hatchery programs are often modifying various program elements to be able to adaptively manage the program in ways that minimize effects on listed species and allow operators to achieve program goals." 5-ER-1133. The 2019 SEAK BiOp emphasizes that the prey increase program is only part of the mitigation funding proposed in the actions under review. The mitigation funding "was also designed to take immediate action to address limiting habitat conditions for primarily four Chinook salmon populations… and make progress toward recovery by improving

abundance and productivity."[7] 5-ER-1134. When NMFS's actions are taken together, the "habitat related recovery projects support[] long term recovery of Chinook salmon stocks." *Id.*

It cannot be overstated that NMFS is in the unenviable position of managing listed SRKWs and listed Chinook salmon, when the latter is the primary prey for the former. If WFC is truly concerned about both the SRKW and wild salmon populations, it must acknowledge the necessary compromises to manage for both species. WFC has placed itself in a difficult position by refusing to do so. WFC asked the district court to do anything it could to help the starving SRKW. After the district court upheld the prey increase program for the benefit of the SRKW, WFC is appealing to remove benefits to the SRKWs because the prey increase program does not align with WFC's policy preference to abolish hatcheries. The vacatur balancing test cannot be driven by WFC's policy preferences in this manner.

---

[7] These conservation programs will also benefit the SRKW through prey abundance and health of wild salmon over the intermediate and long term. 5-ER-0888. The ATA joins the arguments made by NMFS and the State in response to WFC's allegations pertaining to one of these Chinook populations. *See* ECF No. 111 at 23 n. 9; ECF No. 113 at 31-32.

**4.      NMFS's Errors Do Not Require Vacatur of the ITS or the Prey Increase Program.**

The balancing test required for vacatur requires the Court to "weigh the seriousness of the agency's errors against the disruptive consequences of an interim change that may itself be changed." *Ctr. for Food Safety*, 56 F.4th at 663 (internal quotation marks omitted). In granting the State's motion to stay the district court's order, this Court acknowledged "a sufficient likelihood of demonstrating on appeal that the certain and substantial impacts of the district court's vacatur on the Alaskan salmon fishing industry outweigh the speculative environmental threats posed by remanding without vacatur." ECF No. 48 at 4. The Court reached the opposite conclusion in response to WFC's motion to stay the upholding of the prey increase program. *Id.* at 5 (recognizing that WFC had not demonstrated a likelihood to succeed particularly in light of the disruptive consequences to the SRKW if the prey increase program was vacated).

The above analysis, coupled with the balancing assessment of this section, prove this Court's preliminary assessment true. The significant cultural, economic, and regulatory disruptions of vacatur outweigh NMFS's errors. This is particularly true when remand without vacatur only involves speculative risks of environmental harm and actually threatens environmental harm from vacating the prey increase program. NMFS is already working to correct the errors identified by the district court, estimating that improved analyses will be completed by November 2024.

ECF No. 57 at 1. With agency fixes on the way, equity demands avoiding the cultural and economic devastation that would result from vacating the ITS and prey increase program.

### a. There Is a Serious Possibility that NMFS Will Be Able to Substantiate the ITS and Prey Increase Program Decisions on Remand.

The ATA does not appeal the district court's conclusion that NMFS committed multiple errors in the 2019 SEAK BiOp. The ATA primarily defers to and joins in the arguments presented by NMFS and the State regarding the lack of seriousness of NMFS's errors. That said, the ATA offers brief analysis demonstrating that the seriousness of NMFS's errors does not demand vacatur because there is a "serious possibility that [NMFS would] be able to substantiate its decision on remand." *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 151 (D.C. Cir. 1993).

According to WFC, the decision on remand "will look nothing like the [2019] SEAK BiOp" and, therefore, the same decision cannot be adopted on remand. ECF No. 88 at 39. This situation is unlike the typical situation where a court asks whether the agency "could adopt the same rule on remand." *Pollinator Stewardship Council v. U.S. E.P.A.*, 806 F.3d 520, 532 (9th Cir. 2015). This matter does not involve an agency rule, but agency decisions under the ESA to issue an ITS for the SEAK troll fishery and maintain the prey increase program. Regardless

of "looks," the question is whether there is "at least a serious possibility that the agency would be able to substantiate its decision[s] on remand." *Id.* (quoting *Allied-Signal*, 988 F.2d at 151; internal brackets omitted).

As the district court identified, given the fact that the prey increase program has been implemented in the years since this litigation was initiated, NMFS will be able to better substantiate its decision where the issue with that decision was the uncertainty of the program. *See* 1-ER-0041–42. For that reason, the district court did not abuse its discretion in upholding the prey increase program.[8]

That reasoning should similarly substantiate the decision to issue an ITS on remand because the district court identified that the primary fault of the ITS was its reliance on the uncertain mitigation for the prey increase program. *See* 4-ER-0638–47. With the prey increase program providing mitigation that covers more than prey impacts from just the SEAK troll fishery, much of the seriousness of the error with respect to the ITS has been resolved. Consequently, NMFS will be well-equipped on remand to substantiate the decision to issue an ITS for the SEAK fisheries. WFC has not refuted the "serious possibility" that NMFS will substantiate these decisions on remand.

---

[8] The ATA incorporates NMFS's response to WFC's allegations that the prey increase program has not been implemented, as the district court found. *See* ECF No. 88 at 44.

### b. NMFS Is Not Required to Demonstrate that Its Actions Will Definitively Recover the SRKW on Remand.

This Court should not accept WFC's invitation to address its unresolved merits claim for the first time on appeal. Nevertheless, even if it were considered, it would not alter the conclusion that, here, equity demands vacatur.

WFC argues that NMFS failed to "articulate a rational connection" between the facts and NMFS's conclusions because NMFS "did not explain how the salmon fisheries will not continue to starve SRKWs into extinction, regardless of whether mitigation goals are realized." ECF No. 88 at 24-25. WFC identifies that the "SRKWs are declining because of insufficient prey" and that NMFS's actions were not designed to meet a fifteen percent increase in prey needed for recovery of the SRKW. *Id.* at 26-27.

This argument should not inform the Court's analysis of whether NMFS will be able to substantiate its decisions on remand. WFC fails to identify authority that establishes that NMFS's actions analyzed in the 2019 SEAK BiOp must, on their own, completely recover the population of the SRKW. It was sufficient for NMFS to conclude that its actions—including the ITS, the prey increase program, and the other conservation measures for wild salmon—would not "reduce appreciably the likelihood of both the survival and recovery of a listed species." *Turtle Island Restoration Network v. United States Dep't of Commerce*, 878 F.3d 725, 735 (9th Cir. 2017) (quoting definition of "jeopardize

the continued existence of" in 50 C.F.R. § 402.02). WFC conflates "jeopardy" and "recovery" under the ESA and provides no authority supporting that NMFS, with these specific actions, must entirely recover the SRKW.

WFC's reasoning also appears hypocritical. WFC seeks to vacate the prey increase program and rely solely on the closure of the SEAK troll fishery to increase prey for the SRKW. Similarly, the *amicus* brief submitted in support of WFC by the Conservation Angler, *et al.* argues that the prey increase program is effectively asking to the Court to sanction "harming one imperiled species to provide theoretical benefits to another." ECF No. 98-1 at 2. As established in this brief, however, closing the SEAK troll fishery will provide a much less significant prey benefit to SRKWs than the prey increase program.

If the prey increase program, that is targeted to the needs of the SRKW, provides only "theoretical benefits," how are the less significant prey benefits from closing the SEAK troll fishery the better path forward for the SRKW? Is there no rational connection supporting what WFC requests of this Court? Once again, WFC is left in the difficult place of attempting to square its position that the prey increase program must be vacated, although it provides significant prey at the times and areas most needed to the SRKWs, with the position that WFC purportedly brought this lawsuit to obtain more prey on behalf of the SRKW.

### c.     NEPA Violations Do Not Demand Vacatur.

WFC also asserts that "[v]acatur is needed" in response to NMFS's NEPA errors. ECF No. 88 at 70. WFC again failed to acknowledge or respond to the ATA's relevant arguments. *See* ECF No. 60 at 30-31. Recent Ninth Circuit precedent explicitly provides that NEPA is a "purely procedural statute" and that failure to conduct NEPA analyses does not demand vacatur when there will be "significant disruptive consequences of vacatur." *Solar Energy Indus. Ass'n*, 80 F.4th at 998. The proposed *amici* Law Professors suggest that remand without vacatur when NEPA analyses were not conducted should not be allowed because it would negate or vitiate the statute's purpose. ECF No. 97-2 at 17. This Court in *Solar Energy Indus. Ass'n* explicitly rejected that argument when the disruptive consequences of vacatur were significant. 80 F. 4th at 998.

### B.     The District Court Abused Its Discretion by Deciding to Vacate the ITS After Upholding the Prey Increase Program.

This Court reviews the district court's equitable vacatur decisions for an abuse of discretion. *Pit River Tribe v. U.S. Forest Serv.*, 615 F.3d 1069, 1080 (9th Cir. 2010); *see also Watersheds Project v. McCullough*, No. 23-15259, 2023 WL 4557742, at *3 (9th Cir. July 17, 2023). "The district court abuses its discretion when its equitable decision is based on an error of law or a clearly erroneous factual finding." *Kenney v. United States*, 458 F.3d 1025, 1032 (9th Cir. 2006) (internal quotation marks omitted). "An abuse of discretion is a plain error,

discretion exercised to an end not justified by the evidence, a judgment that is clearly against the logic and effect of the facts as are found." *Morales v. Hickman*, 438 F.3d 926, 930 (9th Cir. 2006) (internal quotation marks omitted).

The above analysis demonstrates that the district court not only reached the wrong conclusion in balancing the equities, but it also abused its discretion. The district court's decision to vacate the ITS with respect to the SEAK troll fishery while allowing the mitigating measure of the prey increase program to proceed constituted an abuse of discretion in three ways.

First, its decision was based on an error of law. The district court "tipped" the balance too far in favor of the SRKW in a manner that swallowed the balancing it was supposed to conduct. 1-ER-0034–35. This is evidenced by the district court paying mere lip service to the disruptive consequences of vacating the ITS in light of the presumption of vacatur and the court's perceived "mandate" to side with the species. *See* 1-ER-0035. The district court appears to have felt compelled to side with the species rather than engaging in the requisite balancing test.

Second, the court made a clearly erroneous factual finding by characterizing the disruptive consequences as only "economic consequences." *Id*. The court seemingly did not consider the disruptive consequence of losing a generational way of life and the cultural impacts on the communities of Southeast Alaska. Additionally, the court did not properly account for the fact that the upheld prey

increase program would produce more prey for SRKWs—at times and areas most important to SRKWs—than what could be reduced by operation of the SEAK troll fishery.

Lastly, the district court's decision to vacate the ITS while upholding the prey increase program was clearly contrary to the logic of the case. As discussed above, it was not an abuse of discretion to uphold the prey increase program. The district court found, at the merits stage of the case, that the primary fault with the ITS was that it was based on the prey increase program, which was "unspecified" and did "not meet the standards for certain mitigation to find no jeopardy" to the SRKW. 4-ER-0646–47. When crafting the remedy, the district court held that "[t]he prey increase program—though previously uncertain and indefinite in the 2019 SEAK BiOp—has now been funded and begun providing prey the past three years" and "is on track to provide the benefits to SRKWs that were anticipated in the 2019 SEAK BiOp." 1-ER-0036 (internal quotation marks and brackets omitted). The fact that the identified error with the ITS had been resolved should have been sufficient to prevent vacating the ITS. The district court's decision to the contrary was an abuse of discretion because it was "clearly against the logic and effect of the facts as are found" and the discretion was "exercised to an end not justified by the evidence." *Morales*, 438 F.3d at 930 (internal quotation marks omitted).

**C.    The District Court's Decision to Strike Opinions of ATA Members Is Worthy of this Court's Consideration.**

WFC argues that the district court's evidentiary rulings to exclude opinions of individual members of the ATA were correct and did not prejudice the ATA. ECF No. 88 at 70-73. The rulings, however, prejudiced the ATA. WFC holds its expert opinions as above reproach. Therefore, similarity aside, every opinion contradicting and identifying faults in WFC's analyses was important to assess the credibility of WFC's experts. Additionally, the rulings had the effect of silencing members of the ATA that have specialized knowledge of the workings of Southeast Alaska on meaningful issues in this litigation.

WFC overstates the threshold for qualification under FRE 702. Paul Olson possessed specialized knowledge of economic issues in Southeast Alaska. ECF No. 60 at 44-47. Tad Fujioka possessed specialized experience on fisheries management, the PST, and fisheries impacts. *Id.* at 48-49. Although Paul Olson and Tad Fujioka do not possess the same level of education that WFC's experts do, individuals do not need a Ph.D. to qualify as an expert under FRE 702. *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000) (an expert need not be "formally qualified as [an] expert" because "in considering the admissibility of testimony based on some 'other specialized knowledge,' [FRE] 702 generally is construed liberally").

WFC admits that Paul Olson's prior, similar, declarations were "uncontested." ECF No. 88 at 72. This Court should consider WFC's voluntary choice to not object to the first two declarations as a waiver of its ability to object to the third and similar declaration of Paul Olson.

The Court should remedy the district court's abuse of discretion under FRE 702 and allow expert testimony that has specialized knowledge of Southeast Alaska and adds further critique to the faulty opinions of WFC's experts. *See Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1231 (9th Cir. 2017) (rulings on admissibility of expert opinions are reviewed for abuse of discretion).

**D. WFC's Motion for Judicial Notice Should Be Denied.**

On November 29, 2023, WFC filed a motion for judicial notice, seeking the Court to consider five exhibits that are not in the appellate record. *See* ECF No. 90. The motion should be denied because the material that is the subject of the motion "is unnecessary to the resolution of the issues presented on appeal." *Bichindaritz v. Univ. of Washington*, 550 Fed. Appx. 412, 413 (9th Cir. 2013). At the very least, the motion should be denied with respect to Exhibit 4 of the motion because that exhibit is not referenced in WFC's cross-appeal brief.

## IV. CONCLUSION

Equity demands remand without vacatur despite NMFS's errors. WFC's arguments to the contrary are driven by its policy preferences, not by what is

best for the many diverse interests at stake. The cultures and economies of Southeast Alaska will be devastated if the ITS is vacated. Those consequences outweigh the agency's errors when NMFS is already well on its way to remedying them. The ATA humbly requests that the Court hold that the 2019 SEAK BiOp should be remanded without vacating the ITS or the prey increase program and reverse and remand the district court's order with instructions to craft a remedy consistent with this Court's holding.

RESPECTFULLY SUBMITTED this 26th day of January, 2024.

*s/ Douglas J. Steding*
Douglas J. Steding, WSBA #37020
Greg A. Hibbard, WSBA #60526
Northwest Resource Law PLLC
71 Columbia Street, Suite 325
Seattle, WA 98104
206.971.1564
dsteding@nwresourcelaw.com
ghibbard@nwresourcelaw.com

*Attorneys for Intervenor-Defendant-Appellant/Cross-Appellee Alaska Trollers Association*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate CM/ECF. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

DATED this 26th day of January, 2024.

*s/ Eliza Hinkes*
Eliza Hinkes
Paralegal

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 23-35322, 23-35323, 23-35324, 23-35354

I am the attorney or self-represented party.

**This brief contains** 8,335 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◉ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated _____.

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Douglas J. Steding **Date** 1/26/2024

*(use "s/[typed name]" to sign electronically-filed documents)*

Feedback or questions about this form? Email us at forms@ca9.uscourts.gov

**Form 8**                                                                                           *Rev. 12/01/22*