Appeal Nos. 23-35322, 23-35323, 23-35324, 23-35354

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

WILD FISH CONSERVANCY,

*Plaintiff-Appellee/Cross-Appellant*,

vs.

JENNIFER QUAN, in her official capacity as the Regional Administrator for the National Marine Fisheries Service, *et al.*,

*Defendants-Appellants/Cross-Appellees*,

and

STATE OF ALASKA and ALASKA TROLLERS ASSOCIATION,

*Intervenor-Defendants-Appellants/Cross-Appellees*.

On Appeal from the United States District Court for the Western District of Washington Case No. 2:20-cv-00417-RAJ-MLP (Hon. Richard A. Jones)

# PLAINTIFF-APPELLEE/CROSS-APPELLANT'S
# CROSS-APPEAL REPLY BRIEF

Brian A. Knutsen
Emma A. O. Bruden
Kampmeier & Knutsen, PLLC
1300 S.E. Stark Street, Suite 202
Portland, Oregon 97214
Tel: (503) 841-6515
brian@kampmeierknutsen.com
emma@kampmeierknutsen.com

Eric A. Lindberg
Corr Cronin, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
Tel: (206) 625-8600
elindberg@corrcronin.com

*Attorneys for Plaintiff-Appellee/Cross-Appellant Wild Fish Conservancy*

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................... i

TABLE OF AUTHORITIES ..................................................... iii

GLOSSARY OF ACRONYMS .................................................. vii

INTRODUCTION ................................................................... 1

ARGUMENT ......................................................................... 2

I.     NMFS Failed to Draw a Rational Connection Between
the Facts and Its No Jeopardy Conclusion ........................... 2

    A.    The Court Has Jurisdiction to Review This Issue ...................... 3

    B.    NMFS Failed to Explain How Authorizing
Fisheries that Are Driving SRKWs to Extinction Is
Consistent with Its No Jeopardy Conclusion ............................. 5

II.    The District Court Abused Its Discretion in Declining to
Vacate the Unlawful Prey Increase Program ....................... 10

    A.    The Court Should Apply Circuit Precent on Vacatur
Standards ................................................................... 11

    B.    The District Court Made Erroneous Findings on
the Seriousness of the Violations ............................. 12

        1.    The District Court Correctly Found the
Violations Serious ..................................................... 12

        2.    The District Court Erred in Finding that
NMFS's Commitment to Implement the
Same Action on Remand Makes the
Violations Less Serious ................................................ 14

3. The District Court Erred in Finding that NMFS's Supposed Site-Specific Reviews Make the Violations Less Serious ...................................18

4. The District Court Erred in Assuming that the Prey Increase Program Would Not Cause Excessive Harm .............................................20

C. The District Court Made Erroneous Findings on the Consequences of Vacatur ......................................23

D. The District Court Abused Its Discretion in Finding that the Disruptive Consequences of Vacatur Outweigh the Seriousness of the Violations ............................27

III. CONCLUSION ....................................................................30

CERTIFICATE OF COMPLIANCE ........................................................32

CIRCUIT RULE 28-2.7 ADDENDUM

Wash Exec. Order No. 18-02 (Mar. 14, 2018).......................................... A-1

2018 Wash. Sess. Laws (excerpts)............................................... A-5

2019 Wash. Sess. Laws (excerpts)............................................. A-15

# TABLE OF AUTHORITIES

## Cases

*350 Mont. v. Haaland*,
    29 F.4th 1158 (9th Cir. 2022)............................................................11

*All. for the Wild Rockies v. U.S. Forest Serv.*,
    907 F.3d 1105 (9th Cir. 2018)..........................................................12

*Allied-Signal v. U.S. Nuclear Regulatory Comm'n*,
    988 F.2d 146 (D.C. Cir. 1993) ..........................................................14

*Apache Survival Coal. v. United States*,
    21 F.3d 895 (9th Cir. 1994)................................................................5

*Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*,
    273 F.3d 1229 (9th Cir. 2001)......................................................5, 22

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
    509 U.S. 209 (1993).........................................................................22

*Ctr. for Biological Diversity v. Haaland*,
    87 F.4th 980 (9th Cir. 2023)........................................................8, 13

*Ctr. for Food Safety v. Regan*,
    56 F.4th 648 (9th Cir. 2022)............................................................29

*Conner v. Burford*,
    848 F.2d 1441 (9th Cir. 1988)....................................................18, 19

*Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*,
    36 F.4th 850 (9th Cir. 2022)......................................................*passim*

*Env't Prot. Info. Ctr., Inc. v. Pac. Lumber Co.*,
    257 F.3d 1071 (9th Cir. 2001)............................................................4

*Fed. Trade Comm'n v. Publ'g Clearing House, Inc.*,
    104 F.3d 1168 (9th Cir. 1997)..........................................................22

*Golden Nugget, Inc. v. Am. Stock Exch., Inc.*,
    828 F.2d 586 (9th Cir. 1987)..............................................................5

*Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.*,
 530 U.S. 238 (2000)......................................................................10

*Hart v. Massanari*,
 266 F.3d 1155 (9th Cir. 2001)......................................................12

*Humane Soc'y of the U.S. v. Locke*,
 626 F.3d 1040 (9th Cir. 2010)...............................................12, 27

*Karuk Tribe of Cal. v. U.S. Forest Serv.*,
 681 F.3d 1006 (9th Cir. 2012) (en banc)................................13, 15

*Klamath-Siskiyou Wildlands Ctr. v. Nat'l*
 *Oceanic & Atmospheric Admin.*,
 109 F. Supp. 3d 1238 (N.D. Cal. 2015).......................................28

*Metcalf v. Daley*,
 214 F.3d 1135 (9th Cir. 2000) ...............................................17, 28

*Migrant Clinicians Network v. U.S. Env't Prot. Agency*,
 88 F.4th 830 (9th Cir. 2023)..............................................4, 12, 29

*Nat'l Family Farm Coal. v. U.S. Env't Prot. Agency*,
 966 F.3d 893 (9th Cir. 2020)........................................................15

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
 524 F.3d 917 (9th Cir. 2008)................................................7, 8, 9

*Nat. Res. Def. Council v. U.S. Env't Prot. Agency*,
 38 F.4th 34 (9th Cir. 2022).....................................................11, 12

*O'Loughlin v. Doe*,
 920 F.2d 614 (9th Cir. 1990)..........................................................5

*Pollinator Stewardship Council v. U.S. Env't Prot. Agency*,
 806 F.3d 520 (9th Cir. 2015).....................................12, 15, 17, 27

*Ratha v. Phatthana Seafood Co.*,
 35 F.4th 1159 (9th Cir. 2022).........................................................3

*Sierra Club v. Marsh*,
 872 F.2d 497 (1st Cir. 1989) .......................................................28

iv

*Solar Energy Indus. Ass'n v. Fed. Energy Regul. Comm'n*,
　80 F.4th 956 (9th Cir. 2023)..............................................................29

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
　985 F.3d 1032 (D.C. Cir. 2021) ..................................14, 16, 17, 28

*Tenn. Valley Auth. v. Hill*,
　437 U.S. 153 (1978)..........................................................................29

*Turtle Island Restoration Network v. U.S. Dep't of Commerce*,
　878 F.3d 725 (9th Cir. 2017)..........................................................8, 9

*United States v. Campbell*,
　291 F.3d 1169 (9th Cir. 2002)........................................................4, 5

*United States v. Gonzalez-Rincon*,
　36 F.3d 859 (9th Cir. 1994).................................................................5

*Wild Fish Conservancy v. Salazar*,
　628 F.3d 513 (9th Cir. 2010)....................................................6, 9, 19

*Wood v. Burwell*,
　837 F.3d 969 (9th Cir. 2016)...........................................................12

## Statutes

16 U.S.C. § 1536...................................................................6, 16, 22, 29

42 U.S.C. § 4332.....................................................................................29

## Regulations

40 C.F.R. § 1502.12 (2019)....................................................................19

40 C.F.R. § 1502.13 (2019)....................................................................19

40 C.F.R. § 1502.14 (2019)....................................................................19

40 C.F.R. § 1502.15 (2019)......................................................................................19

40 C.F.R. § 1502.16 (2019)......................................................................................19

50 C.F.R. § 402.02 ....................................................................................................7

50 C.F.R. § 402.14 ...............................................................................................7, 18

50 C.F.R. § 402.16 ..................................................................................................22

**Other Authorities**

88 Fed. Reg. 54,301 (Aug. 10, 2023)......................................................................29

2018 Wash. Sess. Laws ...........................................................................................24

2019 Wash. Sess. Laws ...........................................................................................24

Wash. Exec. Order 18-02 (2018) ............................................................................24

# GLOSSARY OF ACRONYMS

APA          Administrative Procedure Act

BiOp         Biological Opinion

EIS           Environmental Impact Statement

ESA          Endangered Species Act

HSRG        Hatchery Scientific Review Group

ITS           Incidental Take Statement

NEPA        National Environmental Policy Act

NMFS        National Marine Fisheries Service

pHOS        Proportion of Hatchery-Origin Spawners

SEAK        Southeast Alaska

SRKW       Southern Resident Killer Whale

# INTRODUCTION

The Southern Resident killer whale ("SRKW") is going extinct, primarily due to a lack of Chinook salmon for prey. The National Marine Fisheries Service ("NMFS") nonetheless authorized fisheries in Southeast Alaska at levels that NMFS predicts will cause "take" of "SRKW by reducing prey availability." 6-ER-1206. While NMFS is funding mitigation for those and other commercial fisheries, even if fully implemented it would be inadequate to stop the SRKW's "downward trend in population growth." *See* 5-ER-964. The biological opinion for Southeast Alaska fisheries ("SEAK BiOp") is inconsistent with the Endangered Species Act ("ESA") because NMFS failed to explain how its continued authorization of fisheries that are starving the SRKW into extinction is consistent with its conclusion that the fisheries are not jeopardizing the species.

Given that serious error and those found below, the district court did not abuse its discretion in narrowly partially vacating the SEAK BiOp's incidental take statement ("ITS") for the fisheries. Such relief is particularly warranted because the mitigation—which the district court found illegally vague and uncertain—is not being implemented. Notably, the prey increase program has released less than half of the hatchery fish required by the SEAK BiOp. *Infra* pp. 23–26. Moreover, NMFS now admits that it never implemented a key component of mitigation that was intended to "contribute to prey abundance for SRKWs over the intermediate

and long term"—a new conservancy hatchery program in mid-Hood Canal. 5-ER-888; NMFS's Third Br. 23 n.9. The Court should affirm the partial vacatur of the ITS.

In contrast, the district court abused its discretion in withholding the presumptive remedy of vacatur for the prey increase program. NMFS adopted this federally-funded program to offset impacts from commercial fisheries without any public process under the National Environmental Policy Act ("NEPA") or evaluation under the ESA and without any analysis to determine whether it would actually benefit SRKWs. The unrefuted data show that the program is causing excessive harm and even exceeding "take" limits imposed by NMFS to avoid jeopardizing threatened Chinook salmon. The Court should vacate this illegal program.

## ARGUMENT

### I.     NMFS Failed to Draw a Rational Connection Between the Facts and Its No Jeopardy Conclusion.

In addition to the errors found by the district court, the SEAK BiOp is inconsistent with the ESA because NMFS failed to draw a rational connection between facts found and its conclusion that the fisheries will not jeopardize SRKWs. Conservancy's Second Br. 23–27. NMFS argues the Court should not resolve this issue but does not otherwise dispute this error. NMFS's Third Br. 37–39. Alaska and the Alaska Trollers Association ("Trollers") argue ineffectively that

2

NMFS sufficiently explained its no jeopardy conclusion. Alaska's Third Br. 35–43; Trollers' Third Br. 29–30. The Court should reject these arguments and hold that NMFS failed to draw the required rational connection.

### A.    The Court Has Jurisdiction to Review This Issue.

The district court indicated that resolving this issue was not necessary because the errors found were dispositive of the challenge to the SEAK BiOp. 4-ER-638 n.4. The Conservancy objected to that recommendation by the magistrate judge, explaining that understanding the full extent of errors was needed to evaluate remedies. 2-SER-376–77. NMFS now urges this Court to not address whether it failed to draw a rational connection between the facts found and the no jeopardy conclusion, while simultaneously arguing that the two errors found by the district court are not serious enough to warrant even a partial vacatur of the SEAK BiOp. *See* NMFS's Third Br. 18 (NMFS arguing that vacatur is unwarranted because the district court did not find its "no jeopardy conclusions were fundamentally flawed"). The Court should reject this gamesmanship.

The district court should have resolved all challenges to the SEAK BiOp. In declining to do so, the district court invoked the "cardinal principle of judicial restraint": "if it is not necessary to decide more, it is necessary not to decide more." *Ratha v. Phatthana Seafood Co.*, 35 F.4th 1159, 1168 (9th Cir. 2022); 4-ER-638 n.4. The district court applied that principle when ruling only on the merits,

deferring remedies to future proceedings. *See* 4-ER-652. The subsequent remedy proceedings required the district court to evaluate, inter alia, whether the seriousness of the errors warranted vacatur of the SEAK BiOp. *E.g.*, *Migrant Clinicians Network v. U.S. Env't Prot. Agency*, 88 F.4th 830, 847–48 (9th Cir. 2023). The district court should not have invoked the principle of judicial restraint because it deprived the parties and the district court from evaluating remedies based on the seriousness of all NMFS's errors.

The district court's avoidance of this issue aggrieved the Conservancy. Notably, had the district court found this additional deficiency, it may have vacated the entire SEAK BiOp, including the prey increase program.[1] *See Env't Prot. Info. Ctr., Inc. v. Pac. Lumber Co.*, 257 F.3d 1071, 1075 (9th Cir. 2001) (limiting appeal for a party that receives *all* relief sought). The Conservancy filed a cross-appeal and argued this issue in its opening brief. 8-ER-1914. This issue is squarely before this Court on appeal.

Moreover, "this [C]ourt may affirm on any basis finding support in the record." *United States v. Campbell*, 291 F.3d 1169, 1172 (9th Cir. 2002). The Court therefore may resolve this issue in affirming the district court's vacatur of the ITS. NMFS erroneously argues that this principle does not apply because vacatur is

---

[1] The district court also would have directed NMFS to cure this deficiency. *See* 1-ER-44–45.

reviewed for an abuse of discretion and, according to NMFS, such review is limited to the district court's rationale. NMFS's Third Br. 37–38. This Court has routinely applied this principle to affirm on bases that differ from those relied upon by a district court under an abuse of discretion standard. *See, e.g.*, *Campbell*, 291 F.3d at 1172; *Apache Survival Coal. v. United States*, 21 F.3d 895, 906–07 (9th Cir. 1994); *United States v. Gonzalez-Rincon*, 36 F.3d 859, 866 (9th Cir. 1994); *O'Loughlin v. Doe*, 920 F.2d 614, 616–17 (9th Cir. 1990).

It is particularly appropriate for this Court to resolve such issues where there is no need for further factual development. *See Golden Nugget, Inc. v. Am. Stock Exch., Inc.*, 828 F.2d 586, 590 (9th Cir. 1987); *cf. Apache Survival Coal.*, 21 F.3d at 906–07. Review of the SEAK BiOp is limited to the administrative record with no need for factual development. *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*, 273 F.3d 1229, 1245 (9th Cir. 2001); *see also* 4-ER-628. Accordingly, the Court should resolve this issue.

### B. NMFS Failed to Explain How Authorizing Fisheries that Are Driving SRKWs to Extinction Is Consistent with Its No Jeopardy Conclusion.

NMFS found that the SRKW is sliding towards extinction primarily due to inadequate prey and that Southeast Alaska fisheries will harm and otherwise "take" SRKWs by further reducing prey. NMFS failed to draw a rational connection between such facts and its conclusion that the fisheries are not likely to jeopardize

the SRKW. *See* Conservancy's Second Br. 24–27. Alaska's and the Trollers' arguments to the contrary are unavailing.

Alaska argues that factors other than insufficient prey are the primary causes of the SRKW's decline. Alaska's Third Br. 38–40. This cannot support NMFS's "no jeopardy" opinion because it is not the basis NMFS articulated in the SEAK BiOp. *See Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 529 (9th Cir. 2010). Instead, NMFS relied on Dr. Lacy's modeling that shows prey abundance has the "largest impact on the [SRKW's] population growth rate." 5-ER-964, 6-ER-1190. Alaska focuses on NMFS's finding of a lack of support for a quantitative process "that directly links effects of an action, such as a reduction in prey, to survival and recovery." Alaska's Third Br. 39. That finding has no bearing on the validity of Dr. Lacy's model or NMFS's confidence in the model. NMFS repeatedly relied on Dr. Lacy's modeling, including the findings on the significance of prey abundance, thereby acknowledging that Dr. Lacy's model constitutes the "best scientific and commercial data available" that NMFS must utilize in ESA consultations. *See* 16 U.S.C. § 1536(a)(2); 5-ER-964, 6-ER-1189–90. Regardless, the SEAK BiOp concluded that the SRKW is declining because of low fecundity rates and explicitly found that "this reduced fecundity is largely due to nutritional limitation." 5-ER-1120; *see also* 5-ER-962. NMFS plainly found that insufficient prey is the primary factor contributing to the SRKW's decline.

In defending NMFS's no jeopardy conclusion, Alaska and the Trollers argue the Southeast Alaska fisheries' impacts on prey are not substantial and are mitigated by the prey increase program; Alaska even argues the fisheries do not cause "take" of SRKWs. Alaska's Third Br. 40–43; Trollers' Third Br. 29–30. Alaska further argues that the jeopardy analysis should look myopically at whether the Southeast Alaska fisheries alone would jeopardize the SRKWs. Alaska's Third Br. 36–38, 42–43. "Under this approach, a listed species could be gradually destroyed, so long as each step on the path to destruction is sufficiently modest. This type of slow slide into oblivion is one of the very ills the ESA seeks to prevent." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 930 (9th Cir. 2008).

Jeopardy occurs when an action would "reduce appreciably the likelihood of both the survival and recovery" of the species. 50 C.F.R. § 402.02. To evaluate jeopardy, NMFS must "[a]dd the effects of the action and cumulative effects to the environmental baseline and in light of the status of the species and critical habitat, formulate" its opinion. 50 C.F.R. § 402.14(g)(4). NMFS may not, as Alaska argues, simply determine whether the risks the proposed action poses are appreciably worse than baseline conditions. *See Nat'l Wildlife Fed'n*, 524 F.3d at 929–30. Instead, an action that "causes some deterioration in the species' pre-action condition" jeopardizes the species under two scenarios. *Id.* at 930. First, jeopardy

results if the action tips the species "into a state of likely extinction." *Id.* Second, "where baseline conditions already jeopardize a species, an agency make not take action that deepens the jeopardy by causing additional harm." *Id.* Accordingly, a "no jeopardy" opinion cannot "rest on the conclusion that the agency action only minimally contributes to the species' ongoing jeopardy." *Ctr. for Biological Diversity v. Haaland*, 87 F.4th 980, 991–92 (9th Cir. 2023); *see also Turtle Island Restoration Network v. U.S. Dep't of Commerce*, 878 F.3d 725, 737–39 (9th Cir. 2017).

Applying appropriate standards, NMFS failed to draw a rational connection between the facts and its "no jeopardy" conclusion. SRKWs are at a high risk of extinction, declining to "historically low" levels primarily because of reduced fecundity that "is largely due to nutritional limitation." 5-ER-962, 968, 972–73, 1120; 6-ER-1190; 3-SER-721–22. NMFS failed to identify the increase in prey needed to merely halt the SRKW's decline, but a 15% increase is needed to achieve the growth rate targeted for recovery. 5-ER-964. Southeast Alaska harvests will reduce prey from 0.1% to 12.9%. 5-ER-1125–26. Canadian and U.S. west coast fisheries (south of Canada), included within the baseline, each cause similar reductions. 6-ER-1191–92. NMFS hypothesized that the prey increase program would eventually increase prey by 4% to 5% as partial mitigation for all Pacific Salmon Treaty fisheries. 5-ER-1118; 5-ER-889–90; Alaska's First Br. 24. Overall,

NMFS predicts that the SRKW's "downward trend in population growth" will continue. 5-ER-964; 6-1189.

These facts show that SRKWs are being starved into extinction. Yet, the SEAK BiOp authorized fisheries that exacerbate the SRKW's condition by further reducing prey. The SEAK BiOp found that the fisheries authorized therein are "likely to result in some level of harm constituting take to SRKW by reducing prey availability." 6-ER-1206; *see also* 6-ER-1194 (explaining that the fisheries may "increase the risk of poor body condition and nutritional stress"). NMFS thereby authorized an action that will "cause[] some deterioration in the [SRKW's] pre-action condition," where the species is already declining towards extinction. *Nat'l Wildlife Fed'n*, 524 F.3d at 930. The Court should hold that NMFS failed to draw a rational connection between the facts and its no jeopardy conclusion for SRKWs. *See Turtle Island*, 878 F.3d at 737–39; *Wild Fish Conservancy*, 628 F.3d at 525–29.

NMFS's failure to explain how the fisheries will not continue to starve SRKWs into extinction further supports the district court's vacatur of the ITS. Conservancy's Second Br. 34–35, 41–42. Such relief is especially needed given NMFS's failure to implement mitigation required by the SEAK BiOp, including NMFS's failure to fully implement the prey increase program. *See infra* pp. 23–26.

Further, NMFS completely abandoned another key component of mitigation required by the SEAK BiOp—the new conservation hatchery program in mid-

Hood Canal that was supposed to "contribute to prey abundance for SRKWs over the intermediate and long term." 5-ER-888; NMFS's Third Br. 23 n.9. NMFS indicated to the district court that this mitigation had been implemented but now admits, for the first time in its final appeal brief, that such statements were false. *See* 2-ER-257 ¶ 11 (NMFS claiming it had "successfully used [mitigation] funds as anticipated in the [SEAK BiOp]" for "implementation and development of conservation hatchery programs"); NMFS's Third Br. 23 n.9. NMFS erroneously argues that this issue was not raised at the remedy stage and is therefore waived. NMFS's Third Br. 23 n.9. The Conservancy argued throughout this litigation that all mitigation is not reasonably certain to occur, 4-ER-638–46, and argued at the remedy stage that this specific hatchery was never developed, Second Further Excerpts of Record 17. Regardless, parties waive claims by failing to raise them below, not arguments in support of claims. *Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 245 n.2 (2000).

The presumptive remedy for NMFS's ESA and NEPA errors is vacatur of the whole ITS authorizing all Southeast Alaska salmon fisheries. The district court did not abuse its discretion in issuing a narrow partial vacatur of the ITS.

## II.     **The District Court Abused Its Discretion in Declining to Vacate the Unlawful Prey Increase Program.**

The district court abused its discretion in withholding the presumptive remedy of vacatur for the illegal prey increase program. The district court relied on

erroneous findings as to the seriousness of the violations and the consequence of vacatur. The district court's decision to allow this illegally adopted program to continue indefinitely while NMFS supposedly remedies the violations was inconsistent with this Court's precedents. This Court should reverse and vacate the program.

A.    <u>The Court Should Apply Circuit Precent on Vacatur Standards</u>.

The parties agree that, in considering whether to withhold vacatur of an illegal agency action under the Administrative Procedure Act ("APA"), the Court should consider the two *Allied-Signal* factors: (1) the seriousness of the agency's errors and (2) the disruptive consequences of vacatur. *See* NMFS's Third Br. 7. The parties disagree as to how the Court applies those factors. The Court should deny NMFS's request to ignore precedent and apply injunction standards to the APA's vacatur mandate, whereby there would be no presumption of vacatur and the plaintiff would bear the burden of showing that such relief is warranted. *Id.* at 8–13.

Given Congress' mandate to "set aside" unlawful agency actions, this Court has repeatedly held that vacatur is the presumptive remedy under the APA. *E.g.*, *350 Mont. v. Haaland*, 29 F.4th 1158, 1177 (9th Cir. 2022) (explaining that "vacatur is the presumptive remedy" under the APA); *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 882 (9th Cir. 2022) (same); *Nat. Res. Def.*

*Council v. U.S. Env't Prot. Agency*, 38 F.4th 34, 51 (9th Cir. 2022) (explaining that vacatur is the "traditional remedy" under the APA); *Migrant Clinicians Network*, 88 F.4th at 847 (same). This Court leaves unlawful actions in place "only in limited circumstances;" specifically, "only when equity demands." *Pollinator Stewardship Council v. U.S. Env't Prot. Agency*, 806 F.3d 520, 532 (9th Cir. 2015) (quotations and citations omitted). The Court has made clear that the party seeking to have an illegal action remain in place bears the burden of "overcom[ing] the presumption of vacatur." *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1121–22 (9th Cir. 2018); *see also Humane Soc'y of the U.S. v. Locke*, 626 F.3d 1040, 1053 n.7 (9th Cir. 2010). Accordingly, "remand without vacatur is a remedy used sparingly in this [C]ircuit." *Wood v. Burwell*, 837 F.3d 969, 976 (9th Cir. 2016).

NMFS has not shown that this case law has been overruled or is somehow entirely dicta. Accordingly, it constitutes binding precedent in this Circuit. *See Hart v. Massanari*, 266 F.3d 1155, 1171–72 (9th Cir. 2001). The Court should reject NMFS's request to ignore binding Circuit precedent.

## B. <u>The District Court Made Erroneous Findings on the Seriousness of the Violations</u>.

The district court correctly found NMFS's violations "sufficiently serious," but erred in several respects in finding the severity partially mitigated. 1-ER-33.

### 1. <u>The District Court Correctly Found the Violations Serious</u>.

The district court correctly found NMFS's violations "sufficiently serious"

because "they clearly undermine central congressional objectives of the ESA and NEPA." 1-ER-33. NMFS contends that was error, arguing the district court found only "two violations" for the prey increase program. NMFS's Third Br. 40. That improperly minimizes the rulings.

The district court found that the SEAK BiOp's evaluation of whether the actions are likely to jeopardize threatened Chinook salmon "omits mention of the prey increase program altogether;" i.e., NMFS adopted this program without consulting on whether it will jeopardize threatened salmon. 4-ER-644–46. The ESA's requirement that federal agencies ensure, through consultations, that their actions are not likely to jeopardize imperiled species is the "heart of the ESA." *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1019–20 (9th Cir. 2012) (en banc) (citation omitted). Courts routinely enjoin or vacate agency actions that are implemented without proper ESA consultation. *See, e.g.*, *Ctr. for Biological Diversity*, 87 F.4th at 992; *Env't Def. Ctr.*, 36 F.4th at 890–92.

The district court did not find that NMFS merely failed to conduct a "new" NEPA analysis at the programmatic level as NMFS contends. NMFS's Third Br. 40. Instead, the district court found that NMFS adopted this entirely new major federal action without first undertaking any procedures required by NEPA. 4-ER-650–51. While NMFS characterizes that as a single violation, the violation is exhaustive of all NEPA requirements; e.g., NMFS failed to provide public notice

and allow for public input, develop and consider alternatives, and assess cumulative impacts. *See* Conservancy's Second Br. 35–38. Failure to vacate an action adopted without first preparing the environmental impact statement ("EIS") needed to meet these requirements would "vitiate" NEPA. *See Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1052 (D.C. Cir. 2021) (citation omitted).

The district court did not err in finding the violations to be serious.

### 2. The District Court Erred in Finding that NMFS's Commitment to Implement the Same Action on Remand Makes the Violations Less Serious.

The district court found that "NMFS will be able to 'offer better reasoning' on remand for the continued operation of the prey increase program" such that the violations underlying NMFS's illegal adoption of this program are less serious. 1-ER-42. NMFS continues to argue that the program should not be vacated because, on remand, it intends to merely offer better reasoning for its prior adoption of that program. NMFS's Third Br. 16, 18, 41. The district court erred in finding that such representations diminish the seriousness of NMFS's violations.

One of the factors that courts consider in evaluating the seriousness of the violations is "the extent of doubt [as to] whether the agency chose correctly." *Allied-Signal v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993) (citation omitted). This inquiry does not focus on the agency's self-serving

representations as to its commitment to adopt the same decision on remand. Instead, courts focus on the nature of the violations. "[F]undamental flaws in the agency's decision make it unlikely that the same rule would be adopted on remand." *Pollinator Stewardship*, 806 F.3d at 532. "Technical" errors may be less serious because the agency is more likely to reach the same conclusion on remand. *Nat'l Family Farm Coal. v. U.S. Env't Prot. Agency*, 966 F.3d 893, 929 (9th Cir. 2020). The violations underlying NMFS's adoption of the prey increase program were fundamental flaws involving bedrock requirements of federal environmental laws.

NMFS's complete failure to consult on whether the program will jeopardize threatened salmonids was not a technical deficiency but an egregious violation that undermines the "heart of the ESA." *See Karuk Tribe*, 681 F.3d at 1019–20. NMFS's efforts to cobble together outdated and unrelated BiOps do not, as NMFS contends, reduce the severity of the violations or otherwise make it more likely that NMFS will adopt the same plan on remand. *See infra* pp. 18–19. Notably, NMFS has yet to conduct the comprehensive consultation required to determine whether the program will jeopardize listed species. *See Env't Def. Ctr.*, 36 F.4th at 891. The undisputed data show that the prey increase program is already contributing to violations of "take" limits **established by NMFS** to avoid jeopardizing the continued existence of Chinook salmon. *See infra* pp. 20–23. These data indicate

that NMFS cannot adopt the same decision on remand because it would violate the mandate to "insure" that NMFS's actions do not jeopardize imperiled species. *See* 16 U.S.C. § 1536(a)(2).

NMFS's failure to comply with any NEPA requirements before adopting this major federal action with significant environmental impacts was also plainly a fundamental error that undercuts NMFS's contention that it will adopt the same rule on remand. *See Standing Rock*, 985 F.3d at 1052–53 ("[C]ourts should harbor substantial doubt that 'the agency chose correctly'" when it failed to prepare an EIS before adopting a decision.). As the district court recognized, NMFS must consider alternatives on remand, such as reduced harvests in lieu of increased hatchery production that harms ESA-listed salmon. 1-ER-41.

The district court thus erred in finding that NMFS's intent to merely offer better reasoning on remand for the program somehow lessens the severity of the violations. *See* 1-ER-41–42. Instead, NMFS's representations show that it has unlawfully predetermined its current NEPA process. Conservancy's Second Br. 40. NMFS contends that this assertion presents a false choice between the agency "necessarily reaching a different result on remand or unlawfully predetermining the outcome." NMFS's Third Br. 18 n.6. That misreads relevant standards. The vacatur inquiry does not look to whether NMFS will "necessarily" reach a different result on remand; instead, courts evaluate whether the agency "**may conclude**,"

upon further consideration, that an altered or different action is warranted. *See*

*Pollinator Stewardship*, 806 F.3d at 532–33 (emphasis added). NEPA, on the other

hand, requires that NMFS "fully and fairly evaluate[] all reasonable alternatives"

and not merely "offer[] post-hoc rationalizations for [its] [prior unlawful]

decision." *Env't Def. Ctr.*, 36 F.4th at 882.

Instead of lessening the severity of the violations, NMFS's expressed intent

to provide post hoc rationalizations for its prior unlawful adoption of the prey

increase program underscores the need for vacatur. *See Metcalf v. Daley*, 214 F.3d

1135, 1145–46 (9th Cir. 2000) (setting aside NEPA document prepared after the

agency unlawfully predetermined the outcome, suspending implementation of the

action, and ordering the agency to "begin the NEPA process afresh" in a manner

"free of the previous taint."); *Standing Rock*, 985 F.3d at 1050–52 (explaining that

leaving an action in place during remand encourages agencies to "build first and

conduct comprehensive review later").[2]

The district court erred in finding the violations less serious based on

---

[2] NMFS argues that it has not predetermined the current NEPA process because it has not made any irretrievable commitment of resources. NMFS's Third Br. 18–19 n.6. That is plainly incorrect because NMFS has disbursed funds for the program and authorized "take" in reliance on that program. NMFS's current NEPA process constitutes "a subterfuge designed to rationalize a decision already made" that cannot remedy the NEPA violation. *Metcalf*, 214 F.3d at 1142, 1145–46 (finding that preparation of a NEPA document after the agency committed to an outcome did not moot the claim or remedy the violation).

NMFS's intent to adopt the same prey increase program on remand.

### 3. The District Court Erred in Finding that NMFS's Supposed Site-Specific Reviews Make the Violations Less Serious.

The district court erred in relying on NMFS's representations about site-specific reviews as evidence supposedly showing that harmful effects of the prey increase program will be minimized. *See* 1-ER-44.

NMFS has not actually conducted site-specific ESA and NEPA reviews for each disbursement of funds under the prey increase program but has instead largely pointed to documents that pre-date and have nothing to do with the program. Conservancy's Second Br. 45–47. NMFS argues that the old documents satisfy its ESA and NEPA obligations because, according to NMFS, those documents did not evaluate hatchery releases planned for implementation but instead evaluated larger releases in case the programs were enlarged at some point in the future. NMFS's Third Br. 45–46. That bizarre explanation is inconsistent with the ESA and NEPA.

Before adopting the prey increase program in 2019, NMFS was required to evaluate the "current status" of impacted species and determine whether "the *entire*" program may jeopardize those species. *See Conner v. Burford*, 848 F.2d 1441, 1453 (9th Cir. 1988); 50 C.F.R.§ 402.14(g)(1)–(4). The old BiOps cited by NMFS come nowhere close to meeting those requirements, as they did not evaluate the current status of these species or whether the prey increase program will jeopardize those species. Similarly, NEPA required that NMFS assess the status of

the affected environment in 2019, the impact of the prey increase program, and alternatives to increasing hatchery production to offset fisheries. *See* 40 C.F.R. §§ 1502.12–16 (2019). The old NEPA documents cited by NMFS had nothing to do with the prey increase program and therefore did not satisfy any of those requirements. NMFS's insistence that a collection of old documents that are unrelated to the prey increase program "partially satisfied" legal obligations for its 2019 adoption of the program displays a complete disregard for NMFS's ESA and NEPA obligations.

Even if NMFS was conducting "site-specific" reviews for each disbursement under the prey increase program—which it is decidedly not—that would not remedy its violations. Conservancy's Second Br. 47. NMFS insists that its "site specific" approach, which supposedly includes "some consideration" of cumulative impacts, is the "best way" to evaluate the program. NMFS's Third Br. 47. That ignores this Court's repeated instruction that such a piecemeal approach violates the ESA. *E.g.*, *Env't Def. Ctr.*, 36 F.4th at 891 ("Site-specific review cannot cure a failure to consult at the programmatic level, and incremental-step consultation is inadequate to comply with the ESA."); *Wild Fish Conservancy*, 628 F.3d at 521–25; *Conner*, 848 F.2d at 1453–58.

The district court erred in relying on NMFS's representation about site-specific reviews to find that the program's harmful impacts would be reduced.

### 4. The District Court Erred in Assuming that the Prey Increase Program Would Not Cause Excessive Harm.

The Conservancy explained that the district court erred in finding that the prey increase program's harmful impacts can "conceivably be mitigated" such that vacatur was unwarranted. *See* Conservancy's Second Br. 64–67. In response, NMFS cites unsupported promises to implement the program in a manner that will avoid jeopardizing protected species. The unrefuted data show otherwise.

pHOS is a key metric used to measure the extent of harm to wild salmon populations caused by hatcheries, representing the "proportion of hatchery-origin spawners." *See* 3-SER-696; 2-SER-584 ¶ 32. Higher pHOS rates reflect greater harm to the wild populations by, inter alia, reducing their productivity. The Hatchery Scientific Review Group ("HSRG"), established by Congress, recommends pHOS not exceed 5% or 10% depending on the type of wild population. 2-SER-585 ¶ 35. NMFS has allowed somewhat higher pHOS levels. For example, NMFS used pHOS as a surrogate to establish "take" limits in the Mitchell Act BiOp, setting pHOS take limits at 10%, 30%, and 50% for different Chinook salmon populations. *See* 3-SER-809.

The unrefuted data show that the current pHOS levels for nearly all Chinook salmon populations affected by the prey increase program already exceed acceptable pHOS rates under both the HSRG's and NMFS's standards. 2-SER-337–39 ¶ 6. Using NMFS's own data showing locations and numbers of releases

under the prey increase program, wildlife geneticist Dr. Gordon Luikart explained that the program will further exacerbate those excessive pHOS levels.[3] 2-SER-339–41 ¶¶ 8–16. Notably, pHOS levels already exceed take limits **established by NMFS** in the Mitchell Act BiOp to avoid jeopardizing threatened Lower Columbia River Chinook salmon. *See* Conservancy's Second Br. 65–66. Yet, NMFS's program is increasing hatchery production at facilities in the Lower Columbia River that will lead to further violations of those take limits. 2-SER-341 ¶¶ 13–17. Dr. Luikart explained that the program will "further inhibit the prospects for the continued survival" of threatened Chinook salmon. 2-SER-342–43 ¶¶ 20–21.

NMFS does not refute this pHOS analysis, nor does it identify other pHOS levels it deems acceptable for the prey increase program. *See generally* NMFS's Third Br. at 50–51. Instead, NMFS cursorily claims that it "works with hatchery operators to ensure that none of the hatchery releases will jeopardize" listed species and that it "will not fund the hatchery-fish releases [under the Mitchell Act BiOp] if they will jeopardize any ESA-listed species[.]" NMFS's Third Br. 50. NMFS's only support for these bald assertions are conclusory statements from NMFS officials that **do not even address** the pHOS exceedances or the fact that the prey increase program will exacerbate those exceedances. *See* 2-ER-277 ¶ 8 &

_____

[3] NMFS incorrectly argues Dr. Luikart did not focus on the actual locations of releases under the prey increase program. *See* NMFS's Third Br. at 50.

4-ER-666–67 ¶¶ 19–20. NMFS's unsupported assertion that the program will not jeopardize listed species is insufficient to overcome the unrefuted data and evidence that show otherwise. *See Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993); *Fed. Trade Comm'n v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997).

Further, Washington State has failed to implement weirs required under the Mitchell Act BiOp to reduce pHOS, which renders the "take" authorization in the Mitchell Act BiOp invalid. Conservancy's Second Br. 66. NMFS claims that its correspondence with Washington on this issue shows that NMFS takes its obligations seriously and it asserts that the Mitchell Act BiOp is not "invalid." NMFS's Third Br. 51. That ignores the effect of noncompliance with a BiOp. Failure to implement weirs as required by the Mitchell Act BiOp and the exceedances of the pHOS "take" limits: (1) require that NMFS reinitiate consultation, *see* 50 C.F.R. § 402.16(a); (2) prevent NMFS from committing resources to Mitchell Act programs until the consultation is complete, *see* 16 U.S.C. § 1536(d); and (3) invalidate the Mitchell Act BiOp's authorization to "take" ESA-listed species, *see* 16 U.S.C. § 1536(o); *Arizona Cattle Growers' Ass'n*, 273 F.3d at 1239. NMFS is violating the ESA by continuing to fund increased hatchery production that will worsen pHOS levels that already exceed take limits set by NMFS in the Mitchell Act BiOp.

Contrary to NMFS's unsupported assertions, the data and evidence show that the prey increase program is threatening survival and recovery of ESA-listed salmon populations.

C.   **The District Court Made Erroneous Findings on the Consequences of Vacatur.**

The district court relied on erroneous findings regarding the consequences of vacatur in declining to vacate the prey increase program; namely, that the program was releasing 20 million hatchery smolts annually that would be affected by vacatur.

The SEAK BiOp contemplated that the prey increase program would release 20 million hatchery smolts annually. 5-ER-889. NMFS has achieved less than half that. *See* 1-SER-51. NMFS repeatedly sought to hide that failure in the proceedings below by including releases made through an entirely separate Washington State program whenever discussing releases under NMFS's program. *E.g.*, 1-ER-30 ¶ 3; 1-ER-51. Indeed, NMFS never explained why it identified releases under Washington's program in this litigation. NMFS's obfuscation efforts were successful, as the district court understood NMFS's prey increase program to have released "more than 19 million" smolts in 2022. 1-ER-36. NMFS continues these efforts here, representing that Washington provided funds to help NMFS implement the SEAK BiOp's prey increase program. NMFS's Third Br. 22–23. That misrepresents facts.

Washington's program was developed in response to the Governor's Executive Order 18-02 issued on March 14, 2018, which established a SRKW task force and directed state agencies to take action to benefit SRKWs. Wash. Exec. Order 18-02 (2018) (see Addendum A-2–3). In response, the Washington Legislature passed a budget that allocated $837,000 to the Washington Department of Fish and Wildlife to develop a state "hatchery production plan by December 31, 2018," in cooperation with the HSRG and others, to increase hatchery production to benefit SRKWs. 2018 Wash. Sess. Laws 2308 (see Addendum A-13). Subsequent budgets allocated funds to the Washington Department of Fish and Wildlife to implement the increased hatchery production. *See, e.g.*, 2019 Wash. Sess. Laws 3104–05 (see Addendum A-21–22).

NMFS issued the SEAK BiOp in 2019 after development and commencement of Washington's plan. The SEAK BiOp contemplated that NMFS would implement the prey increase program by issuing federal grants totaling around $5.6 million annually to increase hatchery releases by 20 million smolts each year. 5-ER-888–89, 1118–19. The SEAK BiOp's ITS instructed NMFS to design the program "using the best available information." 6-ER-1212. Accordingly, the SEAK BiOp contemplated a prey increase program developed and implemented by NMFS that is entirely distinct from Washington's program developed and implemented by the Washington Department of Fish and Wildlife.

*See* Amicus Curiae Br. of Wash. Dep't. of Fish & Wildlife 1–4 (describing two separate programs).

The SEAK BiOp indicated that if Congress did not fund the mitigation, or if "other funding sources" were not available, NMFS may be required to reinitiate ESA consultation. 5-ER-889. NMFS argues this supports its inclusion of Washington's hatchery releases as part of the SEAK BiOp's prey increase program. NMFS's Third Br. 22–23. That language contemplated other funding sources that NMFS would use to implement mitigation consistent with the SEAK BiOp. Washington is not providing funds to NMFS to implement the SEAK BiOp's prey increase program. Moreover, Congress has fully funded NMFS's program each year since the SEAK BiOp was issued. 2-ER-256–57 ¶¶ 8–10. The issue is not a need for "other funding sources" as NMFS suggests; the issue is that NMFS has failed to achieve the SEAK BiOp's objectives despite the prey increase program being fully funded.

The district court did not understand that there were two different programs and therefore greatly overestimated the consequences of vacating the prey increase program. In discussing those consequences, the district court stated that "[o]ver $5.4 million of funds were distributed by NMFS in the 2022 fiscal year for the prey increase program, with more than 19 million juvenile Chinook salmon releases." 1-ER-36. The district court found that vacating such a program "would

lead to gaps in prey abundance." *Id.* However, vacatur of the prey increase program would impact less than half of the 19 million smolts that the district court thought would be impacted.

The district court also erred in finding that vacatur of the program would deprive SRKWs of any prey whatsoever. The Conservancy has a long record of advocating for SRKWs, despite Alaska's and the Trollers' bizarre and unsupported attacks to the contrary. 2-SER-447–49 ¶¶ 8–10; 2-SER-454–568; Alaska's Third Br. 49; Trollers' Third Br. 1. The best available science indicates that hatchery production is a significant part of the SRKW's problem and not a solution. Dr. Luikart explained that hatchery production is already contributing to "low productivity of the natural populations" of Chinook salmon and that the prey increase program will exacerbate that problem. 2-SER-596–97 ¶¶ 63–64; 2-SER-342–43 ¶¶ 20–21. The SRKW depends on those salmon for its continued survival. Yet, as Dr. Luikart concluded, the prey increase program will likely "further inhibit the prospects for the continued survival, much less the recovery, of Chinook salmon populations." 2-SER-342–43 ¶¶ 20–21.

More importantly, NMFS has yet to produce **any scientifically defensible plan** showing how increased hatchery production will have a net benefit for

SRKWs.[4] Instead, NMFS cites only a self-serving declaration that asserts, without any analysis of the prey increase program or other factual basis, that vacating the program could reduce prey for SRKWs. NMFS's Third Br. 48. The Court should reject such unsupported assertions.

The district court relied on erroneous findings on the disruptive consequences of vacatur.

### D. The District Court Abused Its Discretion in Finding that the Disruptive Consequences of Vacatur Outweigh the Seriousness of the Violations.

Ultimately, the district court abused its discretion in allowing NMFS to continue implementing the unlawful prey increase program indefinitely while it attempts to remedy the violations. Remand without vacatur is permitted only in "rare" or "limited circumstances" when equity demands that outcome. *Pollinator Stewardship*, 806 F.3d at 532; *Humane Soc'y*, 626 F.3d at 1053 n.7. Such exceptional relief is appropriate only where vacatur would itself cause greater environmental harm or where vacatur would cause severe injuries that significantly

---

[4] NMFS and Alaska leveled a series of misguided arguments as to why they believe that reducing fisheries would not help SRKWs, including because the fish would be eaten by other predators and because correlations between salmon abundance and SRKW fecundity are not as strong as once thought. *E.g.*, NMFS's Third Br. 27–28; Alaska's Third Br. 20. Dr. Lacy fully explained how these attacks on his model are misinformed. 3-SER-619–25 ¶¶ 14–23. However, if these critiques were valid, they would apply equally to fish produced through the prey increase program; e.g., the hatchery fish would not benefit SRKWs because they would be eaten by other predators.

outweigh relatively minor agency errors. *See* Conservancy's Second Br. 59–60 (summarizing Circuit case law); *Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin.*, 109 F. Supp. 3d 1238, 1242–43 (N.D. Cal. 2015) (same). This is not such a case.

NEPA's "'action-forcing' procedures" seek to ensure that agencies take a "'hard look' at environmental consequences" of proposed actions and meaningfully consider alternatives before decisions are made, not simply "'rationalize or justify decisions already made.'" *Metcalf*, 214 F.3d at 1141–43 (citations omitted). NMFS adopted the prey increase program without any consideration of alternatives or public involvement required by NEPA, has continued implementing the program since the district court ruled it was illegally adopted, and has insisted that it will adopt the same program on remand. Allowing NMFS to continue implementing the program under these circumstances facilitates the "ever-growing bureaucratic commitment to [the] project" such that any future request to consider alternatives under NEPA would "prove an exercise in futility." *See Sierra Club v. Marsh*, 872 F.2d 497, 503–04 (1st Cir. 1989). Failure to vacate the program would "vitiate" NEPA, ensuring that NMFS's remand efforts merely provide post hoc rationalizations for its prior unlawful decision. *See Standing Rock*, 985 F.3d at 1052–53; *Env't Def. Ctr.*, 36 F.4th at 882. This case is nothing like *Solar Energy Industries Association v. Federal Energy Regulatory Commission*, relied upon by

NMFS, as here NMFS acknowledges that the prey increase program is a major action "significantly affecting the quality of the human environment" such that a full EIS was required. *See* 80 F.4th 956 (9th Cir. 2023); 42 U.S.C. § 4332(2)(C); 88 Fed. Reg. 54,301 (Aug. 10, 2023).

Similarly, allowing the prey increase program to proceed when there has not been consultation on its significant harms to threatened salmon is inconsistent with the ESA's mandate to "insure" against jeopardizing species. *See* 16 U.S.C. § 1536(a)(2); *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 194–95 (1978). While this Court has "reluctantly remand[ed] without vacatur" for violations of the ESA's consultation requirements, it did so where vacatur would have increased environmental harms and while ordering the agency to comply with the ESA within 180 days. *Ctr. for Food Safety v. Regan*, 56 F.4th 648, 668–69 (9th Cir. 2022). In a recent similar case, the agency also requested remand without vacatur but would not be able to comply with such a remand deadline. *Migrant Clinicians Network*, 88 F.4th at 848–49. The Court vacated the action, explaining that a "blank check remand without vacatur" was not an appropriate remedy "[g]iven the seriousness of the [agency's] failure to comply with its congressionally mandated ESA obligations." *Id.* Allowing NMFS to indefinitely implement the prey increase program while it seeks to remedy the ESA violation was not an appropriate remedy.

The district court was appropriately concerned about the SRKW's need for increased prey abundance. However, NMFS has yet to evaluate the prey increase program under the ESA or NEPA to determine whether it would provide a net benefit to SRKWs, and the data show that the program is exceeding take limits in a manner that threatens to extirpate Chinook salmon populations that SRKWs depend upon. Moreover, the district court greatly overestimated the number of fish released under the program that would be affected by vacatur. The district court abused its discretion in withholding the presumptive remedy of vacatur for the prey increase program.

## III.    <u>CONCLUSION</u>.

Wild Fish Conservancy respectfully requests the Court hold that, in addition to the errors found by the district court, the SEAK BiOp is arbitrary for failing to draw a rational connection between the facts found and the conclusion that the fisheries will not jeopardize SRKWs. The Conservancy requests this Court affirm partial vacatur of the ITS. Finally, the Conservancy requests this Court vacate the prey increase program, reversing the district court's decision to leave it intact.

//

//

Respectfully submitted this 23rd day of February 2024.

KAMPMEIER & KNUTSEN, PLLC

By: s/ Brian A. Knutsen
    Brian A. Knutsen, WSBA No. 38806
By: s/ Emma A. O. Bruden
    Emma A. O. Bruden, WSBA No. 56280
1300 S.E. Stark Street, Suite 202
Portland, Oregon 97214
Tel: (503) 841-6515 (Knutsen)
    (503) 719-5641 (Bruden)
Email: brian@kampmeierknutsen.com
    emma@kampmeierknutsen.com

Paul A. Kampmeier, WSBA No. 31560
Mariah Harrod, WSBA No. 60585
705 Second Avenue, Suite 901
Seattle Washington 98104
Tel: (206) 858-6983 (Kampmeier)
    (206) 739-5184 (Harrod)
Email: paul@kampmeierknutsen.com
    mariah@kampmeierknutsen.com

CORR CRONIN, LLP

Eric A. Lindberg, WSBA No. 43596
1015 Second Avenue, Floor 10
Seattle, Washington 98104
Tel: (206) 625-8600
Email: elindberg@corrcronin.com

*Attorneys for Plaintiff Wild Fish Conservancy*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the requirements of Federal Rules of Appellate Procedures 32(a)(5) and (a)(6) because it has been prepared in 14-point Times New Roman font, a proportionally spaced font.

I further certify that this brief complies with Circuit Rule 28.1-1(d) because the brief, excluding items exempted by Federal Rule of Appellate Procedure 32(f), contains 7,000 words.

DATED this 23rd day of February 2024.

 s/ Brian A. Knutsen
Brian A. Knutsen, WSBA No. 38806
*Attorney for Plaintiff-Appellee/Cross-Appellant*

# CIRCUIT RULE 28-2.7

# ADDENDUM

## TABLE OF CONTENTS

Wash. Exec. Order No. 18-02 (Mar. 14, 2018)......................................................A-1

2018 Wash. Sess. Laws (excerpts)..…………..……………………………………………….A-5

2019 Wash. Sess. Laws (excerpts)………………………………………………..…..A-15



**STATE OF WASHINGTON**

**OFFICE OF THE GOVERNOR**

*P.O. Box 40002 • Olympia, Washington 98504-0002 • (360) 902-4111 • www.governor.wa.gov*

**EXECUTIVE ORDER 18-02**

**SOUTHERN RESIDENT KILLER WHALE
RECOVERY AND TASK FORCE**

**WHEREAS,** Southern Resident Killer Whales (Southern Residents) are an iconic and treasured species in Washington and throughout the Pacific Northwest;

**WHEREAS,** Southern Residents are classified as endangered in Washington and surrounding waters, under the U.S. Endangered Species Act and in Canada under the Species at Risk Act;

**WHEREAS,** the population of Southern Residents has declined, from a high of 98 in 1995, to 76 today, which is the lowest number of Southern Residents in more than three decades. Recent science also indicates that many Southern Residents are in poor condition and are struggling to raise calves;

**WHEREAS,** if Southern Residents were to become extinct, we would suffer an unacceptable loss to our environment, economy, and way of life. We would also lose an essential component of our marine ecosystem and an indicator of the health of our waters;

**WHEREAS**, Southern Residents hold significant cultural value to native tribes and all Washingtonians;

**WHEREAS,** Southern Residents, through the whale watching industry alone, contribute as much as $60 million to the local economy annually and provide hundreds of jobs to the Puget Sound region;

**WHEREAS,** Southern Residents make their home in Washington's marine waters for a portion of the year, but they are also highly migratory seeking prey along the west coast from Northern California to Southeast Alaska. Therefore, Southern Residents rely on healthy ecosystems and food sources from Washington and throughout the west coast of the United States and Canada;

**WHEREAS,** three primary factors threaten Southern Resident populations: (1) prey availability, (2) legacy and new toxic contaminants, and (3) disturbance from noise and vessel traffic. The health of Southern Residents and Chinook salmon are tightly linked. Recent scientific studies indicate that reduced Chinook salmon runs undermine the potential for the Southern Resident population to successfully reproduce and recover. Both Southern Residents and Chinook salmon populations are adversely impacted by warming oceans and ocean acidification due to climate change. Presence of contaminants and accumulation of pollutants in Washington's waters are

also linked to the decline of Southern Residents. Key sources of contamination in storm water runoff remain to be addressed and the potential for a catastrophic oil spill continues to threaten Southern Residents and the entire ecosystem of Puget Sound. In addition, increased boat and ship traffic has caused greater underwater noise that interferes with Southern Resident critical feeding and communication;

**WHEREAS,** both swift near-term actions and effective long-term actions are necessary to recover these iconic and endangered animals. Essential recovery actions that are described in both United States and Canadian federal plans and federally approved regional plans must be implemented through close coordination with all of our partners including state, local, tribal, and Canadian governmental entities and other private sector partners to be successful;

**NOW THEREFORE, I,** Jay Inslee, Governor of the state of Washington, by virtue of the power vested in me by the Constitution and statutes of the state of Washington do hereby order and direct as follows:

### Implement Immediate Actions to Benefit Southern Resident Killer Whales

Within existing resources, I ask the following state agencies, in consultation with the appropriate local governments, federal agencies, and tribal governments, to conduct the immediate actions listed below to further the purpose of this Executive Order.

- Washington Department of Fish and Wildlife (WDFW) with review from the Governor's Salmon Recovery Office (GSRO) and the Puget Sound Partnership (PSP)—By July 31, 2018, identify the highest priority areas and watersheds for Southern Resident prey in order to focus or adjust, as needed, restoration, protection, incentives, hatcheries, harvest levels, and passage policies and programs.
- WDFW and Washington State Parks and Recreation Commission (WSPRC)—By April 30, 2018, develop implementation plans for increased enforcement, outreach and education of vessel regulations as well as enforcement of Chinook fisheries regulations in areas frequented by orcas.
- Washington State Department of Ecology (Ecology)—By April 30, 2018, create a curriculum to improve and increase the number of trainings for vessels in the whale watching industry to become "vessels of opportunity" to assist in the event of an oil spill.
- Washington State Department of Transportation (WSDOT)—By May 31, 2018, develop strategies for quieting state ferries in areas most important to Southern Residents.
- WDFW—By April 30, 2018, review and amend, as needed, 2018 recreational and commercial fishing regulations prioritizing protection of key areas and fish runs for Southern Resident recovery. I will also ask our tribal co-managers, and international and federal fisheries managers to work directly with WDFW and its Commission in developing recommendations for implementing this action.
- WDFW—By April 30, 2018, explore options and develop a proposal to alter fish food used in state hatcheries to limit the amount of Polychlorinated Biphenyls (PCBs) in Southern Resident prey.

- PSP, WDFW, GSRO—By December 15, 2018, demonstrate how Chinook recovery projects benefit Southern Resident recovery, beginning in the 2018 grant round, for the Pacific Coast Salmon Recovery Fund, the Puget Sound Acquisition and Restoration Program, the Estuary and Salmon Restoration program and the Washington Coastal Restoration Initiative.
- PSP, WDFW, GSRO, WSPRC, Washington State Department of Licensing (DOL)—By July 1, 2018, prioritize existing outreach resources to support Southern Resident recovery. Collaborate with the Governor's Office to develop a public education program and identify needed resources.
- Ecology—By July 31, 2018, develop criteria to prioritize financial assistance beginning in the 2019-21 biennium for storm water projects that benefit Southern Resident recovery.

**Establishment of the Southern Resident Killer Whale Task Force**
A Southern Resident Killer Whale Task Force is hereby created to identify, prioritize, and support the implementation of a longer term action plan needed for the recovery of Southern Residents and necessary to secure a healthy and sustained population for the future. The plan shall include actions needed to make significant progress in addressing all three of the identified threats to Southern Residents. The Task Force should monitor and evaluate the immediate actions undertaken by state agencies and build upon the progress and effectiveness of that work when developing longer term actions. Where available and applicable, the Task Force should build upon existing state, regional and federal plans.

Members of the Task Force will include directors or their senior designees from the Washington Departments of Agriculture, Commerce, Ecology, Health, and Transportation, as well as the Puget Sound Partnership, the Governor's Office of Indian Affairs, the Recreation and Conservation Office, and the Governor's Salmon Recovery Office. I also invite the Department of Fish & Wildlife and its Commission, the Department of Natural Resources, and the Washington State Parks and Recreation Commission to participate on the Task Force as members in full.

I will separately invite representatives of appropriate federal, tribal, and local governments, the private sector and the non-profit sector, to participate in the Task Force. I will invite each Washington legislative caucus to appoint a member to participate in the Task Force.

I shall appoint co-chairs and convene the Southern Resident Killer Whale Task Force (Task Force) beginning in April 2018.

The Task Force shall work with all levels of government and other partners to identify needed policies and programs, recommend priority actions to support recovery efforts, highlight budget needs, and recommend any legislation needed to support this Executive Order. The Task Force shall coordinate their work with appropriate representatives of the Government of Canada, the Province of British Columbia, and the states of Oregon, California, Idaho, and Alaska.

The Task Force shall prepare a comprehensive report and recommendations for recovering Southern Residents, with a full draft due by October 1, 2018, and a final report by November 1, 2018. The report should detail ongoing and new actions that will address all of the major threats

to Southern Residents, including prey availability, legacy and ongoing toxic contaminants, and disturbance from noise and vessel traffic. A second report outlining the progress made, lessons learned, and outstanding needs shall be completed by October 1, 2019. With the submission of its second report, the Task Force shall dissolve.

I direct the Puget Sound Partnership and ask the Department of Fish and Wildlife to organize the necessary agency experts and staff to support the work of the Task Force. The Governor's Policy Office and the Office of Financial Management will provide assistance and guidance to the lead agencies as needed to ensure the success of the Task Force.

The Governor's Office will work with both the State Legislature and State Congressional delegation to solicit their early and ongoing advice and guidance.

The Southern Resident Killer Whale Task Force shall conduct its business in an open, transparent manner, and its meetings will be open to the public.

Signed and sealed with the official seal of the state of Washington on this 14th day of March, 2018, at Olympia, Washington.

By:

/s/
Jay Inslee
Governor

BY THE GOVERNOR:

/s/
Secretary of State

# 2018

# SESSION LAWS

OF THE

# STATE OF WASHINGTON

## 2018 REGULAR SESSION
## SIXTY-FIFTH LEGISLATURE

Convened January 8, 2018.  Adjourned March 8, 2018.



Published at Olympia by the Statute Law Committee under
Chapter 44.20 RCW.

K. KYLE THIESSEN

Code Reviser

**A - 5**

# WASHINGTON SESSION LAWS
## GENERAL INFORMATION

1. EDITIONS AVALIABLE.

   (a) *General Information.* The session laws are printed in a permanent softbound edition containing the accumulation of all laws adopted in the legislative session.  The edition contains a subject index and tables indicating Revised Code of Washington sections affected.

   (b) *Where and how obtained - price.*  The permanent session laws may be ordered from the Statute Law Committee, Pritchard Building, P.O. Box 40552, Olympia, Washington 98504-0552.  The edition costs $25.00 per set plus applicable state and local sales taxes and $7.00 shipping and handling.  All orders must be accompanied by payment.

2. PRINTING STYLE - INDICATION OF NEW OR DELETED MATTER.

   The session laws are presented in the form in which they were enacted by the legislature.  This style quickly and graphically portrays the current changes to existing law as follows:

   (a) In amendatory sections

      (i) underlined matter is new matter.

      (ii) deleted matter is ((lined out and bracketed between double parentheses)).

   (b) Complete new sections are prefaced by the words NEW SECTION.

3. PARTIAL VETOES.

   (a) Vetoed matter is ***printed in bold italics.***

   (b) Pertinent excerpts of the governor's explanation of partial vetoes are printed at the end of the chapter concerned.

4. EDITORIAL CORRECTIONS. Words and clauses inserted in the session laws under the authority of RCW 44.20.060 are enclosed in [brackets].

5. EFFECTIVE DATE OF LAWS.

   (a) The state Constitution provides that unless otherwise qualified, the laws of any session take effect ninety days after adjournment sine die.  The Secretary of State has determined the effective date for the Laws of the 2018 regular session is June 7, 2018.

   (b) Laws that carry an emergency clause take effect immediately, or as otherwise specified, upon approval by the Governor.

   (c) Laws that prescribe an effective date take effect upon that date.

6. INDEX AND TABLES.

   A cumulative index and tables of all 2018 laws may be found at the back of the final volume.

# TABLE OF CONTENTS

| Chapter No. | | Bill No. | Subject | Page |
|---|---|---|---|---|

### 2018 SESSION

| 278 | | ESSB | 6199 | Consumer directed employment program—Individual providers | 1751 |
| 279 | | SB | 6363 | Milwaukee road corridor | 1785 |
| 280 | | SB | 6368 | Agricultural fairs | 1787 |
| 281 | | SB | 6369 | Certificates of veterinary inspection—Feed lots | 1791 |
| 282 | | SB | 6393 | Self-insured and state fund pension liabilities—Calculation | 1792 |
| 283 | | SSB | 6399 | Telemedicine payment parity—Recommendations | 1795 |
| 284 | | SB | 6407 | Child welfare services—Private case management—Network administrators | 1796 |
| 285 | | SB | 6408 | Body worn cameras—Law enforcement and corrections officers | 1879 |
| 286 | | ESSB | 6413 | Firefighting—Toxic chemical use | 1884 |
| 287 | | SSB | 6437 | Abandoned recreational vehicles—Disposal—Cost | 1886 |
| 288 | | SSB | 6452 | Children's mental health—Partnership access line | 1891 |
| 289 | | SB | 6462 | Oil tank insurance—Real estate disclosure | 1894 |
| 290 | | SSB | 6474 | Tribal compact schools—School requirement modifications—Pilot | 1895 |
| 291 | | ESSB | 6491 | Assisted outpatient behavioral health treatment | 1898 |
| 292 | | SSB | 6493 | Intercollegiate athletic programs—Budgeting | 1922 |
| 293 | | SSB | 6514 | Higher education—Behavioral health and suicide | 1924 |
| 294 | | SSB | 6544 | Future of work task force | 1928 |
| 295 | | ESSB | 6614 | Property tax—State levy | 1930 |
| 296 | | ESSB | 6137 | Motor vehicle manufacturers and dealers—Relationship | 1931 |
| 297 | PV | ESSB | 6106 | Transportation budget—Supplemental | 1939 |
| 298 | PV | ESSB | 6095 | Capital budget—Supplemental | 2014 |
| 299 | PV | ESSB | 6032 | Operating budget—Supplemental | 2120 |
| 300 | | SB | 5722 | Conversion therapy—Sexual orientation and gender identity | 2437 |
| 301 | | SHB | 2887 | County commissioners—District-based elections | 2440 |
| 302 | PV | HB | 1085 | Single family detached homes—Minimum floor area | 2446 |
| 303 | PV | EHB | 2097 | Religious affiliation—Disclosure | 2450 |
| 304 | PV | ESHB | 2938 | Campaign finance—Enforcement and reporting | 2453 |
| 305 | | SSB | 6124 | Involuntary commitment act—Court hearings by video | 2480 |
| 306 | | 2ESHB | 2057 | Residential real property—Abandonment and foreclosure | 2486 |
| 307 | | HB | 1939 | Cesar Chavez day | 2515 |

### STATE MEASURES

PROPOSED CONSTITUTIONAL AMENDMENTS

SENATE JOINT RESOLUTION 8210. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2519

### INDEX AND TABLES

TABLES

BILL NO. TO CHAPTER NO. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2521

**A - 7**

# TABLE OF CONTENTS

**Chapter**   **Bill**

  **No.**     **No.**     **Subject**                      **Page**

RCW SECTIONS AFFECTED BY 2018 STATUTES.........................2525

UNCODIFIED SESSION LAW SECTIONS AFFECTED BY 2018 STATUTES ....2543

SUBJECT INDEX OF 2018 STATUTES ...........................................2549

HISTORY OF STATE MEASURES...............................................2589

HISTORY OF ADOPTED CONSTITUTIONAL AMENDMENTS ......................2591

**A - 8**

(b) In addition to members appointed by the director of the state conservation commission, four legislators may serve on the food policy forum in an ex officio capacity. Legislative participants must be appointed as follows:

(i) The speaker of the house of representatives shall appoint one member from each of the two largest caucuses of the house of representatives; and

(ii) The president of the senate shall appoint one member from each of the two largest caucuses of the senate.

(c) The commission shall coordinate with the office of farmland preservation and the department of agriculture to avoid duplication of effort. The commission must report to the appropriate committees of the legislature, consistent with RCW 43.01.036, with the forum's recommendations by ((October 31, 2018)) June 30, 2019.

(3) ((\$375,000)) \$275,000 of the general fund—state appropriation for fiscal year 2018 and ((\$375,000)) \$475,000 of the general fund—state appropriation for fiscal year 2019 are provided solely for grants and technical assistance. Of the amounts provided in this subsection, ((\$125,000 in each fiscal year is)) \$25,000 in fiscal year 2018 and \$225,000 in fiscal year 2019 are provided solely for activities related to water quality improvements and fecal coliform DNA speciation statewide.

**\*Sec. 307.** 2017 3rd sp.s. c 1 s 307 (uncodified) is amended to read as follows:

**FOR THE DEPARTMENT OF FISH AND WILDLIFE**

| | |
|---|---|
| *General Fund—State Appropriation (FY 2018)* | *((\$46,860,000)) \$45,121,000* |
| General Fund—State Appropriation (FY 2019) | ((\$46,483,000)) \$47,569,000 |
| General Fund—Federal Appropriation | ((\$118,809,000)) \$130,365,000 |
| General Fund—Private/Local Appropriation | ((\$63,920,000)) \$63,918,000 |
| ORV and Nonhighway Vehicle Account—State Appropriation | ((\$437,000)) \$699,000 |
| Aquatic Lands Enhancement Account—State Appropriation | ((\$10,460,000)) \$10,423,000 |
| Recreational Fisheries Enhancement—State Appropriation | ((\$3,084,000)) \$3,118,000 |
| Warm Water Game Fish Account—State Appropriation | ((\$2,773,000)) \$2,660,000 |
| Eastern Washington Pheasant Enhancement Account—State Appropriation | \$675,000 |
| State Wildlife Account—State Appropriation | ((\$118,033,000)) \$117,751,000 |
| Special Wildlife Account—State Appropriation | ((\$71,000)) \$3,234,000 |
| Special Wildlife Account—Federal Appropriation | \$505,000 |
| Special Wildlife Account—Private/Local Appropriation | ((\$3,576,000)) \$3,573,000 |

**A - 9**

Wildlife Rehabilitation Account—State Appropriation . . . . . . . . . . . . . $361,000
Ballast Water and Biofouling Management Account—State
    Appropriation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $10,000
Hydraulic Project Approval Account—State Appropriation . . . . . . ((\$690,000))
                                                                         \$29,000
Environmental Legacy Stewardship Account—State
    Appropriation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .((\$2,765,000))
                                                    \$2,763,000
Regional Fisheries Enhancement Salmonid Recovery Account—
    Federal Appropriation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $5,001,000
Oil Spill Prevention Account—State Appropriation . . . . . . . . . . .((\$1,122,000))
                                                   \$1,120,000
Pension Funding Stabilization Account—State
    Appropriation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $5,178,000
Oyster Reserve Land Account—State Appropriation . . . . . . . . . . . . . . $527,000
Performance Audits of Government Account—State
    Appropriation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $325,000
Aquatic Invasive Species Management Account—State
    Appropriation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .((\$1,658,000))
                                                    \$1,656,000
            TOTAL APPROPRIATION . . . . . . . . . . . . . . . . . . . . .((\$428,145,000))
                                                   \$446,581,000

    The appropriations in this section are subject to the following conditions and limitations:

    (1) ((\$467,000)) \$67,000 of the general fund—state appropriation for fiscal year 2018 and \$467,000 of the general fund—state appropriation for fiscal year 2019 are provided solely to pay for emergency fire suppression costs. These amounts may not be used to fund agency indirect and administrative expenses.

    (2) ((\$1,098,000)) \$1,109,000 of the general fund—state appropriation for fiscal year 2018 and ((\$1,098,000)) \$1,109,000 of the general fund—state appropriation for fiscal year 2019 are provided solely for payments in lieu of real property taxes to counties that elect to receive the payments for department-owned game lands within the county.

    (3) \$415,000 of the general fund—state appropriation for fiscal year 2018, \$415,000 of the general fund—state appropriation for fiscal year 2019, and \$440,000 of the general fund—federal appropriation are provided solely for county assessments.

    (4) Prior to submitting its 2019-2021 biennial operating and capital budget requests related to state fish hatcheries to the office of financial management, the department shall contract with the hatchery scientific review group (HSRG) to review the proposed requests. This review shall: (a) Determine if the proposed requests are consistent with HSRG recommendations; (b) prioritize the components of the requests based on their contributions to protecting wild salmonid stocks and meeting the recommendations of the HSRG; and (c) evaluate whether the proposed requests are being made in the most cost-effective manner. The department shall provide a copy of the HSRG review to the office of financial management with its agency budget proposal.

**A - 10**

(5) $400,000 of the general fund—state appropriation for fiscal year 2018 and $400,000 of the general fund—state appropriation for fiscal year 2019 are provided solely for a state match to support the Puget Sound nearshore partnership between the department and the United States army corps of engineers. Prior to implementation of any Puget Sound nearshore ecosystem restoration projects in Whatcom county, the department must consult with and seek, to the maximum extent practicable, consensus on those projects among appropriate landowners, federally recognized Indian tribes, agencies, and community and interest groups.

(6) Within the amounts appropriated in this section, the department shall identify additional opportunities for partnerships in order to keep fish hatcheries operational. Such partnerships shall aim to maintain fish production and salmon recovery with less reliance on state operating funds.

(7) $525,000 of the general fund—state appropriation for fiscal year 2018 and (($425,000)) $525,000 of the general fund—state appropriation for fiscal year 2019 are provided solely for training for a work unit to engage and empower diverse stakeholders in decisions about fish and wildlife, ((and)) the continued conflict transformation with the wolf advisory group, and for cost share partnerships with livestock owners and the use of range riders to reduce the potential for depredation of livestock from wolves. The department shall cooperate with the department of agriculture to shift the responsibility of implementing cost-sharing contracts with livestock producers to use nonlethal actions to minimize livestock loss from wolves and other carnivores to the department of agriculture.

(8) $1,259,000 of the state wildlife account—state appropriation is provided solely for the fish program, including implementation of Substitute House Bill No. 1597 (commercial fishing). If the bill is not enacted by July 31, 2017, the amount provided in this subsection shall lapse.

(9) $1,630,000 of the aquatic invasive species management account, $600,000 of the general fund—federal appropriation, $62,000 of the state wildlife account—state appropriation, and $10,000 of the ballast water and biofouling management account—state appropriation are provided solely for activities related to aquatic invasive species, including implementation of Substitute House Bill No. 1429 or Substitute Senate Bill No. 5303 (aquatic invasive species). If neither bill is enacted by July 31, 2017, the amounts provided in this subsection shall lapse.

(10) Within amounts provided in this section, the department must consult with affected tribes and landowners in Skagit county to develop and implement a plan designed to address elk-related agricultural damage and vehicular collisions by using all available and appropriate methods including, but not limited to, cooperative fencing projects and harvest in order to minimize elk numbers on private lands and maximize the number of elk located on state and federal lands. The plan must be implemented by September 1, 2018.

(11) Within the appropriations of this section, the department shall initiate outreach with recreational fishing stakeholders so that recreational fishing guide and non-guided angler data can be collected and analyzed to evaluate changes in the structure of guide licensing, with the objectives of: (a) Improving the fishing experience and ensuring equitable opportunity for both guided and non-guided river anglers, (b) managing fishing pressure to protect wild steelhead and other

species; and (c) ensuring that recreational fish guiding remains a sustainable economic contributor to rural economies. The department shall convene public meetings in the North Olympic Peninsula and Klickitat River areas, and may include other areas of the state, and shall provide the appropriate standing committees of the legislature a summary of its findings, by December 31, 2017.

(12) ((~~$450,000 of the general fund—state appropriation for fiscal year 2018 and $450,000 of the general fund—state appropriation for fiscal year 2019 are provided solely for the department to grant to the regional fisheries enhancement groups.~~

~~(13)~~))(a) $5,500,000 of the general fund—state appropriation for fiscal year 2018, $5,500,000 of the general fund—state appropriation for fiscal year 2019, and $325,000 of the performance audits of government account—state appropriation are provided solely as one-time funding to support the department in response to its budget shortfall. <u>Of the amounts provided in this subsection, $450,000 of the general fund—state appropriation for fiscal year 2018 and $450,000 of the general fund—state appropriation for fiscal year 2019 are provided solely for the department to grant to the regional fisheries enhancement groups.</u> In order to address this shortfall on a long-term basis, the department must develop a plan for balancing projected revenue and expenditures and improving the efficiency and effectiveness of agency operations, including:

(i) Expenditure reduction options that maximize administrative and organizational efficiencies and savings, while avoiding hatchery closures and minimizing impacts to fisheries and hunting opportunities; and

(ii) Additional revenue options and an associated outreach plan designed to ensure that the public, stakeholders, the commission, and legislators have the opportunity to understand and impact the design of the revenue options.

(iii) The range of options created under (a)(i) and (ii) of this subsection must be prioritized by impact on achieving financial stability, impact on the public and fisheries and hunting opportunities, and on timeliness and ability to achieve intended outcomes.

(b) In consultation with the office of financial management, the department must consult with an outside management consultant to evaluate and implement efficiencies to the agency's operations and management practices. Specific areas of evaluation must include:

(i) Potential inconsistencies and increased costs associated with the decentralized nature of organizational authority and operations;

(ii) The department's budgeting and accounting processes, including work done at the central, program, and region levels, with specific focus on efficiencies to be gained by centralized budget control;

(iii) Executive management, program management, and regional management structures, specifically addressing accountability.

(c) In carrying out these planning requirements, the department must provide quarterly updates to the commission, office of financial management, and appropriate legislative committees. The department must provide a final summary of its process and plan by ((~~May~~)) <u>September</u> 1, 2018.

(d) The department, in cooperation with the office of financial management shall conduct a zero-based budget review of its operating budget and activities to be submitted with the department's 2019-2021 biennial budget submittal.

**A - 12**

Information and analysis submitted by the department for the zero-based review under this subsection shall include:

(i) A statement of the statutory basis or other basis for the creation of each program and the history of each program that is being reviewed;

(ii) A description of how each program fits within the strategic plan and goals of the agency and an analysis of the quantified objectives of each program within the agency;

(iii) Any available performance measures indicating the effectiveness and efficiency of each program;

(iv) A description with supporting cost and staffing data of each program and the populations served by each program, and the level of funding and staff required to accomplish the goals of the program if different than the actual maintenance level;

(v) An analysis of the major costs and benefits of operating each program and the rationale for specific expenditure and staffing levels;

(vi) An analysis estimating each program's administrative and other overhead costs;

(vii) An analysis of the levels of services provided; and

(viii) An analysis estimating the amount of funds or benefits that actually reach the intended recipients.

(13) $580,000 of the general fund—state appropriation for fiscal year 2019 is provided solely for the implementation of chapter 1, Laws of 2018 (ESSB 6091) (water availability).

(14) $76,000 of the general fund—state appropriation for fiscal year 2018 and $472,000 of the general fund—state appropriation for fiscal year 2019 are provided solely for the department to increase enforcement of vessel traffic near orca whales, especially commercial and recreational whale watchers and shipping, and to reduce underwater noise levels that interfere with feeding and communication. While the patrol focus is to be on orca whale protection when the animals are present, nothing prohibits responses to emergent public safety or in-progress poaching incidents. In the event that orca whales are not present in marine waters of Puget Sound, emphasis will be placed on patrols that protect living marine resources in northern Puget Sound.

(15) $837,000 of the general fund—state appropriation for fiscal year 2019 is appropriated for the department to increase hatchery production of key prey species fish throughout the Puget Sound, coast, and Columbia river. The department shall work with the governor, federal partners, tribal co-managers, the hatchery scientific review group, and other interested parties to develop a biennial hatchery production plan by December 31, 2018, that will: (a) Identify, within hatchery standards and endangered species act constraints, hatchery programs and specific facilities to contribute to the dietary needs of orca whales; (b) consider prey species preferences and migratory patterns of orca whales; and (c) include adaptive management provisions to ensure the conservation and enhancement of wild stocks. The final plan will be reviewed by the hatchery scientific review group and submitted to the appropriate committees of the legislature by December 31, 2018.

(16) $115,000 of the general fund—state appropriation for fiscal year 2019 is provided solely for an interagency agreement with the office of financial

management for facilitation services and support the governor's efforts to develop a long-term action plan for orca whale recovery.

(17) $55,000 of the state wildlife account—state appropriation is provided solely for implementing the provisions of Engrossed Substitute Senate Bill No. 6127 (halibut fishery). If the bill is not enacted by June 30, 2018, the amount provided in this subsection shall lapse.

(18) $65,000 of the general fund—state appropriation for fiscal year 2019 is provided solely for the implementation of Engrossed House Bill No. 2957 (nonnative finfish escape). If the bill is not enacted by June 30, 2018, the amounts provided in this subsection shall lapse.

(19) $183,000 of the general fund—state appropriation for fiscal year 2019 is provided solely for the department to evaluate translocation as a management tool to advance the recovery of wolves using the state environmental policy act (SEPA) process. The department shall provide a report to the legislature outlining the results of the SEPA process no later than December 31, 2019.

(20) $373,000 of the general fund—state appropriation for fiscal year 2018 and $417,000 of the general fund—state appropriation for fiscal year 2019 are provided solely for the department to complete the third and final phase of the Puget Sound steelhead research project.

(21) $100,000 of the general fund—state appropriation for fiscal year 2018 and $400,000 of the general fund—state appropriation for fiscal year 2019 are provided solely for the department to add a veterinarian, microbiologist, and make laboratory upgrades to ensure the hatchery program complies with recent changes in water quality and health laws.

(22) $400,000 of the general fund—state appropriation for fiscal year 2018 and $100,000 of the general fund—state appropriation for fiscal year 2019 are provided solely for restoration costs that are a result of wildfire damage.

(23) $300,000 of the general fund—state appropriation for fiscal year 2019 is provided solely for the department to implement and enforce chapter 2, Laws of 2016 (Initiative Measure No. 1401).

(24) The department must ensure the following actions occur prior to initiating construction of the Buckmire slough project:

(a) The department shall engage with hunters and other stakeholders to consider alternative project designs that balance the multiple recreational uses and species habitat needs at the wildlife area;

(b) The department shall quantify potential habitat and recreational hunting loss associated with the project, and will work with stakeholders and interested members of the public to develop strategies for mitigating those losses; and

(c) Where necessary, the department shall make payments to all public and private entities that contributed to the purchase of the unit's 540 acres of waterfowl habitat, in amounts that are required by the funding entity.

*\*Sec. 307 was partially vetoed. See message at end of chapter.*

 *\*Sec. 308.*  2017 3rd sp.s. c 1 s 308 (uncodified) is amended to read as follows:

**FOR THE DEPARTMENT OF NATURAL RESOURCES**

General Fund—State Appropriation (FY 2018)  . . . . . . . . . . . . .((\$48,463,000))
                                                              \$74,728,000
General Fund—State Appropriation (FY 2019)  . . . . . . . . . . . . .((\$48,264,000))
                                                              \$49,316,000

**A - 14**

# 2019

# SESSION LAWS

### OF THE

# STATE OF WASHINGTON

## 2019 REGULAR SESSION
## SIXTY-SIXTH LEGISLATURE

Convened January 14, 2019.  Adjourned April 28, 2019.



Published at Olympia by the Statute Law Committee under
Chapter 44.20 RCW.

Kathleen Buchli

Code Reviser

# WASHINGTON SESSION LAWS
## GENERAL INFORMATION

1. EDITIONS AVALIABLE.

    (a) *General Information.* The session laws are printed in a permanent softbound edition containing the accumulation of all laws adopted in the legislative session. The edition contains a subject index and tables indicating Revised Code of Washington sections affected.

    (b) *Where and how obtained - price.* The permanent session laws may be ordered from the Statute Law Committee, Pritchard Building, P.O. Box 40552, Olympia, Washington 98504-0552. The edition costs $25.00 per set plus applicable state and local sales taxes and $7.00 shipping and handling. All orders must be accompanied by payment.

2. PRINTING STYLE - INDICATION OF NEW OR DELETED MATTER.

    The session laws are presented in the form in which they were enacted by the legislature. This style quickly and graphically portrays the current changes to existing law as follows:

    (a) In amendatory sections

    (i) underlined matter is new matter.

    (ii) deleted matter is ((lined out and bracketed between double parentheses)).

    (b) Complete new sections are prefaced by the words NEW SECTION.

3. PARTIAL VETOES.

    (a) Vetoed matter is ***printed in bold italics.***

    (b) Pertinent excerpts of the governor's explanation of partial vetoes are printed at the end of the chapter concerned.

4. EDITORIAL CORRECTIONS. Words and clauses inserted in the session laws under the authority of RCW 44.20.060 are enclosed in [brackets].

5. EFFECTIVE DATE OF LAWS.

    (a) The state Constitution provides that unless otherwise qualified, the laws of any session take effect ninety days after adjournment sine die. The Secretary of State has determined the effective date for the Laws of the 2019 regular session is July 28, 2019.

    (b) Laws that carry an emergency clause take effect immediately, or as otherwise specified, upon approval by the Governor.

    (c) Laws that prescribe an effective date take effect upon that date.

6. INDEX AND TABLES.

    A cumulative index and tables of all 2019 laws may be found at the back of the final volume.

# TABLE OF CONTENTS

| Chapter No. | | Bill No. | | Subject | Page |
|---|---|---|---|---|---|

### 2019 SESSION

415  PV  ESHB  1109  Operating budget . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2943
416  PV  ESHB  1160  Transportation budget. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3509

(ii) The majority leader and minority leader of the senate shall appoint one member from each of the two largest caucuses of the senate.

(d) Meetings of the forum may be scheduled by either the director of the commission or the director of the department of agriculture.

(e) Staffing for the forum must be provided by the commission working jointly with staff from the department of agriculture.

(f) The commission and the department of agriculture shall jointly develop the agenda for each forum meeting as well as a report from the food policy forum. The report must contain recommendations and a workplan to implement the recommendations and must be delivered to the appropriate committees of the legislature and the governor by June 30, 2021.

***(4) $82,000 of the general fund—state appropriation for fiscal year 2020 and $81,000 of the general fund—state appropriation for fiscal year 2021 are provided solely for the implementation of Second Substitute House Bill No. 1579 (chinook abundance). If the bill is not enacted by June 30, 2019, the amounts provided in this subsection shall lapse.***

(5) $20,000 of the general fund—state appropriation for fiscal year 2020 is provided solely for the following activities:

(a) The commission and the department of agriculture must produce a gap analysis reviewing existing conservation grant programs and completed voluntary stewardship program plans to identify what technical assistance and cost-share resources are needed to meet the requirements placed on those activities by the legislature.

(b)(i) The commission, in collaboration with the department of agriculture, must develop recommendations for legislation or additional work that may be needed to implement a sustainable farms and fields grant program that prioritizes funding based on net reduction of greenhouse gas emissions on farm, aquatic, or ranch lands, including carbon sequestration.

(ii) The recommendations must incorporate the gap analysis required by this section. The recommendations must include information about how the grant program can complement and avoid competing with existing conservation programs, and provide cost share benefits to existing and new programs designed to improve water quality, critical habitats, and soil health and soil-health research on farm, aquatic or timber lands.

(iii) The recommendations must be developed with input from stakeholder meetings with representatives from the environmental and agricultural communities.

(c) The commission and the department of agriculture must provide an update to the appropriate committees of the legislature by August 1, 2019, and final recommendations by November 1, 2019.

*Sec. 306 was partially vetoed. See message at end of chapter.*

<u>NEW SECTION.</u> **Sec. 307.  FOR THE DEPARTMENT OF FISH AND WILDLIFE**

General Fund—State Appropriation (FY 2020) . . . . . . . . . . . . . . . $74,521,000
General Fund—State Appropriation (FY 2021) . . . . . . . . . . . . . . . $63,849,000
General Fund—Federal Appropriation . . . . . . . . . . . . . . . . . . . . . $141,326,000
General Fund—Private/Local Appropriation . . . . . . . . . . . . . . . . . $69,360,000
ORV and Nonhighway Vehicle Account—State Appropriation . . . . . . $701,000
Aquatic Lands Enhancement Account—State Appropriation . . . . . $11,871,000

Recreational Fisheries Enhancement Account—State
    Appropriation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $3,332,000
Warm Water Game Fish Account—State Appropriation . . . . . . . . . . $2,824,000
Eastern Washington Pheasant Enhancement Account—State
    Appropriation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$675,000
State Wildlife Account—State Appropriation . . . . . . . . . . . . . . . . $115,447,000
Special Wildlife Account—State Appropriation. . . . . . . . . . . . . . . . $2,904,000
Special Wildlife Account—Federal Appropriation . . . . . . . . . . . . . . . .$517,000
Special Wildlife Account—Private/Local Appropriation. . . . . . . . . . $3,653,000
Wildlife Rehabilitation Account—State Appropriation . . . . . . . . . . . . .$361,000
Ballast Water and Biofouling Management Account—State
    Appropriation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$10,000
Model Toxics Control Operating Account—State
    Appropriation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $2,946,000
Regional Fisheries Enhancement Salmonid Recovery
    Account—Federal Appropriation . . . . . . . . . . . . . . . . . . . . . . . $5,001,000
Oil Spill Prevention Account—State Appropriation . . . . . . . . . . . . . $1,199,000
Aquatic Invasive Species Management Account—State
    Appropriation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $1,906,000
Pension Funding Stabilization Account—State
    Appropriation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $5,186,000
Oyster Reserve Land Account—State Appropriation. . . . . . . . . . . . . .$524,000
        TOTAL APPROPRIATION . . . . . . . . . . . . . . . . . . . . . . $508,113,000

The appropriations in this section are subject to the following conditions and limitations:

(1) $467,000 of the general fund—state appropriation for fiscal year 2020 and $467,000 of the general fund—state appropriation for fiscal year 2021 are provided solely to pay for emergency fire suppression costs. These amounts may not be used to fund agency indirect and administrative expenses.

(2) $415,000 of the general fund—state appropriation for fiscal year 2020, $415,000 of the general fund—state appropriation for fiscal year 2021, and $440,000 of the general fund—federal appropriation are provided solely for county assessments.

(3)(a) A legislative task force is established to recommend a group or entity to review the department's budget requests in place of the hatchery scientific review group. The task force is comprised of two members from each of the two largest caucuses in the senate, appointed by the president of the senate, and two members from each of the two largest caucuses in the house of representatives, appointed by the speaker of the house. The task force shall be staffed by the office of program research and senate committee services. The task force must consult with tribes.

(b) The task force must review the purpose and activities of the hatchery scientific review group and develop recommendations for the legislature to establish a replacement group or entity that will analyze state spending and projects related to hatcheries that are proposed in state operating and capital budgets. Among other things, the task force shall recommend a process by which the replacement organization or entity, starting with the 2021-2023 fiscal biennium, contracts with the department to review the department's proposed

agency biennial operating and capital budget requests related to state fish hatcheries prior to submission to the office of financial management. This review shall: (i) Examine if the proposed requests are consistent with independent scientific review standards using best available science; (ii) evaluate the components of the request based on the independent needs of each particular watershed and the return of salmonids including naturally spawning, endangered, and hatchery stocks; and (iii) evaluate whether the proposed requests are being made in the most cost-effective manner. This process must require the department to provide a copy of the review to the office of financial management and the legislature with its agency budget proposal.

(c) The task force shall report to the legislature on its findings and recommendations by December 1, 2019.

(4) $400,000 of the general fund—state appropriation for fiscal year 2020 and $400,000 of the general fund—state appropriation for fiscal year 2021 are provided solely for a state match to support the Puget Sound nearshore partnership between the department and the United States army corps of engineers.

(5) $762,000 of the general fund—state appropriation for fiscal year 2020, $580,000 of the general fund—state appropriation for fiscal year 2021, and $24,000 of the state wildlife account—state appropriation are provided solely for the implementation of Second Substitute Senate Bill No. 5577 (orca whales/vessels). If the bill is not enacted by June 30, 2019, the amounts provided in this subsection shall lapse.

(6) $156,000 of the general fund—state appropriation for fiscal year 2020 and $155,000 of the general fund—state appropriation for fiscal year 2021 are provided solely for operating budget impacts from capital budget projects funded in the 2017-2019 fiscal biennium.

(7) $450,000 of the general fund—state appropriation for fiscal year 2020 and $450,000 of the general fund—state appropriation for fiscal year 2021 are provided solely for the department to develop a pinto abalone recovery plan, expand field work, conduct genetics and disease assessments, and establish three satellite grow-out facilities. $150,000 of the appropriation per fiscal year is for competitive grants to nonprofit organizations to assist in recovery and restoration work of native shellfish.

(8) $350,000 of the general fund—state appropriation for fiscal year 2020 and $350,000 of the general fund—state appropriation for fiscal year 2021, are provided solely for the department to increase the work of regional fisheries enhancement groups.

(9) $457,000 of the general fund—state appropriation for fiscal year 2020, $457,000 of the general fund—state appropriation for fiscal year 2021, and $110,000 of the state wildlife account—state appropriation are provided solely for the department to pay for costs to maintain upgraded network infrastructure and pay the debt service on purchased equipment.

(10) $165,000 of the general fund—state appropriation for fiscal year 2020, $166,000 of the general fund—state appropriation for fiscal year 2021, and $495,000 of the state wildlife account—state appropriation are provided solely for new service or vendor costs, including PC leases, mobile devices, a remote management system, IT issue tracking technology, and virtual private network services.

A - 20

(11) $3,500,000 of the general fund—state appropriation for fiscal year 2020 and $3,500,000 of the general fund—state appropriation for fiscal year 2021 are appropriated for the department to increase hatchery production of salmon throughout the Puget Sound, coast, and Columbia river. Increases in hatchery production must be prioritized to increase prey abundance for southern resident orcas. The department shall work with federal partners, tribal co-managers, and other interested parties when developing annual hatchery production plans. These increases shall be done consistent with best available science, most recent hatchery standards, and endangered species act requirements, and include adaptive management provisions to ensure the conservation and enhancement of wild stocks. Of the amounts provided in this subsection, $500,000 in fiscal year 2020 is for wells and generators at the Samish hatchery.

(12) $2,257,000 of the general fund—state appropriation for fiscal year 2020 and $1,785,000 of the general fund—state appropriation for fiscal year 2021 are provided solely to grant to the northwest Indian fisheries commission to grant to tribes for hatchery operations that are prioritized to increase prey abundance for southern resident orcas. Of the amounts provided in this subsection:

(a) $1,535,000 in each fiscal year is for additional hatchery production in the following amounts per fiscal year: $150,000 for the Quinault Indian Nation, $169,000 for the Tulalip Tribes, $268,000 for the Quileute Tribe, $186,000 for the Puyallup Tribe, $112,000 for the Port Gamble S'Klallam Tribe, $23,000 for the Muckleshoot Indian Tribe, $207,000 for the Squaxin Island Tribe, $142,000 for the Skokomish Indian Tribe, and $278,000 for the Lummi Nation.

(b) $472,000 in fiscal year 2020 is for improvements to hatchery facilities that support additional hatchery production in the following amounts: $98,000 for the Tulalip Tribes, $38,000 for the Puyallup Tribe, $14,000 for the Port Gamble S'Klallam Tribe, $25,000 for the Muckleshoot Indian Tribe, $200,000 for the Squaxin Island Tribe, $24,000 for the Skokomish Indian Tribe, and $73,000 for the Lummi Nation.

(13) $771,000 of the general fund—state appropriation in fiscal year 2020 and $76,000 of the general fund—state appropriation in fiscal year 2021 are provided solely for the department to provide to tribes for hatchery operations that are prioritized to increase prey abundance for southern resident orcas. Of the amounts provided in this subsection, $76,000 in each fiscal year is for the Yakama Nation for additional hatchery production, $195,000 in fiscal year 2020 is for the Yakama Nation for improvements to hatchery facilities, and $500,000 in fiscal year 2020 is for the Confederated Tribes of the Colville Reservation for improvements to hatchery facilities.

(14) $425,000 of the general fund—state appropriation for fiscal year 2020 and $175,000 of the general fund—state appropriation for fiscal year 2021 are provided solely to grant to public utility districts for additional hatchery production that is prioritized to increase prey abundance for southern resident orcas and other species that are critical to the marine food web. Of the amounts provided in this subsection, $250,000 in fiscal year 2020 is for Puget Sound energy for wells and generators at the Baker river fish hatchery.

(15) $1,361,000 of the general fund—state appropriation for fiscal year 2020 and $1,360,000 of the general fund—state appropriation for fiscal year

2021 are provided solely for the following activities to increase the availability of salmon for southern resident orcas: Surveying forage fish populations, conducting rulemaking for fish screens, reducing salmon predation by nonnative fish, prioritizing fish barrier removal, developing a strategy to reestablish salmon runs above dams, and increasing review of shoreline armoring proposals to protect forage fish.

(16) $710,000 of the general fund—state appropriation for fiscal year 2020 and $253,000 of the general fund—state appropriation for fiscal year 2021 are provided solely for the department to migrate to the state data center and are subject to the conditions, limitations, and review provided in section 719 of this act.

(17) $278,000 of the general fund—state appropriation for fiscal year 2020 and $278,000 of the general fund—state appropriation for fiscal year 2021 are provided solely for the department to provide grants to the Lummi Nation to increase salmon production at the Skookum creek hatchery and the Lummi bay hatchery.

(18) $477,000 of the general fund—state appropriation for fiscal year 2020 and $477,000 of the general fund—state appropriation for fiscal year 2021 are provided solely for the implementation of Engrossed Substitute House Bill No. 2097 (statewide wolf recovery). If the bill is not enacted by June 30, 2019, the amounts provided in this subsection shall lapse.

(19) $200,000 of the general fund—state appropriation for fiscal year 2020 and $200,000 of the general fund—state appropriation for fiscal year 2021 are provided solely for the department for elk management in the Skagit valley in cooperation with affected tribes and landowners. Authorized expenditures include, but are not limited to, elk fencing and replacement hay to mitigate the impacts of elk on agricultural crop production.

(20) $49,000 of the general fund—state appropriation for fiscal year 2020, $47,000 of the general fund—state appropriation for fiscal year 2021, and $37,000 of the state wildlife account—state appropriation are provided solely for the implementation of Second Substitute House Bill No. 1579 (chinook abundance). If the bill is not enacted by June 30, 2019, the amounts provided in this subsection shall lapse.

*NEW SECTION. **Sec. 308. FOR THE DEPARTMENT OF NATURAL RESOURCES**

General Fund—State Appropriation (FY 2020) . . . . . . . . . . . . . . . $74,086,000
General Fund—State Appropriation (FY 2021) . . . . . . . . . . . . . . . $62,093,000
General Fund—Federal Appropriation . . . . . . . . . . . . . . . . . . . . . . . $34,977,000
General Fund—Private/Local Appropriation . . . . . . . . . . . . . . . . . . . $2,534,000
Forest Development Account—State Appropriation . . . . . . . . . . . . $54,165,000
ORV and Nonhighway Vehicle Account—State Appropriation. . . . . $8,166,000
Surveys and Maps Account—State Appropriation. . . . . . . . . . . . . . . $2,595,000
Aquatic Lands Enhancement Account—State Appropriation . . . . . $18,537,000
Resource Management Cost Account—State Appropriation . . . . . $128,255,000
Surface Mining Reclamation Account—State Appropriation . . . . . . $4,103,000
Disaster Response Account—State Appropriation. . . . . . . . . . . . . . $23,063,000
Park Land Trust Revolving Account—State Appropriation. . . . . . . . . $750,000
Forest and Fish Support Account—State Appropriation . . . . . . . . . $16,354,000
Aquatic Land Dredged Material Disposal Site Account—State

**A - 22**